**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DISTRICT OF COLUMBIA AND THE COMMONWEALTH OF VIRGINIA,**<br>*Plaintiffs*,<br>v.<br>**NATIONAL PARK SERVICE**, *et al.*,<br>*Defendants*. | Case No.: 1:26-cv-03838 |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR A TEMPORARY RESTRAINING ORDER AND 5 U.S.C. § 705 STAY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Statutory Background ........ 2

II. Factual Background ........ 5

STANDARD ........ 9

ARGUMENT ........ 10

I. The District and Virginia Have Standing ........ 11

II. The District and Virginia Are Likely to Succeed on the Merits ........ 21

A. The Arch Violates the Commemorative Works Act ........ 21

B. The Arch Violates 40 U.S.C. § 8106 ........ 25

C. The Arch Violates the Height of Buildings Act ........ 26

D. The Decision to Construct the Arch Is Arbitrary and Capricious ........ 31

E. Defendants Have Violated the National Environmental Policy Act ........ 34

F. Defendants Have Violated the National Historic Preservation Act ........ 36

III. The District and Virginia Will Suffer Irreparable Harm as Soon as Construction Begins ........ 38

IV. The Public Interest and Balance of Equities Tip Sharply in Favor of Relief ........ 42

V. The Court Should Issue a TRO or Section 705 Stay as Soon as Defendants Formally Approve the Arch and an Administrative Stay in the Interim. ........ 44

CONCLUSION ........ 45

**TABLE OF AUTHORITIES**

*Cases*

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ....................44

*Aluminum Co. of Am. v. United States*,
790 F.2d 938 (D.C. Cir. 1986) ....................21

*Am. Ass'n of Nurse Practitioners v. McMahon*,
836 F. Supp. 3d 175 (D.D.C. 2026) ....................10, 43

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Chao*,
409 F.3d 377 (D.C. Cir. 2005) ....................24

*Aviles-Wynkoop v. Neal*,
978 F. Supp. 2d 15 (D.D.C. 2013) ....................10

*Bank of Am. Corp. v. City of Miami*,
581 U.S. 189 (2017) ....................12

*Bittner v. United States*,
598 U.S. 85 (2023)....................30

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011)....................26

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)....................31

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ....................35

*City of Bos. Delegation v. Fed. Energy Reg. Comm'n*,
897 F.3d 241 (D.C. Cir. 2018) ....................12

*City of Los Angeles v. Fed. Aviation Admin.*,
63 F.4th 835 (9th Cir. 2023)....................13

*City of Olmsted Falls v. Fed. Aviation Admin.*,
292 F.3d 261 (D.C. Cir. 2002) ....................11

*City of Phoenix v. Huerta*,
869 F.3d 963 (D.C. Cir. 2017) ....................20, 36, 37

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) ....................................................................................43

*Clean Wisc. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) ....................................................................11

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ....................................................................................29

*Croson v. District of Columbia*,
2 F.2d 924 (D.C. Cir. 1924) ..........................................................................31

*Ctr. for Taxpayer Rts. v. IRS*,
190 F.4th 990 (D.C. Cir. 2026) ......................................................................38

*Cummock v. Gore*,
180 F.3d 282 (D.C. Cir. 1999) ......................................................................20

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ....................................................................................40

*District of Columbia v. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................40

*Eagle Cnty. v. Surface Transp. Bd.*,
82 F.4th 1152 (D.C. Cir. 2023) ......................................................................12

*Esteras v. United States*,
606 U.S. 185 (2025) ....................................................................................24

*Farmers Union Cent. Exch. v. FERC*,
734 F.2d 1486 (D.C. Cir. 1984) ....................................................................33

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ................................................................................5, 31

*Fund for Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003). ..............................................................42

*Her Majesty the Queen in Right of Ontario v. U.S. EPA*,
912 F.2d 1525 (D.C. Cir. 1990) ....................................................................21

*In re Aiken Cnty.*,
645 F.3d 428 (D.C. Cir. 2011) ......................................................................21

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)....................30

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976)....................4

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................40, 43

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................30

*Mahoney v. District of Columbia*,
662 F. Supp. 2d 74 (D.D.C. 2009)....................18

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020)....................28

*Metromedia, Inc. v. City of San Diego*,
453 U.S. 490 (1981)....................18

*Michigan v. EPA*,
576 U.S. 743 (2015)....................33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................5, 31, 32

**Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015)....................5, 34, 35

*Nat'l Conservative Pol. Action Comm. v. FEC*,
626 F.2d 953 (D.C. Cir. 1980)....................38

*Nat'l Council of Nonprofits v. OMB*,
763 F. Supp. 3d 13 (D.D.C. 2025)....................10

*Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026)....................25, 26, 42

*Nevada v. Dep't of Energy*,
457 F.3d 78 (D.C. Cir. 2006)....................34

*New Jersey v. EPA*,
989 F.3d 1038 (D.C. Cir. 2021)....................16

*Nw. Pipeline Corp. v. Pipeline Right of Way Easement*,
197 F. Supp. 2d 1241 (E.D. Wa. 2002) ....................39

*Nken v. Holder*,
556 U.S. 418 (2009) ....................10, 43

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
963 F. Supp. 1 (D.D.C. 1997) ....................41

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ....................18

*Se. Fisheries Ass'n v. Lutnick*,
No. 26-1533, 2026 WL 1430499 (D.D.C. May 21, 2026) ....................40

**Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025) ....................13, 15, 17, 35, 36

*Simmons v. U.S. Army Corps of Eng'rs*,
120 F.3d 664 (7th Cir. 1997) ....................35

*Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.*,
680 F. Supp. 2d 62 (D.D.C. 2010) ....................40

*Spirit Airlines, Inc. v. DOT*,
997 F.3d 1247 (D.C. Cir. 2021) ....................32, 33

*State of N.C. Envt'l Pol'y Inst. v. EPA*,
881 F.2d 1250 (4th Cir. 1989) ....................45

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ....................19

*Town of Barnstable v. FAA*,
740 F.3d 681 (D.C. Cir. 2014) ....................12

*United States v. Johnson*,
529 U.S. 53 (2000) ....................29

*United States v. Quality Stores, Inc.*,
572 U.S. 141 (2014) ....................30

*United States v. Texas*,
144 S. Ct. 797 (2024) ....................10

*Util. Solid Waste Activities Grp. v. EPA*,
901 F.3d 414 (D.C. Cir. 2018) ....................32

*Winter v. NRDC, Inc.*,
555. U.S. 7 (2008) ....................43

*Constitutional Provisions*

U.S. Const. art. I, § 8, cl. 17 ....................2, 43

*Statutes*

5 U.S.C. § 704 ....................21

5 U.S.C. § 705 ....................9, 10, 11, 42, 44, 45

5 U.S.C. § 706 ....................5

16 U.S.C. § 669b ....................17

33 U.S.C. § 1313 ....................16

33 U.S.C. § 1323 ....................15

40 U.S.C. § 8106 ....................1, 3, 7, 10, 25, 26

40 U.S.C. § 8701 ....................3

40 U.S.C. § 8711 ....................3

40 U.S.C. § 8722 ....................3

40 U.S.C. § 8901 ....................3, 4, 22, 43

40 U.S.C. § 8902 ....................3, 22

40 U.S.C. § 8903 ....................3, 22

40 U.S.C. § 8904 ....................19

40 U.S.C. § 8905 ....................4, 19, 23

40 U.S.C. § 9102 ....................3

42 U.S.C. § 4321 ....................4

42 U.S.C. § 4336 ....................4, 5, 34

54 U.S.C. § 300101 ....................4

54 U.S.C. § 306108 ....................4, 20, 36

Act of July 16, 1790,
1 Stat. 130 ....................2

Act of Mar. 1, 1899, ch. 322,
30 Stat. 922 ....................3, 29

Act of Aug. 24, 1912,
Pub. L. No. 62-302, 37 Stat. 417 ....................25, 26

Act of Oct. 24, 2000,
Pub. L. No. 106-348, 114 Stat. 1358....................22

Height of Buildings Act,
Pub. L. No. 61-196, 36 Stat. 452 (1910)....................2, 30, 31

Memorial Bridge Act,
Pub. L. No. 68-463, 43 Stat. 974 (1925)....................23, 24, 25

Omnibus Parks & Public Lands Management Act of 1996,
Pub. L. No. 104-333, 110 Stat. 4093....................22

D.C. Code § 5-101.03 ....................13

D.C. Code § 6-601.05 ....................2, 26, 27, 28, 29

D.C. Code § 6-641.15 ....................30

D.C. Code § 7-2201 ....................13

D.C. Code § 8-151.08 ....................17

D.C. Code § 8-2221.28 ....................17

*Regulations*

36 C.F.R. § 800.1 ....................20

36 C.F.R. § 800.3 ....................4, 36, 37

36 C.F.R. § 800.4 ....................4, 37

36 C.F.R. § 800.5 ....................4, 36, 37

36 C.F.R. § 800.6 ....................4, 36, 37

63 Fed. Reg. 20496 (1998) ....................37

21 D.C.M.R. § 503 ....................16

21 D.C.M.R. § 516 ....................16

21 D.C.M.R. § 540 ....................16

*Other Authorities*

3 Admin. L. & Prac. (3d ed. 2026) ....................21, 45

Webster's Unabridged Dictionary (1913) ....................26, 28

Wright & Miller, Federal Practice & Procedure (3d ed. 2026) ....................41

## INTRODUCTION

Defendants have announced that, as soon as November 5, they will begin construction of a 250-foot triumphal arch in Memorial Circle, a busy traffic rotary that abuts the border between the District of Columbia and Virginia. This project is flagrantly unlawful. The Commemorative Works Act and 40 U.S.C. § 8106 require the federal government to obtain specific congressional authorization before building a monument on federal land in the District; it has obtained none. The Height of Buildings Act provides that, with limited exceptions not relevant here, "[n]o building" in the District may exceed 130 feet; the Arch would nearly double that height restriction. And a series of other statutes—the Administrative Procedure Act, the National Environmental Policy Act, and the National Historic Preservation Act—require Defendants to consider alternatives, weigh costs, and engage in appropriate consultation before undertaking a project that would transform the region's physical landscape and upend its historic plan. In their rush to break ground on the Arch, Defendants have made only half-hearted gestures at complying with these requirements.

Perhaps recognizing that the project is legally indefensible, Defendants have made clear that they will attempt to outrun judicial review. Last week, they informed this Court that they may begin construction of the Arch *the very day* it is approved. It is entirely foreseeable that, once construction begins, Defendants will argue, as they have done in other cases, that an order halting construction would irreparably harm the federal government, pose security risks, and impermissibly alter the status quo they have unilaterally created.

The Court should not allow this cynical gambit to succeed. The District and Virginia have indisputable standing to challenge the Arch and an overwhelming likelihood of success on the merits. Further, they will suffer a battery of irreparable injuries as soon as construction begins—from disruptions of local traffic to environmental degradation to threats to security and emergency

preparedness. Plaintiff States have therefore filed this Complaint and Motion in advance of Defendants' formal decision approving the Arch so that the Court may act swiftly to enjoin its construction as soon as that decision is announced. In addition, to prevent irreparable harm in the interim, Plaintiff States respectfully request that the Court administratively stay construction of the Arch until it has an opportunity to rule on the present Motion.

Defendants cannot proceed with construction of a monumental arch in open defiance of Congress's will. And they should not be rewarded for rushing to implement that decision in a manner that would evade effective judicial review. The Motion should be granted.

## BACKGROUND

### I. Statutory Background

1. In 1790, Congress exercised its "exclusive" authority over the "Seat of Government," U.S. Const. art. I, § 8, cl. 17, to establish the District of Columbia as the Nation's capital. *See* Act of July 16, 1790, 1 Stat. 130. From the start, Congress intended the District to be a planned city. *See* Maloney Decl. ¶¶ 77–80. And over the intervening centuries, Congress has enacted a series of statutes to ensure that any development in the capital region respects its design and the needs of its residents and visitors alike.

First, Congress has acted to preserve the primacy of the capital's central symbols of American democracy—most notably, the U.S. Capitol Building and the Washington Monument—by sharply restricting the height of buildings in the District. In 1910, it enacted the Height of Buildings Act, Pub. L. No. 61-196, 36 Stat. 452 (codified as amended at D.C. Code § 6-601.05 *et seq.*) (Height Act), which provides that—with limited exceptions not relevant here—"[n]o buildings" in the District "shall be erected, altered, or raised in any manner as to exceed the height of 130 feet on a business street or avenue," or "90 feet in height" "[o]n a residence street." D.C.

Code § 6-601.05(b)–(c). Unlike an 1899 version of the Height Act that this statute repealed, the 1910 Height Act contains no exemption for federal buildings. *See* Act of Mar. 1, 1899, § 7, ch. 322, 30 Stat. 922 (exempting any "Federal or municipal buildings" from prior height restrictions).

Second, Congress has sought to "secure comprehensive planning for the physical development of the National Capital and its environs" by requiring that any federal construction in the District receive the review and approval of the National Capital Planning Commission (NCPC). 40 U.S.C. § 8701(b)(1). Federal agencies must "advise and consult" with NCPC as they "prepare plans and programs . . . that affect the plan and development of the National Capital." *Id.* § 8722(b)(1). For new "statues, fountains, and monuments," agencies must also consult with the Commission of Fine Arts (CFA). *Id.* § 9102(a). NCPC must approve "the location, height, bulk, number of stories, and size of Federal public buildings in" the District. *Id.* § 8722(d). As presently constituted, NCPC includes six presidential appointees, two congressional committee chairs, and four representatives of the District government, including the Mayor and the Chairman of the D.C. Council. *Id.* § 8711(b).

Finally, Congress has required certain federal buildings in the capital region to obtain the approval of Congress itself. In 40 U.S.C. § 8106, Congress provided that "[a] building or structure shall not be erected on" any federal land in the District of Columbia "without express authority of Congress." Similarly, in the Commemorative Works Act, *id.* §§ 8901–8909, Congress barred the construction of any "commemorative work" in the District or its environs unless Congress has "specifically authorized" it. *Id.* §§ 8902(a)(1)–(2), 8903(a)(1). Once a commemorative work receives Congress's approval, the agency or entity authorized to establish the work must also consult with the National Capital Memorial Advisory Commission "regarding the selection of alternative sites and design concepts for the commemorative work," and obtain the approval of

both CFA and NCPC for the final site and design. *Id.* § 8905(a)(1)–(2). Congress designed this process to ensure that new monuments in the District and the surrounding region "preserve the integrity of the comprehensive design . . . for the Nation's Capital," "reflect a consensus of the lasting national significance of the subjects involved," and "ensure the continued public use and enjoyment of open space in the District of Columbia and its environs." *Id.* § 8901(1)–(2), (4)(B).

2. In addition to observing statutory requirements specific to the capital region, agencies constructing new works must adhere to several foundational statutes that govern agency actions more broadly.

Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 300101 *et seq.*, requires agencies to "take into account the effect of [any] undertaking on any historic property" before taking new agency action. *Id.* § 306108. Pursuant to Section 106 and its implementing regulations, agencies must consult extensively with local jurisdictions and other stakeholders during each of four phases in the development of a federal project: agencies must engage with the relevant jurisdictions to conduct initial project planning, *see* 36 C.F.R. § 800.3, identify historic properties in the vicinity of the project, *id.* § 800.4, assess potential adverse impacts on those properties, *id.* § 800.5, and determine how to avoid or reduce such adverse effects, *id.* § 800.6.

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, similarly contains "action-forcing provisions" to ensure that agencies "consider[] . . . the environmental impact of their actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (citation omitted). Under this Act, agencies must prepare a detailed "environmental impact statement" for any proposed agency action that "has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). If an agency concludes that a proposed action will have no such impact, it must prepare an "environmental assessment" that "set[s] forth the basis of [the]

agency's finding of no significant impact." *Id.* § 4336(b)(2). That environmental assessment must "accurately identify the relevant environment concern," take a "hard look at the problem," and "make a convincing case for [the agency's] finding of no significant impact," including by demonstrating that the agency considered "reasonable alternatives to the proposed action." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322–23 (D.C. Cir. 2015).

Finally, federal agencies must comply with the Administrative Procedure Act (APA). That familiar statute demands that agency actions be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). To satisfy this requirement, agencies must explain their decisions, consider costs, and assess reasonable alternatives. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts must vacate actions that fail to satisfy these requirements or are otherwise contrary to law. 5 U.S.C. § 706.

## II. Factual Background

On October 15, 2025, President Trump announced that he intended to construct a 250-foot triumphal arch in the District of Columbia. *See* Ex. 1 at 3.[1] The President explained that this Arch would be located in Memorial Circle because "[s]omething's supposed to be here." Ex. 2 at 3. When asked whom the Arch was for, the President said: "Me." Ex. 3 at 1.

Over the following year, the National Park Service (NPS) worked to fulfill the President's wishes. In April 2026, it unveiled a proposed design for the Arch and submitted it to the CFA for review. Ex. 4 at 38–39. After that Commission announced its support for the design, subject to minor revisions, NPS submitted the proposal to NCPC for its preliminary approval. Ex. 5; Ex. 6. Having received that approval, NPS submitted a proposal for NCPC's final approval at a meeting

---

[1] All exhibits cited in this memorandum are attached to the Reddy Declaration. A full set of the materials that NPS submitted to NCPC is available at www.ncpc.gov/review/project/8778/.

scheduled for November 5, 2026. Ex. 7.

As set forth in its final submissions, NPS proposes to construct a 250-foot "Triumphal Arch" in Memorial Circle to "honor[] the nation's 250th anniversary." Ex. 8 at 1 (NPS, Triumphal Arch at Memorial Circle, Revised Envt'l Assessment, DOI-NPS-136973 (Oct. 2026) (Revised EA)). This Arch would be a "concrete structure clad in granite or marble veneer," topped with a "central winged figure and two statues," and surrounded by a paved plaza. *Id.* at 3–4. Its interior would contain a ground floor with ticketing and security; a gallery level with a stair hall and two program spaces; and an observation deck. Ex. 9 at 2 (NPS, Triumphal Arch at Memorial Circle: NCPC Preliminary Project Report (June 2026) (Prelim. Project Report)); *see* Ex. 6 at 14–17. NPS estimates that the building could accommodate 450 visitors at a time, and that between 2,000 to 22,000 people would visit the site each day. Revised EA at 51.

NPS says that construction of the Arch would take place year-round "over an approximately two-to-three year period," and that it would last for "20 hours per day . . . for the duration of the construction period." *Id.* at 7, 10. Throughout this period, the project would "alter existing traffic operations": the south side of Memorial Circle would be closed for "construction and staging," westbound traffic from Memorial Bridge would be reduced to two lanes, and "construction traffic could be substantial" as approximately "20 to 30 trucks . . . carr[y] 80 to 100 loads per day." Prelim. Project Report at 11–12. In addition, NPS would make permanent changes to traffic operations in this "major traffic rotary," including by installing several new traffic signals, "reshap[ing] roadway geometry," and creating "a dedicated pickup and drop-off area along Memorial Avenue." Ex. 10 at 4–5, 10 (NPS, Revised Finding of No Significant Impact (Oct. 2026) (Revised FONSI)).

NPS also acknowledges that the Arch would cause "direct physical disturbances and long-

term changes to the site's" environment. Prelim. Project Report at 13. To build the Arch, work crews would need to excavate and remove "approximately 1,400 truckloads of existing soil," "import roughly 400 truckloads of engineered fill," and run utility lines to the site. Revised FONSI at 6–7. They would also need to implement "stormwater and erosion control practices" to "protect adjacent drainage systems and waterways" during construction. *Id.* at 7. Before construction ends, NPS explains, it would need to install a long-term stormwater retention system "in compliance with District of Columbia stormwater management regulations." *Id.* at 7, 14.

In addition, NPS acknowledges that the Arch would have "adverse effects on the integrity" of the surrounding historic landscape. *Id.* at 11. Memorial Bridge was designed to "bind[] together . . . the North and the South in one indivisible Union" by creating a direct line of sight between Arlington House and the Lincoln Memorial. Maloney Decl. ¶¶ 89–90; Kirchen Decl. ¶¶ 44, 62. The Arch would "occupy the center of this designated vista, obstructing the reciprocal view and impairing the clarity of this sightline." Revised FONSI at 11. It would also diminish the "traditional visual primacy" of the Washington Monument—one of the central design elements of the capital area—by adding "a competing illuminated vertical element to the Monumental Core." *Id.* at 12.

Commenters, participating parties, and NCPC staff have repeatedly advised NPS that the Arch and the process leading to its approval are unlawful. Several commenters observed that NPS has not obtained congressional approval for the Arch, as required by both the Commemorative Works Act and 40 U.S.C. § 8106. *See, e.g.*, Ex. 11 at 5. The general counsel of NCPC has explained that the Arch is subject to the 130-foot limit in the Height Act, which the Commission has consistently applied to federal buildings in the District since NCPC was given responsibility for approval of federal buildings in 1938. Ex. 12 at 2. And the historic preservation officers for

both the District of Columbia and Virginia have explained that NPS failed to engage adequately in the consultations required by Section 106 of the NHPA and its implementing regulations. *See* Ex. 13 at 1; Kirchen Decl. ¶¶ 52–55, 80.

Nonetheless, NPS has made clear that it intends to proceed with construction of the Arch. It has issued a finding that the Arch would have "no significant impact" on the environment, and thus that no environmental impact statement is required under NEPA. *See* Revised FONSI at 2. It has terminated the consultation required by Section 106 of the NHPA. Ex. 14 at 1. And it has explained that—given what it deems the symbolic importance of building a 250-foot Arch in Memorial Circle to commemorate the 250th anniversary of American independence—it has "eliminated" from consideration any alternatives to construction of the Arch as planned. Revised EA at A-1. In light of these determinations, Secretary Burgum recently announced that "[a]fter 125 years of waiting, the most powerful capital in the world will be home of the most spectacular and beautiful arch of them all!" Ex. 22 at 2.

NCPC has likewise made clear that it will approve the project. The Commission's chairman has published a lengthy essay asserting that "[i]t is a national embarrassment" that the Arch has not yet been built, and stating that he "will vote to approve this project." Ex. 23 at 3. Six members of the Commission, including the chairman, are federal appointees subject to the control of the President. And the Commission has already voted, repeatedly, to approve preliminary plans for the Arch with minor or no modifications.

In recent weeks, two additional developments have further clarified the Administration's plans. On September 20, 2026, President Trump announced in a post on Truth Social that he had "agreed to convert the magnificent Triumphal Arch . . . into a top grade Military Complex/ Triumphal Arch to house, store, and have the rapid ability to use large numbers of drones, plus

Snipers, on both the roof and plaza areas, and additionally have and hold large quantities of sniper ammunition in storage." Ex. 15 at 1. The final plans for the Arch do not reference any such military uses of the building; those documents affirmatively state that the proposed project "does not involve hazardous materials." Revised FONSI at 18. Nonetheless, the White House has rejected the contention that the President's "plans [for a military complex] ha[ve] changed," and the Department of the Interior has stated that "[t]he current design of the Triumphal Arch is capable of accommodating the national security functions—and more—highlighted in the President's Truth Social Post." Ex. 16 at 2. Consistent with those statements, both the Secretary of Defense and the Secretary of Homeland Security have filed declarations attesting that the Arch "will be utilized as a dual-purpose structure: a major national monument that also incorporates military utility," and that it will include "counter-sniper personnel," "drones," and "ammunition." Decl. of Pete Hegseth ¶¶ 10–12, 13.d, *Lemmon v. Trump*, No. 1:26-cv-00544-TSC, ECF No. 74-9 (Oct. 28, 2026); *see* Decl. of Markwayne Mullin ¶¶ 15–20, *Lemmon*, *supra*, ECF No. 74-8 (Oct. 28, 2026).

In addition, last week, Defendants provided notice to this Court that they are on the cusp of beginning construction. That notice stated that, "[i]n the event the NCPC approves the [Arch] Proposal at the November 5 meeting and the Department of [the] Interior thereafter issues a final decision authorizing construction of the Proposal . . . . construction could commence as early as November 5, 2026." Notice, *Lemmon*, *supra*, ECF No. 63 (Oct. 21, 2026)).

## STANDARD

A temporary restraining order or a Section 705 stay is warranted when the movant demonstrates: "(1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by

the injunction." *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see Am. Ass'n of Nurse Practitioners v. McMahon*, 836 F. Supp. 3d 175, 194 (D.D.C. 2026) (same factors "govern issuance of relief under Section 705"). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

An administrative stay may be granted "in an exercise of [a court's] docket-management authority." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of application to vacate stay). Such a stay "freeze[s] legal proceedings until the court can rule on a party's request for expedited relief," and may be issued to "minimize harm" while the Court deliberates on the underlying motion. *Id.* (citation omitted); *see Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13, 16–17 (D.D.C. 2025).

## ARGUMENT

The Court should enter a temporary restraining order and a Section 705 stay preventing construction of the Arch before it begins. The Arch is manifestly unlawful: it has not received the congressional approval required by the Commemorative Works Act and 40 U.S.C. § 8106; it nearly doubles the 130-foot height limit imposed by the Height Act; and Defendants have flouted the requirements of the APA, NEPA, and the NHPA by refusing to consider alternatives to the Arch, assess the costs of housing a military installation at a tourist attraction, or engage in the necessary consultation with state historic preservation officers. Plaintiffs would suffer irreparable injury the moment construction starts, as the project would disrupt traffic at a major transportation hub between the District and Virginia, upend the District's emergency preparedness, inflict environmental damage, degrade a historic viewshed, and negate Plaintiffs' procedural and statutory rights. Further, there is plainly no public interest in permitting the federal government to

upset the century-old status quo and rush to begin construction of an illegal monument a year after the President announced his intention to undertake this project. Accordingly, as soon as Defendants formally approve the Arch, the Court should grant a temporary restraining order and a Section 705 stay prohibiting construction. And it should issue an administrative stay preventing Defendants from starting such construction until it rules on this Motion.

## I. The District and Virginia Have Standing.

The District and Virginia have standing to challenge the construction of the Arch. Like other litigants, government entities can demonstrate standing in various ways, including by showing "direct harm to [their] economic, environmental, or administrative interests." *Clean Wisc. v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (per curiam). Courts routinely find "standing for a city suing an arm of the federal government when a harm to the city itself has been alleged." *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 268 (D.C. Cir. 2002) (emphasis omitted). Here, the construction of the Arch inflicts numerous concrete harms on both Plaintiffs.

*First*, construction of the Arch would clog traffic at one of the principal corridors between the District and Virginia, impeding travel and requiring both jurisdictions to incur costs to assess and mitigate those effects. Memorial Circle sits at "the gateway to Washington, D.C." and serves as "a key commuter corridor for both motorists and bicyclists." Revised EA at 49. Each day, more than 27,000 vehicles, 1,100 cyclists, and 1,200 pedestrians traverse the Circle between Virginia and the District, and the roadways "regularly exhibit[] operational strain." *Id.* at 50. Throughout the two- to three-year period of construction, Defendants would close the south side of the Circle, reduce the number of lanes on Memorial Bridge, and introduce detours, with "[a]dditional short-term closures and detours . . . required at the beginning of the project." *Id.* All the while, "construction traffic would be substantial," as dozens of vehicles bring up to a hundred loads of

soil and fill to and from the site each day. Prelim. Proj. Report at 11–12. The predictable result, as NPS acknowledges, is that construction would "intensify congestion" in and around Memorial Circle, cause "increased queuing, intermittent delays, and less consistent traffic flow," and "reduce the predictability of travel for all users" traveling between the District and Virginia. Revised EA at 51; *see* Mendelson Decl. ¶¶ 58–62.

Those traffic delays would harm the District and Virginia. The D.C. Circuit has repeatedly recognized that "a [municipality] has a concrete interest in avoiding increased traffic." *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1170 (D.C. Cir. 2023), *rev'd on other grounds*, *Seven Sky Cnty. Infra. Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025); *see, e.g.*, *City of Bos. Delegation v. FERC*, 897 F.3d 241, 250 (D.C. Cir. 2018) (municipality has standing to assert "construction-related harm from increased traffic"); *Town of Barnstable v. FAA*, 740 F.3d 681, 691 (D.C. Cir. 2014) (it "might well appear self-evident" that a municipality has standing to challenge actions that "adversely affect . . . traffic"). And Plaintiffs' interests are particularly clear because increased traffic at one of the major arteries between the District and Virginia would foreseeably impede both jurisdictions' operations. Among other things, increased congestion would make it more difficult for emergency responders to travel between the District and Arlington County—jurisdictions that have mutual-aid agreements and that regularly provide emergency aid to one another. *See* Ex. 27. It would impede one of the District's emergency evacuation routes. *See* Ex. 28. And it would foreseeably deter tourists, workers, and other visitors from traveling between Arlington and the District, undermining each jurisdiction's economy and tax base. *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 200 (2017) (city had standing to challenge action that led to reduced economic activity and thereby "diminished the City's property-tax revenue").

In addition, both the District and Virginia would need to expend resources to assess and

respond to the traffic disruptions on their roadways. For instance, the Revised EA indicates that changes resulting from construction of the Arch would degrade the level of service on roadways that Virginia is responsible for maintaining. Revised EA at B-24, B-30. The Arch project will also affect the District's transportation planning and coordination efforts and require continued professional staff time and resources. Mendelson Decl. ¶¶ 60–64. Both during construction and after it concludes, transportation officials would need to assess and study the Arch project's impacts and engage in mitigation planning. *See* Mendelson Decl. ¶¶ 58–64. This required reprioritization of resources to assess and study the project's impacts and any necessary mitigation responses is the sort of resource diversion and direct "expenditures [that] constitute what precedent has long recognized to be a cognizable proprietary injury to states" and municipalities. *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1181 (D.C. Cir. 2025); *see City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 842 n.4 (9th Cir. 2023) (affirming that construction projects that "increase the use of [municipal] roads and streets" directly implicate municipal "powers" and "responsibilities").

*Second*, the Arch will require the District to expend additional resources on emergency planning and preparedness. Congress has required the District to develop "plans and programs to provide necessary protection, relief, and assistance for persons and property in the District" in the event of a "disaster." D.C. Code § 7-2201; *see id.* § 5-101.03(1), (4), (3) (assigning the Mayor the "duty" to "preserve the public peace," "prevent crime," and "protect the rights of persons and of property"). The District has entrusted that responsibility to its Homeland Security and Emergency Management Agency (HSEMA), which evaluates, monitors, and mitigates threats and coordinates emergency and disaster response. Mendelson Decl. ¶ 65.

The Arch will require HSEMA to expend resources on new risk assessments and update

preparedness plans because of the unique threats that the Arch and its construction pose to the District. *Id.* ¶¶ 68–72. Memorial Bridge currently serves as a critical corridor for evacuations from the District, as well as for first responders who need to enter the District in an emergency. *Id.* ¶¶ 67, 69. The construction-related closures of the Circle, and the new pedestrian crossings and additional pedestrian and vehicular traffic after construction is finished, will complicate evacuations from and emergency response in the District. *Id.* ¶¶ 67, 69–70. As a consequence, HSEMA will immediately need to devote additional resources and staff time to revise evacuation and emergency plans, regularly monitor road closures at Memorial Circle, and adjust protocols during events like presidential inaugurations. *See id.*

In addition, HSEMA will need to prepare for the risks the Arch and nearby construction equipment will pose to incoming aircraft. *Id.* ¶¶ 65, 68, 72. The District and Northern Virginia have one of the most restrictive and complex civilian airspaces in the country. *See* Ex. 24 at 7–9. Due to its close proximity to the approach to Reagan National Airport, the 250-foot Arch and associated construction "tower cranes reaching approximately 320 feet" will pose risks to air safety that directly implicate HSEMA's emergency planning and response. Mendelson Decl. ¶ 68. These risks are real. As the National Transportation Safety Board found in its investigation of the tragic January 29, 2025, mid-air collision over the Potomac River, there have been "about 18 reports per year" of "near proximity events" in the crowded airspace near Reagan National Airport. *See* Ex. 25 at 73 n.73, 274. As a result, HSEMA will immediately need to divert personnel resources to understand operational implications from ongoing construction, develop contingency procedures, and establish consequence management plans in the event of an aircraft collision with the structure. Mendelson Decl. ¶¶ 65, 68, 72.

These safety risks, and HSEMA's planning and preparedness costs, will substantially

increase due to the Arch's planned use as a "military installation." *Id.* ¶¶ 68, 71–72. The District's Monumental Core is not designed to support active military operations, and the introduction of weapons systems, munitions, and drones would alter HSEMA's risk environment dramatically, requiring a level of coordination and preparedness far beyond existing civilian-planning frameworks. *Id.* And the Federal Aviation Administration's study of the Arch's aviation impacts predated the announcement of military use and did not contemplate a launch site for drones. *Id.* ¶ 68.

The costs of planning, overtime pay for employees, and expenses arising from the delay of other important projects that HSEMA will incur to address these urgent risks are well-established injuries in fact for purposes of Article III. *See Sierra Club*, 125 F.4th at 1181 (holding that New York suffered injury as a result of federal rule expanding LNG rail transport because it would need to spend "hundreds of thousands of additional dollars on safety measures to mitigate the risks posed by [LNG] rail cars"). And nothing about these costs is speculative: the District will need to ensure that protocols and plans are in place for events that are guaranteed to take place, such as the 2029 presidential inauguration. The same is unfortunately true for the risks that HSEMA must plan for, as tragedies like Flight 5342, January 6, and the Navy Yard shooting show. *See id.* ("Because two such [derailments] have already occurred, the risk of a third is neither remote nor speculative.").

*Third*, the Arch will have environmental impacts that directly implicate the District's compliance and environmental interests. Under the Clean Water Act, the federal government is "subject to, and [must] comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution." 33 U.S.C. § 1323(a). As Defendants acknowledge, construction of the Arch will

require a large-scale excavation of Memorial Circle, exposing soil and sediment that will, absent appropriate mitigation efforts, be carried into the Potomac River by stormwater. Revised EA at 7, 9–10, 47–48, A-4, D-1. Similarly, the completed Arch will include a newly paved surface of 62,875 square feet of impervious area that cannot absorb water. *Id.* at 9. Absent mitigation efforts, that paved surface will cause stormwater runoff to increase substantially, increasing the risk that sediment will flow into the river. *See id.* at 9, 47–48.

The District will incur costs no matter how Defendants address these discharges. If Defendants do not seek approvals from the District for these discharges, they will be in violation of the District's laws and will be making uncontrolled discharges into its waters, inflicting a quintessential environmental injury. Mendelson Decl. ¶ 52. By contrast, if Defendants implement measures to be in "compliance with" the District's stormwater requirements—as they have indicated they will do, both during and after construction, Revised EA at 9—then they will need to obtain a District-approved Soil Erosion and Sediment Control plan before "engag[ing] in . . . land-disturbing activity, including . . . excavating" to manage the site's construction runoff, *see* 21 D.C.M.R. § 540, and a District-approved Stormwater Management Plan to control post-construction runoff, *see id.* § 516; *see* Mendelson Decl. ¶¶ 48–52. The District and its agencies will need to expend time and resources to review and approve these plans and monitor compliance, including through field inspections. Mendelson Decl. ¶ 51; *see* 21 D.C.M.R. § 503. Those expenses are not optional: if the District does not review, approve, and confirm compliance with these plans, the District risks noncompliance with federal law, which requires the District to maintain water quality standards in the Potomac by ensuring that entities limit direct and indirect discharges into the river. 33 U.S.C. § 1313(c), (d). The environmental costs of Defendants' actions thus inflict a concrete injury. *See New Jersey v. EPA*, 989 F.3d 1038, 1046–48 (D.C. Cir. 2021)

(State suffered cognizable Article III injuries where defendant's actions complicated its compliance with federal environmental law, "impair[ed]" its "authority to implement" environmental regulations, and forced it to expend additional resources).

The Arch will also require the District to take action to protect local wildlife. As the public trustee for natural resources within its borders, the District has an obligation to conserve wildlife in the District and must take steps to monitor threats to endangered and other vulnerable species. *See* D.C. Code § 8-151.08(8). The District also has conservation duties imposed by federal law, such as the responsibility to manage and control the taking of wildlife in the District, D.C. Code § 8-2221.28, and the duty to implement a State Wildlife Action Plan under a U.S. Fish and Wildlife Service grant, 16 U.S.C. § 669b(c); *see* Ex. 29.

The Arch directly implicates those interests and obligations. NPS acknowledges the potential occurrence of two endangered or proposed endangered bats—the northern long-eared bat and the tricolored bat—near the site of the Arch. Revised EA at A-6. The presence of tall construction cranes, the installation of new artificial lights, and, eventually, a monumental Arch all have, at minimum, the potential to interfere with these bats as they forage in or traverse Memorial Circle. Mendelson Decl. ¶¶ 53–54. As the District is required by its State Wildlife Action Plan to take conservation measures with respect to these species, *see* Ex. 29 at 14, 17, 87, 198, it will need to expend additional funds to study the impacts of the Arch on these species and take appropriate protective measures. Mendelson Decl. ¶¶ 53–54. These costs are sufficient to confer standing. *See Sierra Club*, 125 F.4th at 1181.

*Fourth*, the Arch will change the character of Northern Virginia and the District and substantially disrupt the District's L'Enfant Plan. It is well established that States and municipalities across the country—large and small; urban, suburban, or rural—have a

"substantial" interest in land management and in protecting the "character" and "appearance of" their towns, suburbs, and cities. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507 (1981) (plurality op.); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978). This is true of Virginia, where the Arch will be largely visible from sites in Arlington County, including from Arlington National Cemetery. Kirchen Decl. ¶ 22. It is also true of the District, whose well-preserved historic neighborhoods, low city profile crowned by historic landmarks, and distinctive L'Enfant Plan make it unique among American cities and help the District attract new residents, visitors, and even heritage tourists from around the world. Maloney Decl. ¶¶ 98–99. Both the District and Virginia thus have a strong interest in defending the integrity of the L'Enfant Plan and preserving the historic character of the region's landmarks and oldest neighborhoods. *See, e.g.*, *Mahoney v. District of Columbia*, 662 F. Supp. 2d 74, 90 (D.D.C. 2009) ("There can be no doubt that '[t]he government has a substantial interest in the preservation and enhancement of the human environment . . . .'" (alteration in original) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984))).

Defendants' Arch substantially damages this interest. By blocking the symbolic axis connecting Arlington House to the Lincoln Memorial, the Arch not only robs both structures of much of their meaning but also violates the L'Enfant Plan's "emphasis on framing and leaving fully unobstructed . . . visual termini" of the District's avenues. Maloney Decl. ¶¶ 93, 97. At 250 feet, the Arch will also be one of the city's tallest structures, visible from across the height-limited District, and will "adversely affect all other prominent historic landmarks on the skyline of the national capital in its vicinity," including Arlington National Cemetery, the Washington Monument, the Capitol Building, and National Cathedral, by "noticeably diminishing their relative prominence." Maloney Decl. ¶ 36; Kirchen Decl. ¶¶ 22–26. And the Arch will "diminish

characteristic features" of the well-preserved Georgetown Historic District, where the District owns several properties, and will directly affect District-owned landmarks and properties, including the Francis Scott Key Bridge, the historic Duke Ellington School, and the Georgetown library. Maloney Decl. ¶¶ 33–34. All of these harms will make it more difficult for the District to promote the integrity of its plan, maintain its historic character, and protect the value and character of its own properties, and they will make it more difficult for both Plaintiffs to maintain their unique attractiveness to residents and visitors.

*Fifth*, Defendants have violated the District's and Virginia's procedural rights. The Commemorative Works Act grants the District a representative on the National Capital Memorial Advisory Commission (NCMAC) and directs project sponsors to consult with the Commission. 40 U.S.C. §§ 8904(a)(6), 8905(a). This consultation requirement allows the District a crucial voice in the planning of new monuments and helps to ensure that both Congress and project sponsors are mindful of impacts on the District. But Defendants bypassed NCMAC in its entirety. Mendelson Decl. ¶¶ 24, 30. This by itself is sufficient to support standing, since a party that "has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards of redressability and immediacy." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)). And here, the District has a strong "concrete interest" in ensuring that the Arch is not built in Memorial Circle, where it will impose significant costs on the District.

Defendants' decision to ignore NCMAC also impacted a second set of rights, namely, the District's rights to participate in NCPC, which votes on site and design proposals for all projects subject to the Commemorative Works Act. *See* 40 U.S.C. § 8905(a)(2). Crucially, NCPC takes such votes only *after* NCMAC provides its advice. *Id.* § 8905(a); Mendelson Decl. ¶ 15. As this

sequenced approval structure suggests, advice from NCMAC is necessary to allow NCPC members to cast an informed vote on projects under review. Mendelson Decl. ¶¶ 15, 24. And without that information, none of the District's representatives on the Commission, including Chairman Mendelson of the D.C. Council, could meaningfully evaluate the project or fulfill their role on the Commission, Mendelson Decl. ¶¶ 32–39, and the District was effectively excluded from the process. *See Cummock v. Gore*, 180 F.3d 282, 291 (D.C. Cir. 1999) (holding that federal commission's denial of access to information to commission member had the effect of improperly "exclud[ing] [her] from meaningful participation" in deliberations).

Finally, Defendants violated a third set of procedural rights, this time under Section 106 of the NHPA and its implementing regulations, which requires federal agencies to consult with the relevant State Historic Preservation Officers (SHPOs) to develop solutions to reduce adverse impacts on historic properties. *See* 54 U.S.C. § 306108. Though such consultations must begin "early in the . . . planning" process to ensure that a "broad range of alternatives may be considered," 36 C.F.R. § 800.1(c), Defendants declined to consult the District's SHPO until *after* making site selection and design decisions. Maloney Decl. ¶¶ 38–41; Kirchen Decl. ¶¶ 32, 45. And once they finally initiated consultations, Defendants unlawfully expedited the consultations without the SHPOs' consent, Maloney Decl. ¶ 45; Kirchen Decl. ¶ 39, and made clear that that they would not actually consider alternatives to the Arch's site or design concept, in violation of Defendants' duty to consult and formulate alternatives, Maloney Decl. ¶¶ 44–55; Kirchen Decl. ¶ 60.

A violation of a SHPO's Section 106 consultation rights is an Article III injury whenever that violation affects a concrete and particularized interest of the State. *See, e.g.*, *City of Phoenix v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017), *amended on reh'g*, 881 F.3d 932 (D.C. Cir. 2018). And here, Defendants' decision to flout the Section 106 process deprived Plaintiffs of an

opportunity to protect treasured sites within their boundaries, including Arlington National Cemetery and several District-owned properties within the Georgetown Historic District. Kirchen Decl. ¶ 80; Maloney Decl. ¶¶ 33–34, 98–99.

## II. The District and Virginia Are Likely to Succeed on the Merits.

The District and Commonwealth are exceedingly likely to succeed in showing that the Arch project is unlawful. Defendants' decision to authorize construction of the Arch is a final agency action subject to review under the APA. *See* 5 U.S.C. § 704; *In re Aiken Cnty.*, 645 F.3d 428, 435 (D.C. Cir. 2011) (decision to issue or deny "a construction license" is "a final agency action that [plaintiffs] may challenge under the APA"); *Her Majesty the Queen in Right of Ontario v. U.S. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("the absence of a formal statement of the agency's position . . . is not dispositive" in assessing finality in light of the "'flexible and pragmatic way' in which we apply the finality requirement" (citation omitted)). And constructing the Arch is both contrary to law and arbitrary and capricious: it flouts the requirements of the Commemorative Works Act and the Height Act; contravenes the APA's reasoned decisionmaking requirements; and violates the procedural mandates of NEPA and the NHPA. Indeed, Defendants' violations are sufficiently clear and indisputable that the District and Virginia are entitled to mandamus, prohibitory, and equitable relief even in the absence of a final agency action. *See Aluminum Co. of Am. v. United States*, 790 F.2d 938, 942 (D.C. Cir. 1986) (Scalia, J.) ("Nonfinal agency actions are interlocutorily reviewable in extraordinary circumstances—where, for example, they are in clear violation of law."); 3 Admin. L. & Prac. § 8:25 (3d ed. Mar. 2026) (plainly unlawful agency actions may be enjoined, even before they are final, through "nonstatutory review" or mandamus).

### A. The Arch Violates the Commemorative Works Act.

The Arch violates the Commemorative Works Act (CWA). That statute sets strict criteria

that must be satisfied before any "[c]ommemorative works . . . may be established on federal lands" administered by NPS in "the District of Columbia and its environs." 40 U.S.C. §§ 8903(a), 8901(4). The Arch satisfies none of these requirements.

As an initial matter, the Arch is a "[c]ommemorative work." The CWA defines a "commemorative work" to include "any . . . monument . . . or other structure or landscape feature . . . designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." *Id.* § 8902(a)(1). The Arch is plainly a "monument," "structure," or "landscape feature." And Defendants have repeatedly made clear that the Arch's purpose is to "perpetuate in a permanent manner the memory," *id.*, of the 250th anniversary of the nation's independence: they have stated that the 250-foot arch will "honor[] the nation's 250th anniversary," Revised EA at 1, and "celebrate 250 years of American independence," Revised FONSI at 2.

Defendants have nonetheless failed to follow the CWA's requirements for construction of a commemorative work. First, the Arch has not been "specifically authorized by law." 40 U.S.C. § 8903(a)(1). Congress has not enacted any statute authorizing the Arch, let alone in the "specific[]" terms the statute requires. In this respect, the Arch stands in stark contrast with every other commemorative work the federal government has constructed in the District since the CWA's enactment, each of which Congress has authorized in clear and specific terms. *See, e.g.*, Pub. L. No. 106-348, § 1 (2000) (authorizing establishment of "a memorial . . . to honor veterans who became disabled while serving in the Armed Forces of the United States"); Pub. L. No. 104-333, div. I, tit. V, § 508 (1996) (establishment of "a memorial . . . to honor Martin Luther King, Jr.").

Second, Defendants have not followed the CWA's procedural requirements. Defendants never "consult[ed] with the National Capital Memorial Advisory Commission" at any point in the

process. 40 U.S.C. § 8905(a)(1); Maloney Decl. ¶¶ 15, 39. Nor did Defendant Burgum or the Administrator of General Services "submit site and design proposals to the Commission on Fine Arts" and NCPC "[*f*]*ollowing* consultation in accordance with [this] clause." *Id.* § 8905(a)(2) (emphasis added). Instead, they skipped such consultation entirely and sought approval of both bodies without the views of NCMAC and its members. *See* Mendelson Decl. ¶ 29.

Defendants have suggested that they may disregard the CWA's clear requirements because Congress somehow approved construction of the Arch more than a century ago, in a 1925 statute authorizing the construction of Memorial Bridge. *See* Pub. L. No. 68-463, 43 Stat. 974 (1925) (Memorial Bridge Act). It would be surprising, to say the least, if Congress approved a 250-foot arch designed to commemorate that 250th anniversary of American Independence a full century before that anniversary occurred. And even a brief perusal of the Memorial Bridge Act confirms that it did no such thing.

The Memorial Bridge Act states that the Arlington Memorial Bridge Commission "is hereby authorized and directed to proceed at once with the construction of a memorial bridge across the Potomac River . . . together with the landscape features appertaining thereto, all in accordance with the designs, surveys, and estimates of costs transmitted by said commission to Congress under date of April 22, 1924." *Id.* § 1. This statute does not mention an arch. Nor do the "designs, surveys, and estimates of costs" transmitted by the Commission on April 22, 1924. *See* Ex. 18 (Report of the Arlington Memorial Bridge Commission, S. Doc. No. 68-95 (Apr. 22, 1924)). Instead, the Commission's report proposed the construction of "two stately columns" at the south end of Memorial Bridge, each of which would be "166 feet high," designed to "symbolize the one the North and the other the South," and "framing in but not interfering with the view of the Lincoln Memorial from the direction of the Lee Mansion." *Id.* at 9. Needless to say, the

construction of a 250-foot Arch, placed in the center of Memorial Circle, designed to celebrate the Nation's sesquicentennial, and obscuring the view of the Lincoln Memorial from the Lee Mansion, is not "in accordance with th[is]" design. Memorial Bridge Act § 1.

Nor does the Memorial Bridge Act somehow give Defendants leeway to reimagine these two columns as a different structure, in a different location, of a far larger height, and for a different commemorative purpose. As noted, the Act specifically provides that the bridge and any "landscape features appertaining thereto" must be constructed "in accordance with" the Commission's April 22, 1924, proposal. *Id.*; *see id.* § 2 (providing that "construction shall be in accordance with the plans submitted by the said commission"). Furthermore, the Act contains a specific exception authorizing the Commission to "make such changes in design and location *of said bridge* without increasing the total cost of the project as in its discretion may be found to be necessary or advisable." *Id.* § 1 (emphasis added). By specifically authorizing changes to the design of the "bridge," Congress made clear that it did not authorize changes to other features of "the project," such as the "landscape features appertaining thereto." *Id.*; *see Esteras v. United States*, 606 U.S. 185, 195 (2025) ("expressing one item . . . excludes another left unmentioned" (citation omitted)). In any event, the grant of discretion to make "necessary or advisable" changes cannot be construed so broadly as to "render nugatory" Congress's explicit command to construct the arch "in accordance with" the approved design. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005).

Other features of the Memorial Bridge Act reaffirm that this old statute cannot be repurposed for Defendants' arch. The Memorial Bridge Act provides that construction was to be initiated "at once," Memorial Bridge Act § 1, and completed "as speedily as practicable," *id.* § 2, pursuant to a "ten-year program of expenditures and construction," *id.* § 6; those terms preclude

invocation of this statute to initiate construction on a new monument 101 years later. The statute also states that construction "shall be prosecuted to completion . . . in total sum not to exceed $14,750,000," *id.* § 2, and that any changes to the bridge may not "increase[e] the total cost of the project," *id.* § 1. Construction of the original project a century ago cost $12.2 million. Ex. 19. There is no doubt that construction of a marble-plated arch nearly as tall as the Capitol Dome would exceed by orders of magnitude the remaining $2.55 million.

**B. The Arch Violates 40 U.S.C. § 8106.**

The Arch also violates the plain terms of 40 U.S.C. § 8106. Like the CWA, Section 8106 has a simple command: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." The Arch is a "building or structure" that would be erected on federal land in the District. And as already explained, Congress has provided no "authority"—let alone the "express authority" the statute requires—to construct an arch in Memorial Circle.

Defendants' counterarguments are uniformly meritless. They have argued that Section 8106 should not be construed to apply to national parks administered by NPS, because another (since-repealed) provision of the same statute prohibited the construction of any "building exceeding one thousand dollars" in a "national park" without the "express authority of Congress." Act of Aug. 24, 1912, Pub. L. No. 62-302, 37 Stat. 417, 460. This argument is beside the point, since Memorial Circle does not sit within a "national park." *See* Ex. 26 (listing national parks). But Defendants' reading is also wrong. Section 8106 categorically forbids construction in "any reservation, park, or public grounds of the Federal Government in the District of Columbia," a phrase that plainly encompasses national parks. *See Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, 185 F.4th 1185, 1221 (D.C. Cir. 2026) (construing Section 8106 as applicable to "national parks"),

*underlying injunction stayed on other grounds*, 2026 WL 2564318 (U.S. Aug. 31, 2026). The since-repealed provision that Defendants cite does not suggest otherwise: it imposed an *additional* condition on the construction of buildings over one thousand dollars in national parks anywhere in the country; it did not override or qualify the separate prohibition on erecting buildings on federal land in the District. *See* 37 Stat. at 460.

Defendants have also claimed that a statement by an Executive Branch official fourteen years after the statute's enactment demonstrates that Section 8106 was enacted to stop construction by "unauthorized third parties," not the federal government. *Nat'l Trust*, 185 F.4th at 1220. As the D.C. Circuit has explained, the text provides no textual basis for this theory. *Id.* And a "solitary statement, made over a decade after Section 8106's enactment, cannot change the clear statutory text." *Id.*; *see Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." (citations omitted)).

**C. The Arch Violates the Height of Buildings Act.**

The Arch also flouts the Height of Buildings Act. That statute provides that, with narrow exceptions not relevant here, "[n]o buildings" in the District of Columbia "shall be erected, altered, or raised in any manner as to exceed the height of 130 feet on a business street or avenue," or "90 feet in height" "[o]n a residence street." D.C. Code § 6-601.05(b), (c). The 250-foot Arch contravenes that numerical limit, and Defendants offer no plausible argument to the contrary.

To start, the Arch is a "building." In 1910, as now, the term "building" meant "[t]hat which is built; a fabric or edifice constructed." Webster's Unabridged Dictionary at *1646 (1913), https://archive.org/details/2976582. The Arch is a large, concrete edifice that will contain numerous internal rooms, stairways, elevators, bathrooms, and space for hundreds of visitors at a

time. Ex. 6 at 14–18. The fact that the building will be in the shape of a triumphal arch makes no difference. The Height Act states that it applies to a building "erected, altered, or raised *in any manner*," D.C. Code § 6-601.05(b) (emphasis added), and nothing in its text excludes buildings shaped like an arch.

It follows that the Arch cannot "exceed the height of 130 feet." *Id.* But the planned Arch will be 250 feet tall. It is therefore unlawful.

In the face of this exceptionally clear text, Defendants have offered three arguments as to why the Arch is lawful. *See* Ex. 20 at 7–9 (Height of Buildings Act Justification (Oct. 2, 2026)) (Height Act Justification). None has merit.

*First*, Defendants suggest that the Arch actually complies with the Height Act because its base will be "only" 166 feet and the remaining features of the Arch are exempt from the Act's restrictions. *See id.* at 8. As basic arithmetic reveals, however, 166 feet is greater than 130 feet. Even buildings on "the north side of Pennsylvania Avenue between 1st and 15th Streets Northwest"—where the Act's restrictions are loosened—are only "permitted" to reach "an extreme height of 160 feet." D.C. Code § 6-601.05(b). A base of 166 feet is thus unlawful on its own.

In any event, the statute supplies no ground for ignoring the 84 feet of the Arch above its base in assessing compliance with the Height Act. Defendants assert that the Arch's observation deck is exempt from the Height Act because it may be considered a "penthouse." *See* Height Act Justification at 6. But the Act exempts "penthouses" from the Act's height limits only "when and as the same may be approved *by the Mayor of the District of Columbia*" and they are "erected to a height of one story of 20 feet or less." D.C. Code § 6-601.05(h) (emphasis added). The Mayor has not assented to construction of any portion of the Arch. The observation deck is 24 feet, not 20 feet. And it is highly doubtful that the observation deck constitutes a "penthouse" as that term

was used in 1910. *See* Webster's Unabridged Dictionary at *9072 (defining "penthouse" as "[a] shed or roof sloping from the main wall or building, as over a door or window; a lean-to").

Nor is there any basis for exempting the Act's enormous 60-foot statuary from the Height Act's limits. The Act contains no exemption for statues. Although Defendants have pointed to an instance in which the District permitted an office building to include 80-foot towers that extended its height to 210 feet, that was (again) based on the plain text of Section 6-601.05(h), which permits the Mayor to exclude "towers," "[s]pires," "minarets," and "pinnacles" from the Act's limits. D.C. Code § 6-601.05(h). There is no similar exclusion for statues, let alone a statue that lacks the Mayor's approval.

*Second*, Defendants contend that Congress exempted the Arch from the Height Act when it enacted the Memorial Bridge Act in 1925. *See* Height Act Justification at 7. As noted above, that Memorial Bridge Act did not authorize an arch at all, and the limited authorization it did grant has long since expired. *See supra* pp. 23–25. What is more, because the Height Act was enacted in 1910, the Memorial Bridge Act cannot be construed to override that earlier enactment unless it overcomes the "presumption against implied repeals"—a demanding standard that requires a showing that "Congress's intention to repeal is 'clear and manifest' or the laws are 'irreconcilable.'" *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) (internal quotation marks omitted)). The Height Act and the Memorial Bridge Act are not "irreconcilable"; the Executive carried out the Memorial Bridge Act without difficulty more than 90 years ago. *See supra* p. 25. Nor did Congress evidence a "clear and manifest" intention to authorize a 250-foot arch on Columbia Island. At most, the Memorial Bridge Act indicates that Congress permitted the construction of two 166-foot columns at the foot of Memorial Bridge to celebrate the union of North and South after the Civil War; it did

not state in "clear and manifest" terms that Defendants could build a different structure, for a different purpose, in a different place, that exceeded the Height Act by an additional 84 feet.

*Third*, Defendants have suggested that the Height Act does not apply to federal buildings at all. *See* Height Act Justification at 5–7. This novel argument founders on the statute's plain text. The Height Act states that "[n]o buildings" shall be erected in excess of its height limits. D.C. Code § 6-601.05(a), (b), (c). The Act contains no exemption for federal buildings. Those buildings are therefore subject to the Act. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous . . . judicial inquiry is complete." (citation omitted)).

The statute's context confirms what its text plainly provides. Elsewhere in the Height Act, Congress explicitly exempted buildings from its restrictions based on their location, D.C. Code at § 6-601.05(b), physical features, *id.* at § 6-601.05(h), and purpose, *id.* at § 6-601.05(c). Had Congress intended to exempt federal buildings, it surely would have said so—particularly given that federal buildings would have been front of mind for Congress when it enacted a statute governing construction in the Nation's capital. Instead, its failure to include such an exemption alongside a battery of more minor exceptions is compelling evidence that none was intended. *See United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute . . . the proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.").

The Act's history also refutes Defendants' theory. The Height of Buildings Act of 1899 expressly stated that its limitations did "not apply to Federal or municipal buildings." Act of Mar. 1, 1899, § 7, 30 Stat. 922. When Congress amended the statute in 1910 to enact the modern Height Act, it conspicuously did not retain that exemption. On the contrary, it expressly repealed "all

laws in conflict herewith." 36 Stat. 452, 453 (1910). Congress's omission and repeal of the very exemption Defendants ask this Court to read into the statutory text provides strong if not dispositive evidence that Congress did not wish to carry that exemption forward. *See United States v. Quality Stores, Inc.*, 572 U.S. 141, 148–49 (2014) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." (citation omitted)); *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258–59 (2004) (similar).

Indeed, the federal government itself has long construed the Height Act to apply to federal buildings. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024) (a construction of a statute that "was issued roughly contemporaneously with enactment of the statute and [has] remained consistent over time" is entitled to "very great respect" (citations omitted)). NCPC has consistently applied the Height Act to federal buildings since its establishment in 1938. NCPC Height Act Memorandum at 2. The Commission reiterated those views in a lengthy memorandum to the Department of Justice in 1987. *Id.* And it repeated them once more in its review of the Arch. *Id.* at 2–5.

In the face of the overwhelming weight of statutory evidence, Defendants fail to offer anything remotely sufficient to support their claimed federal exemption. They point out that, in 1926, the Height Act was codified in the chapter of the D.C. Code governing zoning. *See* Height Act Justification at 6. A codifier's decision about where to place a congressional statute more than a decade after its enactment is hardly probative of Congress's intent. In any event, even this point cuts against them: as Defendants point out, Congress specifically exempted "federal public buildings" from a different subchapter of the District's zoning laws, but included no similar exemption in the Height Act. *See* D.C. Code § 6-641.15. That is affirmative support for the view that the Height Act contains no such exemption. *See Bittner v. United States*, 598 U.S. 85, 94

(2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning.").

Defendants also suggest that the Act's enforcement mechanism is a poor fit for the federal government because it permits "[t]he corporation counsel of the District of Columbia" to maintain an action to enjoin violations of the statute in "the supreme court of the District of Columbia." Height Act § 8, 36 Stat. at 454–55; *see* Height Act Justification at 6. It would hardly have been strange for this enforcement mechanism to apply against federal officers and agencies in 1910: at that time, the corporation counsel, like all District officials, was appointed by the federal government, and federal officials could be and were haled into the District's supreme court. *See, e.g.*, *Croson v. District of Columbia*, 2 F.2d 924 (D.C. Cir. 1924) (applying District traffic laws to traffic violation committed by federal employee driving federal vehicle). Regardless, the federal government is often subject to a statute's substantive prohibitions even where it is not amenable to suit under the statute's specific cause of action. *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18 (1979). In those cases, as here, plaintiffs may simply enforce the statute through other lawful means, including suits under the Administrative Procedure Act. *See id.*

**D. The Decision to Construct the Arch Is Arbitrary and Capricious.**

Defendants' decision to construct the Arch is also arbitrary and capricious. The Administrative Procedure Act requires that agency actions be "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. To satisfy this standard, an agency must "articulate a satisfy explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's action is arbitrary and capricious if, among other

things, the agency "entirely fail[s] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, or does not "consider responsible alternatives to its chosen policy and . . . give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)).

Defendants fail this test on both grounds. Defendants' justification for the Arch entirely neglects to consider what the President has "agreed" would be one of its principal uses: to serve as "a top grade Military Complex . . . to house, store, and have the rapid ability to use large numbers of drones, plus Snipers . . . and [to] have and hold large quantities of sniper ammunition in storage." Ex. 15 at 1. The federal government has affirmed in multiple public statements and two sworn declarations that the Arch "will be utilized as a dual-purpose structure" that "incorporates military utility," including "counter-sniper personnel," "drones," and "ammunition." Hegseth Decl. ¶¶ 10–12, 13.d; *see* Mullin Decl. ¶¶ 15–20; Ex. 16. Yet the decisional documents for the Arch contain no explanation for how a tourist attraction in a busy traffic circle will safely serve these military functions, nor the obvious costs of doing so—such as the dangers that drones would pose to air safety, the fire-safety risk of housing "large quantities of . . . ammunition," in a monument trafficked by thousands of tourists per day, and the increased likelihood that Memorial Bridge (a designated evacuation route) would be closed during emergencies. Defendants did not consider these or other self-evident risks to their planned military use of the Arch. On the contrary, they have explicitly disclaimed that the Arch will "involve hazardous materials" or present any "safety risks." Revised FONSI at 18. Defendants' failure to weigh the dangers of their course of action or to provide any reasoned explanation for that approach is paradigmatically arbitrary and capricious. *See, e.g.*, *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 433 (D.C. Cir. 2018)

(finding agency action arbitrary and capricious because the agency "shrug[ged] off" the "considerable dangers" posed by its action).

Similarly arbitrary is the agency's failure to adequately consider alternatives to the construction of a 250-foot arch in Memorial Circle. As Defendants have acknowledged, parties identified numerous alternatives to this approach, including building the monument in a different and less sensitive location, using a less obtrusive design, or reducing its height. Revised EA at A-1 to A-2. NPS, however, explicitly "eliminated" each of these alternatives from consideration. *Id.* at A-1. In each case, its rationale was solely that the chosen alternatives did not advance the project's stated "purpose and need" as effectively as a 250-foot arch in Memorial Circle—for instance, because building the Arch in a different location would not achieve "the historic design intent for the Arlington Memorial Bridge and Memorial Avenue corridor"; because a different design would not be sufficiently "grand and ornate"; or because a smaller height would not be "representative of th[e] milestone" of "250 years of American independence." *Id.* at A-1 to A-2.

That is not a "reasoned explanation" by any measure. *Spirit Airlines*, 997 F.3d at 1255. In considering alternatives, an agency cannot simply consider whether they achieve the project's purported goals precisely as well as the agency's preferred action; it must also consider whether they would lower its costs. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." (emphasis in original)); *Farmers Union Cent. Exch. v. FERC*, 734 F.2d 1486, 1511–14 (D.C. Cir. 1984) (holding agency action arbitrary and capricious because the agency did not adequately weigh the problems of a proposed alternative against its "recognized advantages"). A monument that is less "grand and ornate" than the Arch, or whose height in feet does not exactly match the number of years since American independence, may nonetheless be a better option if it

mitigates environmental degradation, traffic disruption, and harm to the integrity of its historic surroundings. Here, parties identified many reasons why that would be so: changing the location, design, or height of the Arch would avoid "creating a massive visual obstruction in the midst of a century-old historic landscape," Maloney Decl. ¶¶ 59–63, require fewer "modifications to the existing roadway network," Ex. 21 at 2 (Letter from Arlington County Dep't of Community, Planning, Housing & Dev. to NCPC (June 17, 2026)), and eliminate any interference with civilian flights, *id.* at 3; Mendelson Decl. ¶ 68, among other benefits. Defendants did not need to agree that these benefits outweighed the costs of their favored option, but it was arbitrary and capricious for Defendants to refuse to consider them.

**E. Defendants Have Violated the National Environmental Policy Act.**

For similar reasons, Defendants have violated the National Environmental Policy Act. NEPA provides that, before concluding that an agency action has no significant impact on the environment, an agency must "prepare an environmental assessment" that concisely "set[s] forth the basis for the agency's finding." 42 U.S.C. § 4336(b)(2). That assessment must include a discussion of "reasonable alternatives to the proposed action" and a "hard look at [its] environmental impacts." *Myersville*, 783 F.3d at 1323–24. An agency violates NEPA if its assessment lacks "sufficient discussion of the relevant issues and opposing viewpoints" to demonstrate that the agency's decision is "fully informed" and "well-considered." *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).

Much as Defendants failed to reasonably explain the basis for their decision, they also failed to conduct the considered assessment that NEPA requires. As noted, NPS's environmental assessment explicitly "eliminates" consideration of every alternative except "no action" or a "250-foot-tall" Arch "within Memorial Circle," because none of the proffered alternatives adequately

advanced Defendants' stated "purpose and need," Revised EA at 3, A-1 to A-2. But NEPA forbids an agency from defining its objectives "in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (Thomas, J.). Here, the agency defined its "purpose and need" in a way that is coterminous with the precise characteristics of the Arch itself: it said that it sought to construct a building whose "height[]" is "representative" of "250 years of American independence," that is "grounded in the historic design intent for the Arlington Memorial Bridge and Memorial Avenue Corridor," and that has a "grand and ornate design." Revised EA at A-1 to A-2; *see id.* at 9 (defining "[t]he purpose of the proposed action" to include "installation of an arch at the intersection of Arlington Memorial Bridge and Memorial Avenue"). But an agency cannot simply "accept[] [certain] parameter[s] as a given" and then "confine [its] analysis" to the sole option that satisfies those parameters. *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 667 (7th Cir. 1997). By loading the dice in this way, Defendants did not consider "reasonable alternatives" as NEPA requires.

Defendants also failed to engage in the "hard look" that NEPA mandates. *Myersville*, 783 F.3d at 1325. Among other things, that standard "requires an agency to look at both the probabilities of potentially harmful events and the consequences if those events come to pass." *Sierra Club*, 125 F.4th at 1183 (citation omitted). Defendants' decisional documents do not mention the military functions that the President has stated, and that his administration has repeatedly reaffirmed, will be part of the Arch design. *See supra* pp. 32–33. Yet converting the Arch into a hardened military installation with ammunition storage, drone staging, and sniper positions poses an obvious risk of serious environmental damage, whether from air disasters or explosions or interferences with wildlife. *See, e.g.*, Mendelson Decl. ¶ 71. An environmental

assessment that entirely ignores these "high-consequence risk[s]"—whatever their probability—is "demonstrably inadequate." *Sierra Club*, 125 F.4th at 1183.

**F. Defendants Have Violated the National Historic Preservation Act.**

Defendants also failed to consult with State Historic Preservation Officers of the District and Virginia in the manner required by the NHPA. The NHPA requires federal agencies to "account [for] the effect of their actions on" historic properties. *City of Phoenix*, 869 F.3d at 971 (alteration in original) (citation omitted); *see* 54 U.S.C. § 306108. In particular, Section 106 and its implementing regulations require agencies responsible for any federal "undertaking" to engage extensively with SHPOs and other stakeholders in a multistage consultation process that seeks to "avoid, minimize, or mitigate [the] adverse effects on historic properties." 54 U.S.C. § 306108; 36 C.F.R. §§ 800.3(c), 800.5(a), 800.6(a).

Defendants have failed to comply with these requirements at every turn. First, Section 106's implementing regulations provide that federal agencies "shall," as part of their "initial planning," "initiate consultation" with the appropriate SHPO concerning project planning and create a "plan for involving the public." 36 C.F.R. §§ 800.3(c), (e). From the outset of this project, it was obvious that the Arch would have significant adverse effects on several historic properties; NPS itself identified more than a dozen affected "historic properties" in the District and Virginia. Maloney Decl. ¶ 31. Nonetheless, Defendants waited more than seven months after publicly announcing the project before contacting the District's and Virginia's SHPOs. Maloney Decl. ¶ 41; Kirchen Decl. ¶ 32. By that time, Defendants had already conducted several rounds of public outreach, and NPS had already "determined the location, design, identification of historic properties, assessment of effects, and proposed mitigation," Kirchen Decl. ¶ 45, which effectively deprived the SHPOs of their right to shape the "initial planning" and public engagement for the

project. 36 C.F.R. § 800.3(c), (e); *see City of Phoenix*, 869 F.3d at 971 (holding that federal agency denied municipality the "right to participate in the process" where agency consulted with the wrong individuals within the local government).

Second, once they finally (and belatedly) engaged with the SHPOs, Defendants improperly short-circuited the consultation process without the SHPOs' consent. Section 106's multistep consultation process requires agencies to consult with SHPOs and other stakeholders during each of four distinct processes: initial consultations (which Defendants skipped), *see* 36 C.F.R. § 800.3, identifying historic properties, *see id.* § 800.4, assessing adverse effects on those properties, *id.* § 800.5, and resolving adverse effects, *id.* § 800.6. Each step involves a distinct set of consultations. Kirchen Decl. ¶ 17. Section 106's regulations allow agencies to "[e]xpedit[e]" these consultations by "addressing multiple steps" together, but only if the "agency official *and the SHPO* . . . agree it is appropriate." 36 C.F.R. § 800.3(g) (emphasis added). Defendants asked the District and Virginia SHPOs to agree to expedited consultations, but when they declined because "the standard [for expediting] set forth" in the Section 106 regulations "had not been met," Defendants expedited the process anyway. Kirchen Decl. ¶ 43; Maloney Decl. ¶¶ 44–45.

Third, Defendants did not engage in required "consultation" with the SHPOs even on an expedited timeline. Once an agency finds a potential "adverse impact" on a historic property, Section 106's regulations specify what the agency must do: it "*shall* consult with the SHPO . . . to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6(a), (b)(1)(i) (emphasis added). As Interior has explained in its own NHPA guidance, this means that NPS must "develop and consider a full range of options" and "[t]ry to identify solutions that will leave all parties satisfied." 63 Fed. Reg. 20496, 20504 (1998). But instead of "[t]ry[ing] to identify solutions" or

"consider[ing] a full range of options," *id.*, NPS did the opposite: it "made clear that it has not and will not consider alternative sites for the Arch" and "indicated that it will not be considering any design alternatives." Maloney Decl. ¶¶ 60, 65; *accord* Kirchen Decl. ¶ 60 ("NPS made clear that it had not and will not consider alternative sites."). Nor did Defendants share or consult on any plans for a military use at the site. Maloney Decl. ¶ 71; Kirchen Decl. ¶¶ 74–76. And when the SHPOs persisted in proposing alternatives and changes, Defendants prematurely terminated the process altogether. Maloney Decl. ¶¶ 72–73; Kirchen Decl. ¶ 77. Because Defendants did not consider the views of the SHPOs and did not try to develop any alternatives, Defendants did not comply with either their mandatory duty to "consult . . . to develop and evaluate alternatives," or even Interior's own NHPA procedures. *See Nat'l Conservative Pol. Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) ("Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures." (citation omitted)).

## III. The District and Virginia Will Suffer Irreparable Harm as Soon as Construction Begins.

The construction of the Arch will inflict irreparable injury on the District and Virginia. A threatened injury is "irreparable if it is 'certain and great,' 'actual and not theoretical,' and 'beyond remediation' at a later date." *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1010 (D.C. Cir. 2026) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016)). And a government, like any organization, "faces irreparable harm when it sues to challenge 'new obstacles [that] unquestionably make it more difficult for [it] to accomplish [its] primary mission in circumstances where 'there can be no do over and no redress.'" *Id.* (quoting *League of Women Voters*, 838 F.3d at 9). Defendants intend to start construction as soon as November 5, the same day they expect that NCPC will grant its final approval of the Arch. As soon as they break ground, Virginia and

the District will both suffer significant and irreparable injuries that will only become more severe as the Arch's construction progresses.

*First*, breaking ground on the Arch will immediately force the District and Virginia to spend scarce funds and personnel resources on addressing the immediate and foreseeable impacts, including on traffic, public safety, and the environment. As soon as it begins, construction will disrupt traffic patterns near Memorial Circle, as Defendants shut down the entire south side of the Circle. Revised FONSI at 5, 8. Construction will also affect the District's and Virginia's transportation planning and coordination efforts and require continued professional staff time and resources. Mendelson Decl. ¶ 61. This will require both jurisdictions to spend funds immediately, including on transportation planning and coordination to account for these changes and study the project's traffic impacts. Mendelson Decl. ¶¶ 61–64; Revised EA at B-24, B-30.

The District will also need to immediately spend funds and resources to study and revise evacuation and emergency-management plans to ensure they are prepared to address the heightened dangers that construction cranes and a rising Arch pose to aircraft and to plan for alternate emergency routes for first responders and evacuees that avoid Memorial Circle. Mendelson Decl. ¶¶ 65–72. The threats to safety in the National Capital Region are considerable, and Plaintiffs simply cannot wait until the next disaster arrives to revise their plans. *Id.* ¶ 72. The District will also have to spend funds and personnel resources on numerous other activities, such as mitigating soil erosion and sediment flow into the Potomac River, *supra* pp. 15–16, and studying the impacts of construction equipment and the Arch on rare and endangered species, *supra* pp. 16–17.

All of these harms warrant immediate injunctive relief. Harm from "increased traffic congestion" is "irreparable" because it "cannot be compensated financially." *Nw. Pipeline Corp.*

*v. Pipeline Right of Way Easement*, 197 F. Supp. 2d 1241, 1246 (E.D. Wa. 2002). And although economic harm does not ordinarily constitute irreparable damage, "economic loss caused by federal agency action is an exception." *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020). That is "because the APA's waiver of sovereign immunity does not extend to damages claims," leaving the Plaintiffs with no way to recover their damages upon final judgment. *Id.*; *see also, e.g.*, *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (order) (holding that the APA's sovereign immunity "waiver [does not] apply to claims seeking money damages" (citation omitted)); *Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) ("[E]ven if the claimed economic injury did not threaten plaintiffs' viability, it is still irreparable because plaintiffs cannot recover money damages against FDA."). And by forcing the Plaintiffs' limited resources to mitigating the impacts of the Arch, Defendants will "perceptibly impair[]" the Plaintiffs' other daily missions, such as improving the condition and safety of existing roads, bike lanes, and sidewalks, addressing daily threats to life and property throughout the National Capital Region, and enhancing the region's natural environment. *League of Women Voters*, 838 F.3d at 8; Mendelson Decl. ¶¶ 47, 57, 65.

*Second*, the District will suffer an irreparable injury due to the significant risks posed by the runoff of soils and sediments from the project site. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Se. Fisheries Ass'n v. Lutnick*, No. 26-1533, 2026 WL 1430499, at *11 (D.D.C. May 21, 2026) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). Construction of the Arch will cause soil erosion and displace sediment, which, at a project of this magnitude, is readily transported by rainfall, stormwater runoff, and wind into nearby waterways like the Potomac River, which falls within the District's jurisdiction. Mendelson Decl. ¶¶ 51–52.

This will threaten water quality in the District, jeopardize its compliance with Environmental Protection Agency water-quality standards, and compel the expenditure of District resources to ensure compliance with federal and District law. *See supra* pp. 15–16.

*Third*, the Arch and its construction will directly and irreparably harm the District's position as "the only completely planned national capital that physically and politically has been sustained and preserved during its continual history as a federal headquarters." Maloney Decl. ¶ 98. The District's adherence to the L'Enfant and McMillan Plans has raised the city's international stature, made the District a model for planned cities worldwide, from Canberra to New Delhi to Brasilia, and attracted millions of visitors to the region. Maloney Decl. ¶ 98. Allowing Defendants to construct a massive new monument that towers over a symbolic landscape, while bypassing "consultation processes and ignoring overwhelming opposition by the general public to fulfill [a] President's mandate" will permanently and irreparably undermine the District's character and reputation as a planned city. Maloney Decl. ¶ 99; *see* 11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2026) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."); *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (holding that plaintiffs may "demonstrate[] irreparable harm in damage to their business reputation").

The Arch will inflict similar harms in Virginia, where it will result in an almost complete disruption of the visual dialogue between the Lincoln Memorial, Arlington National Cemetery, and Arlington House. It will thereby sever an intentionally designed visual connection between, on one hand, the resting place for the soldiers who sacrificed their lives for the Union during the Civil War and Robert E. Lee's former home in Virginia, and, on the other, the memorial for the President who fought and died to keep this nation united across the Potomac River. Kirchen Decl. ¶ 44. The

Arch thus truncates the visual connection that represents the restored Union and that is critical to Virginia's history. Kirchen Decl. ¶ 44. The Arch also adversely affects other Virginia sites that have been designated as National Historic Landmarks, and will impair Virginia's ability to preserve the historic character of these properties. Kirchen Decl. ¶¶ 71–73.

These harms cannot be remedied if construction of the Arch proceeds. The unlawful construction of a project of this scale will be difficult to undo after the structure is completed due to the sheer scale of the building, the difficulty of removing deep foundational piles and installed utilities, and the potential environmental harms that would be likely to accompany demolition on the site after years of disruptive construction. *See Nat'l Trust*, 185 F.4th at 1237. The Court's ability to remedy the Arch's construction at a later date will also be significantly impaired by Defendants' announcement that they will occupy the Arch as a military facility housing ammunition, snipers, drones, and surveillance capabilities. Defendants will surely assert national security grounds (however meritless) to object to any Court-ordered demolition of the Arch at a later stage of litigation. *See id.*

*Fourth* and finally, the irreparable nature of harm in this case is reinforced by the denial of the District's procedural rights under the CWA and both Plaintiffs' rights under the NHPA. Procedural injuries, when combined with other concrete injuries, significantly "bolster plaintiffs' case for a preliminary injunction." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003). And here, the District and Virginia will suffer a plethora of significant concrete harms—from resource diversions and environmental harms to compliance costs and the degradation of the District's historic plan—as soon as construction begins. *See supra* pp. 38–42.

**IV. The Public Interest and Balance of Equities Tip Sharply in Favor of Relief.**

A temporary restraining order or a Section 705 stay is appropriate where: (1) the balance

of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555. U.S. 7, 20 (2008); *see Am. Ass'n of Nurse Practitioners*, 836 F. Supp. 3d at 194. Those two "factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, the balance of equities and public interest tip sharply in Plaintiffs' favor.

The public plainly has an interest in preventing construction of an illegal monument that would substantially disrupt daily life in the capital region. Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12. That is particularly so where Defendants have violated statutes enacted by Congress, in its "exclusive" legislative authority over the District, U.S. Const. art. I, § 8, cl. 17, to ensure that federal space in the capital is "[held] in trust for the American people," *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 290 (1984), and that commemorative works "reflect a consensus of the lasting national significance of the subjects involved," 40 U.S.C. § 8901(4)(B). An injunction would also protect the public from immediate, concrete harms: construction of the Arch would create noise disturbances for 20 hours a day at Arlington National Cemetery, Maloney Decl. ¶ 52, jeopardize water quality in the Potomac, Mendelson Decl. ¶ 52, and disrupt the historic viewshed between the Lincoln Memorial and Arlington House that has been intentionally constructed and maintained to represent the restoration of the Union following the Civil War, Kirchen Decl. ¶ 44.

On the other side of the ledger, Defendants would suffer no cognizable injury if required to wait before beginning construction of an illegal monument. Defendants cannot plausibly claim they have an urgent need to begin building the Arch 101 years after enactment of the statute that they (wrongly) claim authorized its construction and over one year after the President announced his intention to build it. It strains credulity to the breaking point to suggest that there is a national

security imperative to house munitions, snipers, and drones in a civilian monument located within a busy traffic circle. And, in any event, a delay of several weeks—measured against the "two to three years" that Defendants says construction will take, Revised FONSI at 5—cannot plausibly be viewed as a meaningful harm.

More generally, it is in the public interest to stop construction before it starts rather than waiting to rule until it is mid-stream. *See Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) ("The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." (citation omitted)). Once Defendants begin closing roads, excavating soil, and altering the landscape around Memorial Circle, they will start inflicting harms on the public and Plaintiffs that will be difficult to quickly reverse. It is also entirely foreseeable that, at that point, Defendants will attempt to argue that stopping an ongoing construction project will create costs and challenges of its own. Rather than allowing Defendants to generate reasons to stymie judicial review, the Court should preserve the century-long status quo and halt construction now.

**V. The Court Should Issue a TRO or Section 705 Stay as Soon as Defendants Formally Approve the Arch and an Administrative Stay in the Interim.**

The Court should enter a TRO or Section 705 stay as soon as reasonably practicable after Defendants formally approve the Arch on November 5. Defendants have stated that they may afford the Court less than one day between when NCPC formally approves the Arch and Defendants start construction. Ex. 17 at 1. To prevent Defendants from altering the status quo, the Court should enjoin or stay the project before construction begins. And although this Court also has authority to enter an injunction *prior* to Defendants' formal approval, *see supra* p. 21, waiting until Defendants have formalized their approval of the Arch would remove any conceivable dispute over whether Defendants have taken final agency action subject to judicial

review.

In addition, prior to November 5, this Court should enter an order administratively staying construction of the Arch while it considers this Motion. Courts may "exercise their 'equitable powers . . . to preserve a substantial right from irretrievable subversion in an administrative proceeding' " even in the absence of "final agency action." *State of N.C. Envt'l Pol'y Inst. v. EPA*, 881 F.2d 1250, 1257 (4th Cir. 1989) (emphasis omitted) (quoting *Nader v. Volpe*, 466 F.2d 261, 269 (D.C. Cir. 1972)). Similarly, a court may "invoke the All Writs Act" to "protect its 'prospective jurisdiction' " by staying implementation of "an agency action that will, when final, be subject to the court's jurisdiction." 3 Admin. L. & Prac. § 8:25 (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984)). There is no question that the Court may properly review the decision to approve the Arch once the Arch is formally approved. The Court may accordingly issue a brief administrative stay to "protect its 'prospective jurisdiction,'" *id.*, and prevent Defendants from "subver[ting]" Plaintiffs' rights by initiating construction before this Court has a chance to conduct judicial review, *State of N.C. Envt'l Pol'y Inst.*, 881 F.2d at 1257.

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for a temporary restraining order and a stay of the Arch project under 5 U.S.C. § 705. The Court should also administratively stay construction of the Arch while it considers this Motion.

Dated: October 31, 2026

Respectfully submitted,

JAY JONES
Attorney General of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN (1672508)
MICHAEL K. PERLOFF (1601047)
Deputy Solicitors General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 997-5222
Email: mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (1026153)
ELIZA H. SIMON (90035651)
Senior Counsels to the Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH (1044671)
Senior Counsel to the Attorney General

/s/ Karthik P. Reddy
KARTHIK P. REDDY (1048848)
Special Assistant Attorney General
NICOLE S. HILL (888324938)
JOHN B. LYMAN (156467)
SAMANTHA HALL (1014735)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW
Washington, DC 20001
Tel: (202) 279-1261
Email: mitchell.reich@dc.gov

*Counsel for the District of Columbia*