**DECLARATION OF ROGER KIRCHEN**

I, Roger Kirchen, declare as follows:

1. I am a resident of the Commonwealth of Virginia. I am over the age of 18 and have personal knowledge of all the facts stated herein, based on my experience, review of agency records, and information provided to me by agency staff. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Director of the Virginia Department of Historic Resources ("VDHR"). I also serve as the State Historic Preservation Officer.

3. The Virginia Department of Historic Resources is the State Historic Preservation Office ("SHPO") in Virginia. VDHR's mission is to foster, encourage, and support the stewardship and use of Virginia's significant architectural, archaeological, and historic resources as valuable assets for the economic, educational, social, and cultural benefit of citizens and communities.

4. As the SHPO, VDHR administers a number of state and federal programs. Our programs include both the Virginia Landmarks Register and the National Register of Historic Places, and well as Section 106 Review and Compliance under the National Historic Preservation Act ("NHPA").

5. I have worked within VDHR for the past 22 years. Before becoming Director and State Historic Preservation Officer in 2026, I previously served as Deputy Director for Preservation Programs and Director of Review and Compliance. In each of those roles, I oversaw federal projects administered in consultation with VDHR.

6. I have reviewed the materials provided to consulting parties for the Section 106 process for the Triumphal Arch, including the project description, architectural plans and renderings, and all of the evaluative materials submitted with the NPS initiation letter, listed in detail below. I have also participated in the consulting party meetings and reviewed consulting party and public comments.

7. In VDHR's experience as a consulting party, and as described in further detail below, Defendants did not properly engage in the requisite review process under Section 106 of

the NHPA and its implementing regulations prior to receiving final approval by CFA and NCPC. VDHR was not afforded an adequate opportunity to provide input on alternative locations, design concepts, or structures for the Triumphal Arch project, and the final project harms the Commonwealth, undermines its historic preservation interests, and degrades its historic landmarks.

**VDHR's Role in the Standard Consultation Process**

8. I am aware that the NHPA requires a federal agency to "take into account the effect of [an] undertaking on any historic property" before it obtains "approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 54 U.S.C. § 306108. The implementing regulations for the Section 106 process, codified at 36 CFR Part 800, set out the required process for federal agencies in assessing adverse effects on historic properties, including consultation with SHPOs.

9. The primary goal of consultation in the Section 106 process is "to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 CFR § 800.1(a). The federal agency representative typically works with consulting parties, which includes the SHPOs in the affected jurisdiction. *Id.* 800.2(c)(1). The federal agency is also required to initiate "the section 106 process . . . early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." *Id.* 800.1(c). The Section 106 implementing regulations also require the federal "agency official [to] plan consultations appropriate to the scale of the undertaking…" *Id.* 800.2(a)(4).

10. Consulting parties can also include "individuals and organizations with a demonstrated interest in the undertaking…due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties." *Id.* 800.2(c)(5). As Virginia's SHPO, VDHR has been strongly supportive of including such consulting parties in the Section 106 process to ensure that the federal agency complies with the requirement to involve the public and is able to properly consider alternatives to avoid, minimize, or mitigate adverse effects to historic properties.

11. In the Section 106 consultation process, VDHR has a responsibility to reflect the interests of the Commonwealth and its citizens in the preservation of their cultural heritage. *See* 36 CFR § 800.2(c)(1). VDHR further is responsible for "advis[ing] and assist[ing] Federal agencies in carrying out their section 106 responsibilities and cooperates with such agencies, local governments and organizations and individuals to ensure that historic properties are taking [sic] into consideration at all levels of planning and development." *Id.* For projects affecting Virginia historic resources, local governments such as Alexandria and Arlington County, federally recognized tribes with an interest in Virginia and their associated tribal historic preservation officer (THPO), local historical societies, statewide preservation nonprofits, and other affected state agencies such as the Virginia Department of Transportation routinely consult in addition to VDHR.

12. For many projects subject to Section 106 review, the responsible federal agency typically reaches out to the VDHR in the early planning stage, when project design is at the concept phase. If the project is occurring in DC or the National Capital Region, this almost always occurs before submitting a project to CFA or NCPC for a scheduled public review, and particularly before federal agency *approval* of the project. When a project is complex in nature and scope, initiating consultation prior to the project's approval is critical, to ensure that SHPOs have an opportunity to consult about avoidance, minimization, and mitigation of any adverse effects the project may have on historic properties while the responsible federal agency is still assessing the project's scale, location, and design. Consulting SHPOs only after the project has been approved by federal agencies precludes meaningful input from SHPOs.

13. The standard Section 106 review process involves four steps. The first step is initiating the Section 106 process. The Section 106 process formally begins when the agency responsible for the project sends an initiation letter to VDHR. The initiation letter typically includes a general description of the project, identification of the Area of Potential Effects (APE), and a list of potential consulting parties. VDHR's response usually includes a restatement of the purpose of the project to ensure clarity of understanding, any general comments on the scope of the project, comments on any areas of particular concern, any recommendations for procedure and

schedule, and any comments on the APE and list of potential consulting parties. The response sometimes includes suggestions for an expanded APE to ensure the review captures all potentially affected historic properties, or suggestions for additional consulting parties who may be able to provide further expertise on potential adverse effects to those historic properties.

14. The second step involves identification of historic properties. After the federal agency proposes an APE, federal regulations indicate that NPS must consider not only the properties already listed in the National Register of Historic Places within that APE, but must also consider existing data concerning possible historic properties not yet identified, and must take steps to identify and evaluate additional properties within the APE that are eligible or could be eligible for listing in the National Register of Historic Places. These efforts to carry out appropriate identification efforts can include, for example, background research, consultation, oral history interviews, sample field investigations, and field survey. *See* 36 CFR § 800.4. After the federal agency makes its initial identification and evaluation of significant properties within that area, consulting parties including VDHR often suggest additional areas and/or properties to include (and occasionally exclude), based on general knowledge of the Commonwealth, familiarity with our historic resource survey databases, online historic resource maps, and listings in the Virginia Landmarks Register and/or National Register of Historic Places.

15. The third step involves assessing whether the proposed project will have an adverse effect on the identified historic properties. After hearing the federal agency's assessment of adverse effects on historic properties, and discussion of potential alternatives to avoid, minimize, or mitigate adverse effects. VDHR may make recommendations to the federal agency or concur with the agency's determinations about potential adverse effects by applying the criteria of adverse effect included in 36 CFR § 800.5, using the expertise and experienced judgment of VDHR staff, and taking into account the views expressed by other consulting parties and the public. Factors considered include physical damage both immediate and long-term to historic properties, incompatible alterations that diminish the integrity of significant historic features, visual intrusions

such as obstruction of views to or from affected properties, audible and environmental intrusions, ground disturbance of archaeological sites, and other pertinent factors.

16. The fourth step is resolving adverse effects on historic properties. Depending on the nature and complexity of a project, there may be multiple consulting party meetings and written comments as designs are refined and adverse effects resolved sufficiently to reach agreement. All consulting parties, including the sponsoring agency, typically propose alternatives to avoid or minimize adverse effects, either in writing or verbally at meetings. Suggestions can include changes in location, size, design, or materials of a new construction project, and modifications of its relationship to surrounding properties. Likewise, mitigation measures, if avoidance and/or minimization cannot avoid all adverse effects, are typically developed in consultation to seek agreement on reasonable, achievable, and beneficial mitigation. Consultation for projects resulting in adverse effects to historic properties typically concludes with the collaborative development of an agreement document that records the outcome of consultation; the proposed avoidance, minimization, and mitigation measures; and the conditions of approval. For complex projects, adequate consultation to ensure resolution of adverse effects normally requires more than a year of consultation.

17. Often, each of these steps can take considerable time. Even one step in the process will routinely contain multiple rounds of reviews, meetings, and discussions, particularly for complex projects. For example, the second step alone may involve back-and-forth on the scope of the APE itself, and then on the scope of the federal agency's efforts to identify properties within the APE that are not yet listed in the National Register of Historic Places but might be eligible, and then on the ultimate set of historic properties being evaluated for adverse effects.

18. Federal agencies often consult with SHPOs on additional matters as well, including, for example, the environmental assessment and related findings required by the National Environmental Policy Act. *See* 36 CFR § 800.8(a).

19. VDHR has a long and constructive history of working collaboratively with NPS and other federal agencies to complete Section 106 review of many large-scale projects affecting

historic resources in the Commonwealth, including Memorial Bridge rehabilitation, Long Bridge replacement, and expansion of Arlington National Cemetery. These projects demonstrate how effectively the review process works in ensuring the highest quality of civic improvements in and around the Commonwealth.

20. Section 106 reviews are resource-intensive for VDHR. The office typically consults on around 1,500 to 2,000 new Section 106 projects annually, distributed among six staff reviewers—three architectural historians and three archaeologists—and the Review and Compliance Division Director. Most cases are handled by two assigned staff persons, to review impacts to both built resources and archaeology. As Virginia's State Historic Preservation Officer, I participate actively in the most complex cases, including review of the Triumphal Arch.

**Defendants' Deviation from Standard Review Processes for the Triumphal Arch**

21. The Triumphal Arch is currently planned to be an approximately 250-foot-tall structure to be located at Memorial Circle near the western terminus of Arlington Memorial Bridge. Once complete, it would be the largest memorial arch in the world.

22. The site of the Triumphal Arch is located on Columbia Island in the Potomac River, which falls within the territorial boundaries of the District of Columbia, which will be largely visible from Arlington County in Virginia.

23. The proposed location for the Triumphal Arch is a place of extraordinary historic significance. As a cultural landscape, the grand ceremonial urban design of Arlington Memorial Bridge and Memorial Avenue, with its supporting composition of landscape features and artwork, constitutes one of the most significant and recognized places in Washington, D.C., perhaps second only to the National Mall. It originated in the nineteenth-century desire to create a place of national reconciliation after the devastation of the Civil War. Widely regarded as Washington's most beautiful bridge, Memorial Bridge symbolically links North and South by its alignment between the Lincoln Memorial and Arlington House (the Robert E. Lee Memorial) in Arlington National Cemetery. A masterpiece of urban planning and architectural design, the memorial river crossing extends and terminates the great composition of the National Mall, shifting its axis at the Potomac

River to establish an impressive and dignified ceremonial approach to the nation's most revered military cemetery. Its processional route is marked by solemn and restrained pylons and statuary that mark the progress over the gentle arc of the bridge from city to island to cemetery, measuring the distance across each stage of gradual transition from the wide-open river to the nearly half-mile-long enclosing frame of holly hedges, while always keeping in view its architectural terminus, the embracing Hemicycle with Arlington House rising on the wooded hill above it.

24. Because of the Arch's proposed location on such a significant historical landscape, a vast array of adversely affected historic properties have been identified through the Section 106 process. Given that the proposed location affects historic properties in both the District and Virginia, both VDHR and the District of Columbia ("DC HPO") HPO have been included as consulting parties for this undertaking.

25. NPS's initial Assessment of Effects (AOE) report identified the following adversely affected properties: Memorial Avenue Corridor Cultural Landscape, Arlington Memorial Bridge, Lady Bird Johnson Park Cultural Landscape, Arlington National Cemetery Historic District, Arlington House Historic District, Arlington House, Arlington House Cultural Landscape, Lyndon B. Johnson Memorial Grove, Mount Vernon Memorial Highway Historic District, Lincoln Memorial Cultural Landscape, the Lincoln Memorial, National Mall Site and National Mall Historic District, Washington Monument Structure and Washinton Monument and Ground Historic District, Washington Monument and Grounds Cultural Landscape, Rock Creek and Potomac Parkway Historic District, East and West Potomac Park Historic District, Arlington Ridge Park, the Pentagon National Historic Landmark, Fort Myer Historic District and Quarters 1 National Historic Landmark, George Mason Memorial, and Thomas Jefferson Memorial Cultural Landscape.

26. After receiving comments from the VDHR, DC HPO, and other commenting parties, NPS revised the AOE report to list these additional adversely affected properties: the Mall Cultural Landscape, World War II Memorial, L'Enfant Plan of the City of Washington, District of Columbia, Thomas Jefferson Memorial, the United State Capitol, Georgetown Historic District,

Old Naval Observatory, Observatory Hill Historic District, Alban Towers Apartment Building, American Institute of Pharmacy Building, George Washington Memorial Parkway, Halcyon House, Key, Francis Scott Bridge, the National Cathedral, National War College, Vigilant Firehouse, Bridge #5020, Mount Vernon Memorial Highway North Cultural Landscape, Old Warehouse Area and Ground Maintenance Complex, and Frederick Douglass National Historic Site.

27. During consultation, VDHR and the National Trust for Historic Preservation, among others, noted that federal regulations indicate that NPS must consider not only the properties already listed in the National Register of Historic Places, but to take steps to identify and evaluate additional properties within the APE that are eligible or could be eligible for listing in the National Register of Historic Places. NPS acknowledged the requirement, but indicated that it was not aware of any properties not included in its report. NPS further acknowledged the expectation in federal regulations that NPS would conduct surveys to identify and evaluate additional properties within the APE, but stated that it did not intend to conduct such surveys. Rather than doing the work of identifying historic properties in the APE, NPS asked VDHR and Arlington County to do the work of identifying and providing NPS with other properties that it did not include in its AOE. Such additional likely adversely affected eligible properties in Virginia that NPS did not identify, and that VDHR had to bring its attention, include the Air Force Memorial and the Iwo Jima/United States Marine Corps War Memorial.

28. Given the physical scale of the Triumphal Arch project and the anticipated scope of its visual impact on numerous historically significant sites in the Commonwealth and the District of Columbia, Defendants should have provided the SHPOs and consulting parties sufficient opportunity through the Section 106 process to carefully examine which historic properties were included in the assessment of effects and to evaluate the adverse effects on those properties, as well as adequate opportunity for the SHPOs and other consulting parties to work with NPS to identify alternatives for the Triumphal Arch project that would meaningfully adhere to Section 106 requirements to avoid, minimize, and mitigate adverse effects. However, as set out

in more detail below, throughout the Section 106 review for the Triumphal Arch, Defendants have deviated from the standard process to rush the project to final approval, bypassing critical input from consulting parties and the general public and failing to resolve the adverse effects on a vast number of historic properties.

**Delayed Initiation of Consultation with VDHR and Other Parties**

29. For a project of this scale, Defendant NPS should have included VDHR and other consulting parties far earlier in the Section 106 process.

30. As explained above, NPS would usually first seek Congressional authorization under the CWA for projects of this scale. To my knowledge, Defendants to my knowledge have not sought separate authorization for the Triumphal Arch and have instead relied on the 1925 Act.

31. Instead, NPS submitted the concept design for the Triumphal Arch to CFA by the April 2, 2026, deadline, and the commission approved the concept submission with comments on April 16, 2026. CFA approved the final proposal for the architectural design on May 21, 2026, with comments and requesting further information about the program of sculpture. NPS submitted the concept design for the Triumphal Arch to NCPC by the filing deadline of May 1, 2026, and the commission provided comments on the concept submission on June 4, 2026, with a request for more information, and gave its preliminary approval on July 9, 2026.

32. It was not until June 5, 2026—more than seven months after the Triumphal Arch was first announced on October 15, 2025, and after multiple rounds of public comment—that NPS first contacted VDHR to initiate the Section 106 consultation process.

33. NPS's June 5, 2026 initiation letter notified VDHR that the undertaking would affect a number of historic properties and proposed an attached Programmatic Agreement (PA) to identify and resolve adverse effects as the project advanced. The letter included a list of invited consulting parties, NPS's AOE report with appendices including project plans and renderings, APE maps, and a table of affected historic properties and effects. These materials constituted nearly 200 pages of documentation.

34. NPS did not consult with VDHR about its environmental assessment and related findings required by the National Environmental Policy Act. VDHR did ultimately review these documents, after becoming aware of them while reviewing information related to NPS's revised AOE report.

35. NPS's initiation letter identified a list of consulting parties including VDHR, DC HPO, ACHP, eleven Indian nations, ten federal government entities, and three local government entities. It also included a list of six nonprofit organizations (the National Trust for Historic Preservation, Committee of 100 on the Federal City, DC Preservation League, Cultural Landscape Foundation, National Parks Conservation Association, and American Institute of Architects) identified as "other parties that have requested consulting party status" but had not yet been granted such status. Although these organizations have routinely been admitted as consulting parties by NPS and other agencies, their initial exclusion from the consulting party list caused them to miss the first of only two consulting party meetings, precluding their input from this critical step of the Section 106 process.

**Unjustified Expediting of Section 106 Review**

36. Per 36 CFR § 800.3(g), the Federal Agency and SHPO must agree that it is appropriate to address multiple steps under 36 CFR § 800.3 through § 800.6, and they may only do so "as long as the consulting parties and the public have an adequate opportunity to express their views."

37. Even after failing to initiate consultation at an early stage of planning, NPS requested in its initiation letter that VDHR agree to expedite consultation by addressing multiple steps in the Section 106 process, pursuant to 36 CFR § 800.3(g). These steps, set out in §§ 800.3 through 800.6, cover essentially the entire process: initiation, identification of the APE, evaluation of historic properties, assessment of adverse effects, resolution of adverse effects, and conclusion of the PA. NPS indicated that expediting consultation in a consolidated manner would be "the most efficient and appropriate means of carrying out review."

38. In its initiation letter, NPS provided VDHR, DC HPO, consulting parties, and the public a total of 10 calendar days to provide comments on over 180 pages of materials, in an attempt to compress and expedite the review under 36 CFR § 800.3 through § 800.6 into a single 10-day review. In other words, NPS tried to condense what is ordinarily a four-step process condensed into a single step.

39. VDHR did not concur in NPS's proposal to expedite review.

40. Nevertheless, NPS proceeded with Section 106 review on a condensed timeline.

41. NPS invited VDHR and DC HPO to a consulting party meeting on June 15, 2026, just ten days after sending the initiation letter.

42. VDHR responded to the NPS initiation letter in writing on June 15, 2026 and also attended the consulting parties meeting on the same date.

43. In the response letter dated June 15, 2026, attached hereto as Exhibit A, VDHR objected to NPS's proposal to expedite review in accordance with 36 CFR § 800.3(g). Based on the review period provided, the scope of the undertaking, the public interest in the project, the numerous significant historic properties within the APE, and the severity of the adverse effects, VDHR expressed its view that the standard set forth in 36 CFR § 800.3(g) had not been met, as even VDHR itself had not been provided an adequate opportunity to review the project information, let alone other consulting parties and the public.

44. VDHR's June 15 response letter noted that the historic resources that will be adversely affected by this project are nationally significant properties that honor critical times in our Nation's history and memorialize the sacrifices made to protect this Nation. The proposed Arch will result in an almost complete disruption of the visual dialogue between the Lincoln Memorial, Arlington National Cemetery, and Arlington House—an intentionally designed visual connection between the resting place for the soldiers who sacrificed their lives for the Union during the Civil War, and Robert E. Lee's former home in Virginia, with the memorial for the President who fought and ultimately died to keep this Country united across the Potomac River. This visual

connection represents the restored Union, symbolically reuniting the North and the South. This arch truncates that ongoing connection.

45. VDHR criticized NPS's "initiation" of consultation *after* it had already determined the location, design, identification of historic properties, assessment of effects, and proposed mitigation. All of these factors were prepared absent consultation with SHPOs, consulting parties, and the public, and they were approved by federal agencies before consultation has begun.

46. VDHR also explained that, within the time provided, VDHR could not verify the accuracy of the proposed APE, the historic properties NPS has identified within the APE, or the correct application of the criteria of adverse effect in accordance with 36 CFR § 800.5.

47. VDHR further expressed concerns that NPS had provided no meaningful consideration of alternatives that would minimize adverse effects to the maximum extent possible, as required by Section 110 of the NHPA, and VDHR recommended that NPS give more meaningful consideration to other alternatives that would result in substantial avoidance and minimization of adverse effects to these nationally significant historic properties.

48. VDHR also recommended that NPS invite the participation of: Preservation Virginia, the Virginia Museum of History and Culture (the Virginia Historical Society), Arlington Historical Society, Friends of Joint Base Myer-Henderson Hall, the Pentagon Memorial Foundation, the Virginia Secretary of Veterans and Defense Affairs, the Virginia Department of Veterans Services, the Veterans of Foreign Wars, the American Legion, and other veterans groups who may have an interest in the potential effects to Arlington National Cemetery. And VDHR explained that all parties must be afforded sufficient time, in accordance with 36 CFR Part 800, to comment on each part of the review process.

49. To date, VDHR has submitted six additional comment letters to NPS as part of the Triumphal Arch Section 106 process on each of the following dates: July 2, 2026 (letter attached hereto as Exhibit B); July 21, 2026 (letter attached hereto as Exhibit C); August 6, 2026 (letter attached hereto as Exhibit D); September 9, 2026 (letter attached hereto as Exhibit E); September

21, 2026 (letter attached hereto as Exhibit F); and September 25, 2026 (letter attached hereto as Exhibit G).

50. The July 2, 2026 letter responded to NPS's request for clarification of the comments in VDHR's June 15, 2026 letter. The July 2, 2026 letter reiterated VDHR's view that, if NPS is unwilling to consider any potential changes to the design and location of the Arch which could serve as minimization measures, then the potential adverse effects of this undertaking, especially to Arlington National Cemetery, Arlington House, and the cultural landscape connecting these properties to Washington, DC and the Lincoln Memorial via the Arlington Memorial Bridge, are (1) un-minimizable, due to the proposed scope, scale, design, placement, and intentional prominence of the Arch, and (2) un-mitigatable in a manner that is commensurate with the severity and significance of the effects. VDHR also stressed that avoidance of these effects is possible and should be meaningfully considered in the course of the required consultation under Section 106. The letter also re-upped VDHR's request for additional information in order to assess the appropriateness of the APE as defined by NPS, as well as further identification of historic properties within the APE, including identification and evaluation of historic resources that have not been listed in the NRHP. And VDHR supplied several initial ideas for minimization or mitigation measures, while expressing its opinion that the development of mitigation measures is premature when the historic properties potentially affected have not been fully identified, the full nature and extent of the effects have not been determined, and the opinions of consulting parties, including those groups with a demonstrated interest in the project that have not been invited to participate, have not been considered and addressed.

51. The July 21, 2026 letter responded to NPS's request for comments regarding its APE and the historic properties located within the APE. VDHR reiterated its recommendation to conduct or provide a viewshed study and noted that NPS's own documentation indicated that the distance from which this Arch will be visible encompasses significantly more than what NPS has identified within its APE. VDHR also raised concerns about NPS's characterization of some of the direct adverse effects that the Arch would have on historic properties and other impacts that

may not have been sufficiently analyzed by NPS, including the potential reasonable and foreseeable effects of changes to air traffic patterns around the Arch and to/from Reagan Washington National Airport. And to assist NPS in its ongoing identification efforts, VDHR provided maps from its Virginia Cultural Resource Information System (VCRIS) of the properties VDHR has currently recorded within the APE.

52. The August 6, 2026 letter responded to NPS's request for comments regarding its revised APE, viewshed analysis, and assessment of effects for the proposed undertaking. VDHR continued to express its view that NPS has not met the requirements under 36 CFR § 800.4 to identify historic properties, and flagged that NPS has not addressed a majority of VDHR's prior comments in its letters dated June 15, July 2, and July 21 or any comments received from consulting parties and the public. VDHR raised questions about whether NPS had considered alternate locations and/or designs for this project to avoid or minimize effects or a no-build alternative to avoid adverse effects to historic properties, including properties beyond those listed in the NRHP. VDHR also continued to stress that these adverse effects can be avoided while still achieving the goal of commemorating our Nation's 250th anniversary of Independence.

53. The September 9, 2026 letter responded to NPS's request for comments regarding its final assessment of effects for the proposed undertaking. NPS provided the documentation of its final assessment to VDHR on August 28, 2026. NPS originally requested VDHR's response by September 4, 2026, and subsequently extended the deadline to September 16, 2026—though 36 CFR § 800.5(c) provides SHPOs with 30 days from the receipt of certain of NPS's findings to review and object if necessary. VDHR reminded NPS that it did not consent to expedition. VDHR also requested the opportunity to review the public notice comments themselves, not an AI-generated summary regarding the comments on this undertaking. And VDHR noted that initiating construction prior to completion of Section 106 review would violate the NHPA and its implementing regulations.

54. The September 21, 2026 letter responds to NPS's draft memorandum of agreement for the proposed undertaking. VDHR expressed its view that review and proposed signature of the

MOA on behalf of the Virginia SHPO is premature, as the consulting parties are not in agreement with NPS regarding the completion of the identification efforts, the assessment of effects, or the adequacy of NPS's proposed mitigation measure.

55. The September 25, 2026 letter responds in greater detail to NPS's August 28, 2026 a final Assessment of Effects Report, architectural plans, renderings, transportation plans, proposed mitigation measures, and summary of public and consulting parties comments regarding the proposed construction of a Triumphal Arch at Memorial Circle within the George Washington Memorial Parkway. The letter addresses VDHR's continued concerns about NPS's purported purpose and need for the project as proposed, NPS's failure to consider alternative locations and designs, NPS's incomplete identification of historic properties, and NPS's inadequate mitigation proposals. VDHR also concurred with NPS's identification of adverse effects to 13 historic properties in Virginia, and it encouraged NPS to assess the effects to 12 additional properties that were not included in NPS's assessment. NPS did not assess the effects to the 12 additional properties.

56. In addition to providing written comments to NPS, VDHR attended two meetings for consulting parties, on June 15, 2026 and September 9, 2026.

57. VDHR has attempted to provide as much input as possible on the Arch project in order to ensure we have met our obligations to identify adverse effects to historic properties and recommend changes to resolve those adverse effects. However, given the complexity of the project and the extremely condensed timeframe, participation in this Section 106 process has been incredibly burdensome on our office's resources. Review of this project has been led and completed by VDHR's Director of the Review and Compliance Division, who estimates that approximately 136 hours (17 full work days) were devoted exclusively to the review of this project from initiation to preparation of our letter regarding termination, which constitutes 22% of her work time for those months. Project review makes up 40% of Director of the Review and Compliance Division's overall expected work, in additional to division management and other agency critical tasks. And the additional work required to review the Arch project was done

concurrently with typical review obligations, in light of of the other thousands of review requests the Division reviews in a year. As a result of this additional work, other VDHR responsibilities were put on hold, and on at least two occasions, work was completed beyond typical work hours to meet NPS deadlines.

**The Triumphal Arch's Intrusive Location and NPS's Refusal to Consider Alternatives to Resolve Adverse Effects**

58. The most notable deficiency in compliance with the Section 106 process is NPS's failure to consider alternatives to avoid, minimize, or sufficiently mitigate the adverse effects of the Triumphal Arch.

59. The Section 106 process prioritizes *avoidance* of adverse effects, then minimization, then mitigation. In the typical Section 106 process of new memorials, a Federal agency usually begins with the evaluation of a range of possible locations when initiating avoidance efforts. VDHR repeatedly urged that NPS consider alternative locations and designs, and the DC HPO provided NPS with suggestions for alternative locations elsewhere in the District or even on Columbia Island without creating such a visual obstruction in the midst of a historic landscape.

60. Even with several options for relocating the Arch, NPS made clear that it had not and will not consider alternative sites. Instead, NPS has alleged that the Arch *must* be located at Memorial Circle to fulfill the statutory purpose of the 1925 Act. And NPS has indicated that it will not be considering any design alternatives, even though it has an obligation under the NHPA and Section 106 regulations to consider input from consulting parties and the public in addressing adverse effects.

61. NPS's August 28, 2026 report states: "The purpose of the proposed undertaking is to celebrate 250 years of American independence by honoring America's founding principles…in a manner consistent with the avenue's established role as a ceremonial gateway and 'Avenue of Heroes' celebrating valor, sacrifice, and American heritage." NPS further justifies its failure to consider alternatives to the proposed location at Memorial Circle "because the proposed

undertaking is grounded in the historic design intent for the Arlington Memorial Bridge and Memorial Avenue corridor."

62. As VDHR expressed in its September 25, 2026 letter to NPS, VDHR strongly disagrees that the proposed Arch is consistent with the symbolic and nationally significant corridor of Memorial Avenue and the axis connecting Arlington House/Arlington National Cemetery to the Lincoln Memorial. This assertion on the part of NPS is further undermined by the determination that this is an adverse effect to those properties and landscapes—indeed, NPS's AOE report acknowledges that the "most substantial" adverse effects from the Triumphal Arch will occur on those properties that "derive significance, in part, from their planned visual, commemorative, and spatial relationships across the Potomac River and through the monumental core." The proposed Arch is grossly incompatible with these intentionally designed and reverent landscapes.

63. While the McMillan Plan and the McKim Mead & White design for this corridor envisioned some commemorative space in the Memorial Circle, none envisioned a 250-foot-tall, monumental arch celebrating the 250th anniversary of Independence. The cited column design from 1924 was specifically intended to represent the unity between the North and the South (each represented by a column) by further reinforcing the symbolism of the connection between DC and Virginia, Lincoln and Arlington National Cemetery. The column design was not visually heavy and would not have obscured any sightlines across this memorial landscape. The proposed Arch interrupts that connection and its symbolism is antithetical to the concept of the Arlington Memorial cultural landscape.

64. In Republican and Imperial Rome, triumphal arches were erected by generals, later exclusively emperors, to commemorate conquests. They were propagandistic; proclaiming the might and power of the emperor over his enemies. They honored the individual leader who erected them not the sacrifice of the soldiers who died and in fact they often depicted the conquered in submission to the victory. This tradition is further reflected in the history of the construction of many of the triumphal arches throughout Europe that are the inspiration for this project. This symbolism is in no justifiable way consistent with the ceremonial space of Memorial Avenue. It

is incongruous when inserted into the avenue commemorating the reunification between the North and South after the Civil War and even more inappropriate domineering over the final resting place of the men and women who served this Nation in its armed forces. The Triumphal Arch symbolism is even more problematic when considering the purpose of commemorating American Independence; VDHR is unclear how a traditional symbol of conquest and victory is appropriate to commemorate the anniversary Colonial America proclaiming its independence.

65. VDHR further understands that NPS has rejected alternatives to the design, purportedly selecting the largest proposed arch as smaller versions would obscure rather than frame Arlington House from the Lincoln Memorial. While the proposed Arch's central passage enables visibility of Arlington House from a single viewpoint in the vicinity of the Lincoln Memorial, the Arch obscures completely the complementary view from Arlington House across the Potomac to the Lincoln Memorial; it serves only to frame the house from DC while obscuring the connection from Virginia to DC and dominating over the landscape of Arlington National Cemetery. It constructs a gateway where reciprocal connection is symbolic.

66. NPS repeatedly contended in the second consulting parties meeting that NPS did not consider alternative locations because this project is intended to be the "realization of" and consistent with the intent and the requirements of the 1924 Act of Congress authorizing the construction of Arlington Memorial bridge. This assertion is made in spite of the fact that the proposed Arch is a different design concept entirely to the McKim Mead & White proposed pillars and its commemorative purpose, in honor of the 250th anniversary of the Declaration of Independence, was obviously not envisioned by the Act that was enacted over 100 years prior to such anniversary.

67. The justification for failing to consider alternatives is not that no other practical, less intrusive alternative exists, as evidenced by the thoughtful alternatives presented by consulting parties, but that NPS does not wish to consider them. This location meets the requirements for an extremely visually prominent placement for this Arch and the design is as large, domineering, and visually intrusive as possible. Despite the effects to historic properties and its incongruity and

inappropriateness within the landscape, these are choices made by the project's proponent regardless of responsibilities under the NHPA.

68. Accordingly, VDHR has expressed its view to NPS that NPS failed to provide sufficient justification for a lack of viable alternative to this undertaking and has failed to meet its obligations under 54 U.S.C. § 306107.

**Inadequacy of NPS's Proposed Mitigation**

69. NPS's September 15, 2026 proposed Memorandum of Agreement (MOA) included suggested "mitigation" to include construction management control; archaeological investigation; park improvements such as rehabilitation of the landscape along the Arlington Memorial Corridor and wayfinding for pedestrians; documentation of historic features, to include archival-quality drone and ground photography of their condition before construction of the Arch, oral histories, a 3-D digital model, and other items; and various interpretive programs on the corridor and its vicinity, the history of triumphal arches, archaeological investigations, maritime activity along the Potomac, Native peoples, and the like.

70. As VDHR explained in its correspondence with NPS, the laundry list of proposed mitigation measures is not proportionate to the adverse effects of the Arch. Many are routine construction and land management requirements or measures implemented for undertakings causing far lesser adverse effects. By contrast, introducing a massive arch into this setting will effectively destroy one of the most important historical landscapes in the nation's capital and undermine the history it is supposed to celebrate, a harm which is underscored by NPS's failure to give any meaningful consideration to the public's substantial opposition to the project. The mitigation proposals do nothing to address the acknowledged "substantial" adverse visual, spatial, and experiential effects of the Triumphal Arch on the historic integrity of one of the nation's most important symbolic places.

71. The proposed mitigation measures also include little to no mitigation for both of the adversely affected National Historic Landmarks, the Fort Myer National Historic Landmark District and the Pentagon National Historic Landmark.

72. The nature of the adverse effects to these nationally significant landscapes and historic properties and, in the case of Arlington National Cemetery, hallowed ground is so significant that VDHR recommended that NPS consider more than the most basic and minimal mitigation measures. Instead, much of the NPS's proposed documentation mitigation is partially or fully duplicative of existing documentation. Historic American Buildings Survey documentation has been completed for Arlington House. Past Historic American Engineering Record documentation for Arlington Memorial Bridge already exists. There are detailed, extensive, and recent Cultural Landscape Inventories and Reports prepared by NPS of the Memorial Avenue Cultural Landscape and Arlington House. And the "surrounding park lands" including the George Washington Memorial Park, Lady Bird Johnson Park, Mount Vernon Memorial Highway, and Arlington Ridge Park all have recently completed thorough Cultural Landscape Reports or Inventories. Documentation for some of these properties was completed as recently as 2025. Particularly given the existing amount of documentation, NPS's suggestion that documentation will mitigate the harms is inadequate.

73. VDHR does not have the capacity to conduct the required mitigation efforts itself if NPS abdicates its responsibilities. VDHR cannot remedy the erosion to Virginia's historic properties that will result if the Arch project is permitted to proceed as proposed.

**Last-Minute Change in Purpose**

74. Whether there will be additional adverse effects and how those should be addressed remains unclear, because the scope of the proposed Arch is in flux. Although the designs shown for the Arch have been consistent throughout the Section 106 consultation process, the President announced on September 20, 2026 that the Arch would also serve a military function would be converted "into a top grade Military Complex/Triumphal Arch" which will "house, store, and have the rapid ability to use large numbers of drones, plus snipers, on both the roof and plaza area, and additional have a hold large quantities of sniper ammunition in storage."

75. None of the plans included in the consultation materials include spaces that could meet this proposed change in use. VDHR inquired with NPS about whether the designs for the

Arch and plaza will need to change to address this, and whether NPS's proposed mitigation, which relies heavily on interpretation (presumably within the public spaces of the proposed Arch would need to change based on security limitations.

76. No information has been provided about the impact of these uses on the design of the Arch and the surrounding area. NPS has not provided an updated environmental assessment to account for this new purpose, and no further consulting party meetings have been scheduled to discuss potential adverse effects. Under these circumstances, it is premature under the standard process to conclude any Section 106 review, and concluding the review at this time precluded proper consideration of the change in purpose and additional effects to historic properties under 36 CFR §§ 800.4–800.6.

**Unprecedented Termination of Section 106 Consultation**

77. On September 24, 2026, VDHR learned that the Advisory Council on Historic Preservation (ACHP) had issued a termination notice, ending Section 106 consultation with SHPOs and other consulting parties.

78. In response to the ACHP termination, VDHR sent a letter to ACHP on September 29, 2026 (letter attached hereto as Exhibit H). This letter explained that VDHR had been consulting in good faith and providing constructive and specific feedback to NPS regarding the completion of its obligations under 36 CFR Part 800; that VDHR had never indicated that it believed an agreement to resolve adverse effects could not be reached; and that VDHR believed that, due to the significance of the resources and the numerous adverse effects, agreement would take time to negotiate and require that NPS uphold its responsibility to consult in good faith and meet its obligations under 36 CFR Part 800. VDHR expressed its strong disagreement that further consultation would not be productive and offered to be available for any questions ACHP may have.

79. The ACHP provided the Secretary of the Interior with its comments on the undertaking on October 9, 2026. These comments acknowledged that VDHR and DC HPO had "raised numerous concerns to the NPS, including whether alternatives to meet a similar purpose

and need for the undertaking had been considered to meet the NHPA's Section 110(f) requirements (54 U.S.C. § 306107), and whether the NPS's identification efforts and assessment of effects were sufficient for an undertaking of this scale." Ltr. from Vice Chairman Travis Voyles to Sec'y Doug Burgum at 2 (Oct. 9, 2026), https://perma.cc/K436-KEMW. The ACHP also recommended that NPS provide additional information on its efforts to avoid, minimize, or mitigate adverse effects, noting that providing "additional information or explanation as to how the undertaking and its direct adverse effects to historic properties remain[s] in the public interest." *Id.* at 3.

80. Despite VDHR's efforts to provide input to protect historic properties in the Commonwealth, it appears that NPS bypassed the proper Section 106 procedures and rushed the project to final approval. Without properly considering input from the Virginia SHPO and other consulting parties, NPS has not adequately taken into account the interests of the Commonwealth and its citizens in the preservation of our cultural heritage.

I declare under penalty of perjury that the foregoing is true and correct and to the best of my knowledge.

Executed on October 28, 2026, in Richmond, Virginia.

______________________________
Roger Kirchen
Director, Virginia Department of Historic Resources
State Historic Preservation Officer

# EXHIBIT A

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

June 15, 2026

Ms. Jennifer T. Neresian
Regional Director, National Capital Region
National Park Service
5300 Wellington Branch Drive, Suite 100
Gainesville, Virginia 20155

Re: Triumphal Arch at Memorial Circle
Arlington, Virginia
DHR File No. 2026-4065

Dear Ms. Neresian:

The Department of Historic Resources (DHR) has received from the National Park Service (NPS) the initiation of consultation pursuant to Section 106 of the National Historic Preservation Act (NHPA, 54 U.S.C. § 306108) and its implementing regulations 36 CFR Part 800, for the proposed construction of a Triumphal Arch at Memorial Circle within the George Washington Memorial Parkway. The undertaking will be constructed in Washington, DC but will affect historic properties in Virginia. Our comments are provided to the NPS as assistance in meeting its responsibilities under the NHPA and 36 CFR Part 800 as the State Historic Preservation Office for Virginia. NPS requested DHR's concurrence to expedite review of this undertaking in accordance with 36 CFR 800.3 (g). NPS also provided and requested DHR's review of the Area of Potential Effect (APE) for the undertaking, lists and mapping of historic properties within the proposed APE, an assessment of effects report, and a draft Programmatic Agreement (PA) to "govern the resolution of adverse effects."

Per 36 CFR 800.3 (g), the Federal Agency and SHPO must *agree* that it is appropriate to address multiple steps under 36 CFR § 800.3 through § 800.6 as long as consulting parties and the public have an adequate opportunity to express their views. *It is DHR's opinion that this standard has not been met*. Even DHR has not been provided an adequate opportunity to review the project information. Considering the review period currently provided, the scope of the undertaking, the public interest in the project, the numerous significant historic properties within the APE, and the severity of the adverse effects, **DHR objects to expediting review in accordance with 36 CFR 800.3(g).**

NPS provided DHR, the District of Columbia (DC) Historic Preservation Office (HPO), consulting parties, and the public a total of 10 calendar days to provide comments on over 180 pages of materials. While the NPS requested SHPO concurrence with proposed expedition of the review, they also proceeded to attempt to compress and expedite the review under 36 CFR § 800.3 through § 800.6 into a single 10 day review. As DHR is objecting to the proposed

expedition of the review, DHR's comments are provided preliminarily regarding the initiation of the review under 36 CFR § 800.3, the scope of the undertaking, and procedural issues identified thus far. DHR also believes it is inappropriate to review a draft Programmatic Agreement before consulting parties and public comments have been received, reviewed, and meaningfully considered.

**Within the time provided, DHR cannot verify the accuracy of the proposed Area of Potential Effects, the historic properties the NPS has identified within the APE, nor the correct application of the criteria of adverse effect in accordance with 36 CFR § 800.5. Our lack of comment on this information does not indicate concurrence with NPS' determinations.** In accordance with 36 CFR § 800.3 regarding the initiation of consultation, DHR recommends that NPS grant consulting party status to those parties identified in your letter as requesting such and seek to identify additional consulting parties. DHR recommends the NPS invite the participation of: Preservation Virginia, the Virginia Museum of History and Culture (the Virginia Historical Society), Arlington Historical Society, Friends of Joint Base Myer-Henderson Hall, the Pentagon Memorial Foundation, the Virginia Secretary of Veterans and Defense Affairs, the Virginia Department of Veterans Services, the Veterans of Foreign Wars, the American Legion, and other veterans groups who may have an interest in the potential effects to Arlington National Cemetery.

While DHR cannot provide substantive comments on all materials provided related to review under 36 CFR § 800.4 through § 800.6, our initial review suggests further documentation to support the proposed APE is necessary due to the potential visual effects of such a large structure on the landscape; a viewshed study should be included in future supporting documentation of the APE determination. DHR also notes that NPS does not include any historic resources that are not listed in the NRHP or are established as NHLs in their table of identified historic properties. There are likely unlisted historic properties, previously determined eligible or which should be evaluated for eligibility, within the APE that have not been identified by NPS in this information and should be considered in the review in accordance with 36 CFR § 800.4.

Regarding the "initiation" of consultation, NPS has presented this project and its review a fait accompli with the location, design, identification of historic properties, assessment of effects, and proposed mitigation all prepared absent consultation with SHPOs, consulting parties, and the public. Section 106 of the NHPA and the review process outlined in 36 CFR Part 800 is intended to be consultative with the federal agency consulting and seeking input from SHPO/THPOs, consulting parties, and the public throughout the review of an undertaking to inform all steps of the Federal Agency decision making. **It is inconsistent with intent of the NHPA and contrary to 36 CFR Part 800 for this review to occur after all or a majority of the federal agency's decisions have been made and the project is planned for imminent start of construction.**

Per 36 CFR § 800.1 (c) the Federal Agency should ensure initiation of the process "early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process." **The plans included in Appendix A are marked "Released for construction" indicating a level of completeness that would preclude meaningful consideration of a broad range of alternatives and thoughtful consideration of ways to avoid or minimize effects in the design, appearance, or location of the undertaking.** While NPS acknowledges that additional identification and evaluation of effects could occur under the proposed draft PA, functionally the PA language would only facilitate minimal consideration of DHR, DC HPO, consulting party, and public comment on minor elements of the project that have not been finalized, primarily being utility infrastructure and minor design elements. The draft PA provides no meaningful mechanism to allow consultation to inform substantive design choices that would facilitate avoidance or minimization of adverse effects. **Consulting at this stage in the project and requesting comments on everything from the project design to proposed mitigation has precluded DHR's opportunity to provide comments that can inform decision making and does not constitute consultation in accordance with 36 CFR Part 800.**

The NPS has stated that proposed undertaking, the construction of a commemorative arch at Memorial Circle between the Lincoln Memorial and Arlington National Cemetery, will adversely affect numerous nationally significant historic properties. NPS has identified potential effects to at least six National Historic Landmarks (NHLs), including potential adverse effects to the Pentagon and Fort Myer Historic District in Virginia. While DHR has insufficient time to review in detail the completeness of NPS' identification of historic properties and assessment of effects to know if it is an accurate or whether additional effects are present, Section 110 of the NHPA (54 USC §306107) and 36 CFR 800.10 requires that the Federal Agency prior to the approval of a project "*to the maximum extent possible* undertake such planning and actions as may be necessary to minimize harm" to NHLs.

The standard set forth in the NHPA regarding NHLs, and the expectation under 36 CFR § 800.6 (a) for the consideration of alternatives to avoid and minimize adverse effects to historic properties, has clearly not been met. The draft programmatic agreement furthermore provides no substantive process that would allow for this standard to be met. The proposed further design review is unlikely to result in meaningful changes to the appearance of the arch that would avoid or minimize the existing known adverse effects that will occur.

**NPS provided no meaningful consideration of alternatives that would minimize adverse effects to the maximum extent possible.** The only alternative considered was different sizes/heights of the arch. No consideration was given to alternative commemorative designs that would be less visually heavy on the landscape (such as the originally proposed columns in the McMillan Plan). No consideration was given to alternative locations for the arch that would minimize adverse effects to the numerous historic properties identified. As a proposed monument to Our Nation's history, the proposed arch's design and location should have been developed with meaningful input from the public and consideration of the effects it will have on the landscape. **No consideration was given to a no-build alternative.** This is a commemorative work. Its construction is not vital or necessary. It does not serve a purpose or meet a need beyond commemoration and the administration's definition of "beautification." As currently designed, the arch's purported commemorative value is disruptive of and would adversely affect numerous other nationally significant commemorative spaces.

The historic resources that will be adversely affected by this project are nationally significant properties that honor critical times in Our Nation's history and memorialize the sacrifices made to protect this Nation. The proposed arch will result in an almost complete disruption of the visual dialogue between the Lincoln Memorial, Arlington National Cemetery, and Arlington House. This is an intentionally designed visual connection between the resting place for the soldiers who sacrificed their lives for the Union during the Civil War and Robert E. Lee's former home in Virginia with the memorial for the President who fought and ultimately died to keep this Country united across the Potomac River. This visual connection represents the restored Union, symbolically reuniting the North and the South. This arch truncates that ongoing connection. **Framing the view of Arlington House from the Lincoln Memorial through the Arch does not minimize this disruption; it injects an incongruous and conflicting imperialistic symbol into that space.**

The visual competitiveness of the design draws the eye away from and inserts a visually distracting new element into the views from the myriad other memorial spaces along the Potomac River, including, in Virginia, the George Washington Memorial Parkway and US Marine Corps War Memorial (at Arlington Ridge Park) as well as numerous memorial spaces within the District of Columbia. It is likely to introduce additional visual elements into numerous surrounding historic properties. **The project will introduce an intentionally visually disruptive arch on each of these carefully and thoughtfully designed and historic spaces and landscapes.**

**These adverse effects are intentional and inherent in the design of the arch; it is intended to dominate the surrounding landscape.** The purpose of its placement at the selected location (within the existing open space at

the intersection of the George Washington Memorial Parkway and the Arlington Memorial Bridge), its proposed size (more than twice the height of the Lincoln Memorial), and its design (a monolith in white marble with gilded statuary) are all intended to be visually overpowering, dwarfing surrounding monuments and visible from points across Virginia and the District.

**The significance of the historic properties and their surrounding landscapes, some of Our Nation's most revered memorial spaces, combined with the severity of the adverse effects to these properties render the process and mitigation currently proposed in the draft Programmatic Agreement insufficient.** Documentation of adversely affected historic properties, many of which have been extremely well documented, is largely unnecessary and inadequate mitigation. **Many of these effects, especially in Virginia to Arlington National Cemetery and Arlington House, are (1) un-minimizable, due to the proposed scope, scale, design, placement, and intentional prominence of the Arch, and (2) un-mitigatable in a manner that is commensurate with the severity and significance of the effects.**

DHR recommends that the NPS give more meaningful consideration to other alternatives that would result in substantial avoidance and minimization of adverse effects to these nationally significant historic properties. DHR recommends that the NPS consult with DHR, the DC Historic Preservation Office, consulting parties, and the public in accordance with the purpose and intent of Section 106 of the NHPA and 36 CFR Part 800. DHR does not agree to an expedited review of this undertaking pursuant to 36 CFR 800.3(g); as such DHR requests that NPS continue to identify and invite the participation of consulting parties, address any comments received thus far from consulting parties and the public, and consult regarding the scope of the identification efforts in accordance with 36 CFR 800.4 (a). All parties must be afforded sufficient time, in accordance with 36 CFR Part 800, to comment on each part of the review process.

Please contact Samantha Henderson, Director of the Review and Compliance Division at [redacted]@dhr.virginia.gov or [redacted] to continue consultation on this undertaking.

Sincerely,

Roger W. Kirchen
Director, Virginia Department of Historic Resources and
State Historic Preservation Officer

Eastern Region Office
2801 Kensington Avenue
Richmond, VA 23221
Tel: (804) 367-2323
Fax: (804) 367-2391

Western Region Office
962 Kime Lane
Salem, VA 24153
Tel: (540) 387-5443
Fax: (540) 387-5446

Northern Region Office
5357 Main Street
PO Box 519
Stephens City, VA 22655
Tel: (540) 868-7029
Fax: (540) 868-7033

# EXHIBIT B

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

July 2, 2026

Ms. Jennifer T. Neresian
Regional Director, National Capital Region
National Park Service
5300 Wellington Branch Drive, Suite 100
Gainesville, Virginia 20155

Re: Triumphal Arch at Memorial Circle
Arlington, Virginia
DHR File No. 2026-4065

Dear Ms. Neresian:

The Department of Historic Resources (DHR) has received from the National Park Service (NPS) a request for clarification of comments in our June 15, 2026 letter. Our comments as the State Historic Preservation Office for Virginia are provided to the NPS as assistance in meeting its responsibilities under the NHPA and 36 CFR Part 800. As stated in our previous letter it is DHR's opinion that the potential adverse effects of this undertaking, especially to Arlington National Cemetery, Arlington House, and the cultural landscape connecting these properties to Washington, DC and the Lincoln Memorial via the Arlington Memorial Bridge, are (1) un-minimizable, due to the proposed scope, scale, design, placement, and intentional prominence of the Arch, and (2) un-mitigatable in a manner that is commensurate with the severity and significance of the effects. Our opinion, however, does not preclude the statutory responsibly of the NPS to meaningfully consult with the SHPOs and consulting parties on measures to avoid, minimize, and/or mitigate these adverse effects and to do so with the benefit of public input. It remains DHR's opinion that avoidance of these effects is possible and should be meaningfully considered.

The adverse effects of this undertaking to the Arlington National Cemetery Historic District, Arlington House, and the George Washington Memorial Parkway (GWMP) are significant. All of these properties are part of intentionally planned and designed cultural landscapes. It is DHR's opinion that the introduction of a 250-foot tall, monumental arch is inconsistent with those landscapes and would diminish the qualities that make those properties eligible for listing in the National Register of Historic Places (NRHP). The Arch will block and intrude upon significant views and will result in the introduction of a new, modern element into those landscapes. Due to its proposed height, design, and massing, DHR does not have any recommendations for ways in which NPS could minimize these effects through screening or other traditional minimization methods that would reduce the visibility of the Arch. In the letter dated June 22, 2026, NPS has now implied a lack of willingness to consider any potential changes to the design and location of the Arch which could serve as minimization measures. While NPS has proposed ongoing

archaeological investigations and potential utility rerouting as a minimization measure, that would not minimize the effects of the new construction on the known historic properties; it could merely serve to minimize potential effects to currently unknown properties, if they are present.

Regarding minimization measures for temporary, construction-related effects to Arlington National Cemetery Historic District, DHR recommends that NPS ensure limitations on construction noise during operating hours and while memorial services or ceremonies are occurring and adequate transportation access to Arlington during construction especially during operating hours. Minimization of effects to GWMP could include vegetation avoidance plans to avoid landscaping elements that contribute to the Parkway's NRHP eligibility and restoration/replanting plans to restore the landscape, as much as feasible, to its original condition. However, the effects assessment document provided indicates that NPS has already established road closures, detours, and transportation limitations for the project and that the NPS intends for construction work to occur 20 hours per day, year-round. Will NPS consider these proposed minimization measures if they result in an extended construction schedule but minimize temporary effects to historic properties? DHR would note, however, that these minimization measures do not significantly reduce the permanent adverse effects to the historic properties.

In terms of NPS-proposed mitigation for effects to these properties, while there may be a need for some additional documentation of these properties, Arlington National Cemetery, Arlington House, and the GWMP are all very well documented resources. The NPS is the property manager for Arlington House and GWMP; has NPS identified critical documentation needs for these properties that would serve as mitigation that is commensurate with the proposed adverse effects of this undertaking? Absent documentation, critically needed preservation or restoration projects could serve as partial mitigation. DHR is not aware of any preservation or restoration needs at Arlington House or GWMP but presumes that the NPS should be able to provide those options. Likewise with Arlington National Cemetery Historic District, has NPS, in consultation with Army National Military Cemeteries and other consulting parties, identified any proposed mitigation that would have historic preservation value to the historic property?

There are other historic properties more spatially removed from the proposed Arch that may be adversely affected through changes to the setting or feeling of the properties, for which the effects could be minimized or mitigated. These measures, developed in consultation with the affected historic property managers, consulting parties, and the public, could be accomplished through various screening methods or preservation measures. Again, determining what mitigation would be useful to those properties should be established in consultation with consulting parties and the public.

It is not possible to enumerate or know all of the appropriate, feasible, or suitable mitigation measures without a clearly defined Area of Potential Effects (APE), an inventory of historic properties within the APE, a detailed assessment of effects to those historic properties within the APE, and an understanding of the preservation needs of these historic properties; all of this information, per the NHPA and 36 CFR Part 800, should be gathered through review and consultation under 36 CFR 800.4 through 800.6. **As stated in our June 15, 2026 letter, DHR requests additional information in order to assess the appropriateness of the APE as defined by NPS, as well as further identification of historic properties within the APE, which in DHR's opinion, is incomplete.**

As stated in our previous letter, DHR objects to NPS' continued attempts to expedite the review of this project and compress the review required by 36 CFR 800.4 through 800.6. While NPS has received thousands of comments on their initial public notice, the intent of the NHPA and the process outlined in 36 CFR Part 800 should include the opportunity for public and consulting party input throughout the review not just the initiation of the review. As far as DHR is aware, NPS has also not invited additional groups to be consulting parties who might help answer the questions posed in NPS' letter to DHR. **DHR requests that NPS address our comments regarding the APE for**

**the undertaking and conduct a reasonable and good faith effort to identify historic properties within said APE, to include identification and evaluation of historic resources that have not been listed in the NRHP.** The development of appropriate and sufficient minimization and mitigation measures should be a product of meaningful consultation with SHPOs, consulting parties, and the public; DHR's opinion regarding the sufficiency, appropriateness, and feasibility of any possible minimization and mitigation measures is only one opinion that NPS should consider in the resolution of adverse effects. While DHR has supplied several initial ideas for minimization or mitigation measures, **it is DHR's opinion that the development of mitigation measures is premature when the historic properties potentially affected have not been fully identified, the full nature and extent of the effects have not been determined, and the opinions of consulting parties, including those groups with a demonstrated interest in the project that have not been invited to participate, have not been considered and addressed.**

Please contact Samantha Henderson, Director of the Review and Compliance Division at [redacted]@dhr.virginia.gov or [redacted] to continue consultation on this undertaking.

Sincerely,

Roger W. Kirchen
Director, Virginia Department of Historic Resources and
State Historic Preservation Officer

# EXHIBIT C

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

July 21, 2026

Ms. Jennifer T. Nersesian
Regional Director, National Capital Region
National Park Service
5300 Wellington Branch Drive, Suite 100
Gainesville, Virginia 20155

Re: Triumphal Arch at Memorial Circle
Arlington, Virginia
DHR File No. 2026-4065

Dear Ms. Nersesian:

The Department of Historic Resources (DHR) has received from the National Park Service (NPS) a request for comments regarding their Area of Potential Effects (APE) and "to identify the historic properties located within the APE." DHR's comments regarding the APE and the current identification of historic properties are below. DHR reminds NPS that the Federal Agency is responsible for conducting a reasonable and good faith effort to identify historic properties, not SHPO. In an effort to assist NPS, DHR can provide some additional information about historic properties DHR knows to be within the APE, both as currently defined and beyond, but DHR continues to expect that NPS will fulfill its obligations under 36 CFR § 800.4 to identify and evaluate historic properties that are not listed within the National Register of Historic Places (NRHP) within the APE.

<u>Area of Potential Effects</u>

DHR understands that NPS has generally established the APE based on GIS analysis (which has not been provided), topography and existing urban infrastructure, and previous APEs for undertakings in the vicinity including the Long Bridge project and the Memorial Bridge rehabilitation. DHR notes that none of the projects cited by NPS rise to the scale of the proposed new construction in height and visibility. DHR would appreciate the opportunity to learn more about the GIS modelling NPS has used and DHR questions why a viewshed model could not be included in this documentation if NPS conducted this analysis.

The view renderings provided in Appendix A include primarily views from Washington, DC with only three (3) from points in Virginia (all focused on Arlington National Cemetery) in addition to the observation deck views that show areas of Virginia. The potential views from the proposed observation deck looking Northeast and South (pages 43 and 44) illustrate the distance from which this Arch will be visible and it encompasses significantly more than what NPS has identified within their APE. DHR reiterates our recommendation to conduct or provide a viewshed study, not renderings of views of the Arch from select locations but analysis of properties from where the Arch will

be visible. Renderings are useful in assessing effects but when only one historic property within Virginia is depicted, it is not clear that all potential effects are considered based on the information provided.

Specifically, please clarify how the boundary of Arlington Boulevard to the north and northwest takes into consideration the height and visibility of the proposed Arch in relation to the numerous multi-story buildings and the topography. To the west and north of the River on the Virginia side of the APE, the topography, which generally slopes upward, and the curve of the Potomac River would allow for views of the Arch from, at a minimum, areas and buildings located immediately outside the APE (also clearly illustrated in page 43 of Appendix A). DHR recommends that NPS determine whether additional areas in Arlington, particularly to the north of the APE, should be considered based on the views already provided in Appendix A.

To the south of Arlington National Cemetery, please justify the decision to stop the APE at Southgate Road. This cut off excludes the Air Force Memorial (DHR Inventory No. 000-9821, previously recommended potentially eligible for listing in the NRHP) from consideration of the effects. This memorial includes open views towards the Pentagon, across the Potomac River to Washington DC and overlooking Arlington National Cemetery. DHR recommends its inclusion in the assessment of effects or further analysis regarding the potential visibility of the Arch from this location.

“Direct” and “Indirect” Effects

It is DHR’s opinion that the distinction used by NPS to establish the APE between “direct” effects and “indirect” effects is incorrect. In 2019, the D.C. Circuit US Court of Appeals determined, in National Parks Conservation Association v. Semonite et al., that the term “directly” in Section 110(f) of that NHPA (54 U.S.C. 306107) refers to causality not physicality of the effects. ACHP has since issued guidance that clarifies that “if the effect comes from the undertaking at the same time and place with no intervening cause, it is considered ‘direct’ regardless of its specific type (e.g., whether it is visual, physical, auditory, etc.). ‘Indirect’ effects to historic properties are those caused by the undertaking that are later in time or farther removed in distance but are still reasonably foreseeable.” (https://www.achp.gov/news/court-rules-definitions-informs-agencies-determining-effects).

Visual, auditory, or atmospheric effects that are directly caused by an undertaking and will diminish the integrity of a historic property are direct adverse effects. It is DHR’s opinion that the historic properties that NPS has identified in the APE for “indirect” effects (in Table 2 of Appendix D), primarily identified as having potential visual effects, will be directly affected by this undertaking and should be described as such.

NPS has provided no explanation regarding whether the potential for reasonably foreseeable additional effects to historic properties has been considered. Has NPS conducted traffic studies to understand whether the undertaking will result in potential changes to the traffic flow and pedestrian use of the George Washington Memorial Parkway or Arlington Memorial Bridge long term? DHR understands that the Federal Aviation Administration (FAA) will be conducting an aeronautical study as part of this undertaking and that safety lights will be required on the Arch; how has NPS considered the potential reasonable and foreseeable effects of changes to air traffic patterns around the Arch and to/from Reagan Washington National Airport? DHR notes that Reagan Airport has not been included in the APE for this undertaking; due to many restrictions on airspace within this area, additional properties may need to be included in the APE if the aeronautical study suggests changes to air traffic flow around the proposed Arch.

Identification of Historic Properties

DHR reiterates our previous comment from June 15 that the identification of historic properties (as described in Appendices C and D) has thus far only included properties listed in the National Register of Historic Places and National Historic Landmarks. 36 CFR 800.16 (l) defines a historic property as “any prehistoric or historic district,

site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places." Under 36 CFR 800.4 (a) (3), NPS has the responsibility to identify and evaluate possible historic properties that are not yet identified and are not currently listed in the NRHP as part of their identification efforts.

To assist NPS in their ongoing identification efforts, DHR has provided, as an attachment to this letter, maps from DHR's Virginia Cultural Resource Information System (VCRIS) of the properties DHR has currently recorded within the APE. While NPS stated that they consulted VCRIS in their July 10 letter, their identification efforts do not reflect any consideration of this data. NPS has a license to access VCRIS and should include a thorough search of our database in their identification of historic properties. DHR reminds NPS that this information includes properties that have been determined eligible as well as properties that warrant further evaluation of eligibility. When determining the scope of any further identification efforts that should be undertaken, DHR recommends considering what previous surveys have occurred and the age of previous investigations/evaluations; per 36 CFR 800.4 (c) (1) "the passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate properties previously determined eligible or ineligible.".

As it is clear from the existing VCRIS data alone that the potential historic properties in the APE exceed those currently identified by NPS, please advise DHR regarding the proposed scope of additional identification efforts that NPS intends to undertake in order to determine what historic properties are located within the APE. If NPS needs assistance accessing VCRIS as part of their review, please contact our Archives Staff.

DHR reminds NPS that the level of effort afforded to an undertaking's identification of historic properties should take into account "the magnitude and nature of the undertaking and the degree of Federal involvement [and] the nature and extent of potential effects on historic properties." As stated in our June 15 and July 1 letters, it remains DHR's opinion that the magnitude of this undertaking and nature of the potential effects to historic properties is significant; to quote our colleagues in DC "this will be the tallest and most visible monument constructed in the District since completion of the Washington Monument." (letter dated June 26). Therefore, in accordance 36 CFR 800.4 (b) (1), it is DHR's opinion that the undertaking warrants further effort to meet the expectation of a reasonable and good faith effort to carry out identification of historic properties.

Please contact me at [redacted]@dhr.virginia.gov or [redacted] to continue consultation on this undertaking.

Sincerely,

Samantha Henderson, Director
Review and Compliance Division

**Virginia Dept. of Historic Resources**

**V-CRIS**

Virginia Cultural Resource Information System

## Legend

- Architecture Resources
- Architecture Labels
- Archaeological Resources
- Archaeology Labels
- DHR Easements
- County Boundaries




N

Feet

0 500 1000 1500 2000

1:18,056 / 1"=1,505 Feet

**Title: DHR File No. 2026-4065 APE (north)** **Date: 7/21/2026**

*DISCLAIMER:Records of the Virginia Department of Historic Resources (DHR) have been gathered over many years from a variety of sources and the representation depicted is a cumulative view of field observations over time and may not reflect current ground conditions.The map is for general information purposes and is not intended for engineering, legal or other site-specific uses. Map may contain errors and is provided "as-is". More information is available in the DHR Archives located at DHR's Richmond office.*

*Notice if AE sites:Locations of archaeological sites may be sensitive the National Historic Preservation Act (NHPA), and the Archaeological Resources Protection Act (ARPA) and Code of Virginia §2.2-3705.7 (10). Release of precise locations may threaten archaeological sites and historic resources.*

**Virginia Dept. of Historic Resources**

**V-CRIS**

Virginia Cultural Resource Information System

## Legend

- Architecture Resources
- Architecture Labels
- Archaeological Resources
- Archaeology Labels
- DHR Easements
- County Boundaries




**Title: DHR File No. 2026-4065 APE (southeast)** **Date: 7/21/2026**

*DISCLAIMER:Records of the Virginia Department of Historic Resources (DHR) have been gathered over many years from a variety of sources and the representation depicted is a cumulative view of field observations over time and may not reflect current ground conditions.The map is for general information purposes and is not intended for engineering, legal or other site-specific uses. Map may contain errors and is provided "as-is". More information is available in the DHR Archives located at DHR's Richmond office.*

*Notice if AE sites:Locations of archaeological sites may be sensitive the National Historic Preservation Act (NHPA), and the Archaeological Resources Protection Act (ARPA) and Code of Virginia §2.2-3705.7 (10). Release of precise locations may threaten archaeological sites and historic resources.*

**Virginia Dept. of Historic Resources**

**V-CRIS**

Virginia Cultural Resource Information System

## Legend

- Architecture Resources
- Architecture Labels
- Archaeological Resources
- Archaeology Labels
- DHR Easements
- County Boundaries

N

Feet

0 500 1000 1500 2000

1:18,056 / 1"=1,505 Feet




**Title: DHR File No. 2026-4065 APE (southwest)** **Date: 7/21/2026**

*DISCLAIMER:Records of the Virginia Department of Historic Resources (DHR) have been gathered over many years from a variety of sources and the representation depicted is a cumulative view of field observations over time and may not reflect current ground conditions.The map is for general information purposes and is not intended for engineering, legal or other site-specific uses. Map may contain errors and is provided "as-is". More information is available in the DHR Archives located at DHR's Richmond office.*

*Notice if AE sites:Locations of archaeological sites may be sensitive the National Historic Preservation Act (NHPA), and the Archaeological Resources Protection Act (ARPA) and Code of Virginia §2.2-3705.7 (10). Release of precise locations may threaten archaeological sites and historic resources.*

# EXHIBIT D

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

August 6, 2026

Ms. Jennifer T. Nersesian
Regional Director, National Capital Region
National Park Service
5300 Wellington Branch Drive, Suite 100
Gainesville, Virginia 20155

Re: Triumphal Arch at Memorial Circle
Arlington, Virginia
DHR File No. 2026-4065

Dear Ms. Nersesian:

The Department of Historic Resources (DHR) has received from the National Park Service (NPS) a request for comments regarding their revised Area of Potential Effects (APE), viewshed analysis, and assessment of effects for the proposed undertaking. At this time, it is DHR's opinion that NPS has not met the requirements under 36 CFR § 800.4 to identify historic properties. NPS has not addressed a majority of DHR's prior comments in our letters dated June 15, July 2, and July 21 or any comments received from consulting parties and the public. While DHR continues to agree that the undertaking, as proposed, will adversely affect numerous historic properties, it remains DHR's opinion that finalizing a determination of effect in accordance with 36 CFR § 800.5 is premature.

<u>Alternatives</u>

NPS has not addressed DHR's comments from June 15 and July 2 regarding the consideration of alternatives to avoid and/or minimize adverse effects to historic properties. DHR reminds the NPS of the expectation in 36 CFR Part 800 that the review of an undertaking will evaluate a broad range of alternatives in the consideration of potential effects to historic properties. The National Historic Preservation Act (the Act) in 54 US Code § 306107 also obligates the NPS to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to National Historic Landmarks (NHLs). Has the NPS considered alternate locations and/or designs for this project to avoid or minimize effects? Has NPS considered a no-build alternative to avoid adverse effects to historic properties? Has NPS addressed the comments from DC Historic Preservation Office (DCHPO) regarding alternate locations to avoid effects to the nationally significant properties, including adversely affected NHLs, within the current APE for this undertaking?

The NPS is obligated, per the Act 54 USC § 306102 (b), to ensure that:

> *"historic propert[ies] under the jurisdiction or control of the agency [are] managed and maintained in a way that considers the preservation of their historic, archeological, architectural, and cultural values in compliance with section 306108 of this title and gives special consideration to the preservation of those values in the case of property designated as having national significance;"*

NPS has jurisdiction and control over both this undertaking and many of the adversely affected historic properties in the APE. Absent a meaningful consideration of alternatives, **is authorizing this undertaking as proposed consistent with the Federal Agency's expectation for the management of historic properties under their jurisdiction and for giving special consideration to the preservation of the values that make these properties nationally significant?** These adverse effects can be avoided while still achieving the goal of commemorating our Nation's 250th anniversary of Independence.

APE and Identification Efforts

While NPS has failed to provide an explicit response to the issue of alternatives, the intent of the Federal Agency to proceed with the undertaking as proposed is clear. As such, DHR will provide the following additional comments regarding the undertaking as currently proposed. DHR has received the additional information provided regarding the basis for the, now expanded, APE for the undertaking. DHR acknowledges that NPS has added an additional seven (7) properties in Virginia to their assessment of effects. The additional information fails to address DHR's comments in our July 21 letter regarding reasonably foreseeable effects from long term changes in the use of the areas, including air, vehicular, and pedestrian traffic changes resulting from the construction of the proposed arch. NPS has only addressed additional viewshed impacts in this revised submission not other potential effects.

As DHR has stated in our June 15, July 2, and July 21 letters, the NPS has **still failed** to meet the expectations in 36 CFR § 800.4 (b) (1) to make a reasonable and good faith effort to carry out identification of historic properties, defined in 54 US Code § 300308 and 36 CFR § 800.16 (l) to include not just properties listed in the National Register of Historic Places (NRHP) but also those properties that are eligible for inclusion in the NRHP. NPS has not identified any properties beyond those listed in the NRHP, including the numerous properties already recorded in DHR's V-CRIS database as eligible for listing, in their identification and evaluation and as such **their identification efforts are incomplete. Any assessment of effects prepared by NPS fails to meet the expectation of Section 106 of the Act to consider effects to historic properties, again not just NRHP listed properties, and is likewise incomplete**.

Consulting Parties and Public Comments

While NPS has invited additional consulting parties and provided them with this most recent assessment of effects from July 28, the newly invited parties have not been provided all of the information shared with SHPOs and they have been asked to restrict their comments to the assessment of effects. The input of consulting parties has not been sought regarding the definition of the Area of Potential Effects and the identification efforts nor have they been afforded the opportunity to comment broadly on the undertaking as a whole. The consulting parties were offered a similarly constrained time frame to review the 70 pages of information provided on July 28. This does not meet the purpose and intent of consultation to under 36 CFR Part 800 to seek, discuss, and consider the views of consulting parties in the Section 106 review process.

DHR reiterates our requests from our August 4 email. DHR requests that the NPS provide information to DHR and DCHPO about their efforts to engage in consulting parties. DHR requests that consulting parties be provided sufficient time to review the hundreds of pages of documents prepared thus far for this undertaking. DHR would also like to review the public notice comments NPS has received regarding this undertaking so that we, as Virginia SHPO, can understand the comments expressed by citizens of the Commonwealth of Virginia regarding this project.

Please contact me at s[redacted]dhr.virginia.gov or [redacted] to continue consultation on this undertaking.

Sincerely,

Samantha Henderson, Director
Review and Compliance Division

Eastern Region Office
2801 Kensington Avenue
Richmond, VA 23221
Tel: (804) 367-2323
Fax: (804) 367-2391

Western Region Office
962 Kime Lane
Salem, VA 24153
Tel: (540) 387-5443
Fax: (540) 387-5446

Northern Region Office
5357 Main Street
PO Box 519
Stephens City, VA 22655
Tel: (540) 868-7029
Fax: (540) 868-7033

# EXHIBIT E

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

September 9, 2026

Ms. Jennifer T. Nersesian
Regional Director, National Capital Region
National Park Service
5300 Wellington Branch Drive, Suite 100
Gainesville, Virginia 20155

Re: Triumphal Arch at Memorial Circle—Final Assessment of Effects
Arlington, Virginia
DHR File No. 2026-4065

Dear Ms. Nersesian:

The Department of Historic Resources (DHR) has received from the National Park Service (NPS) a request for comments regarding their final assessment of effects for the proposed undertaking. The NPS provided these documents to DHR and consulting parties on August 28. While NPS originally requested written comments by September 4, they have extended the requested review period to September 16. NPS has also requested a consulting party meeting on September 9. DHR looks forward to the opportunity to participate in the consulting parties meeting and hearing from NPS regarding the determinations contained within this new submission. We also look forward to the opportunity to hear from consulting parties regarding the undertaking and their perspectives regarding the assessment of effects.

The NPS has requested a response to their revised identification of historic properties; additional information regarding alternatives; avoidance and minimization measures; assessments of effects for over 250 historic properties; and potential mitigation measures. The revised assessment of effects is substantively changed from the original document submitted on June 5 and contains new information not previously included in any prior submission. DHR reminds NPS that we did not concur with their request to expedite the review of this undertaking pursuant to 36 CFR § 800.3 (g). While DHR appreciates that NPS extended their requested timeline for response, in accordance with 36 CFR Part 800, DHR is not obligated to provide our comments within the arbitrary and inappropriately short time frame requested.

While NPS has determined overall that the undertaking will adversely affect numerous historic properties, NPS has also determined that numerous historic properties within the Area of Potential Effects (APE) will not be adversely affected. Per 36 CFR § 800.5 (c) SHPO has 30 days from the receipt of this finding to review the finding and object if necessary. DHR will utilize the review time that the regulations afford us. While DHR will work to provide our comments as close to the requested September 16, per the regulations,

our lack of full comments within the time frame set by NPS should not be construed as failure to comment or agreement with/lack of objection to NPS' findings.

Consulting Parties and Public Comments

The revised final assessment of effects includes tables outlining consulting parties' comments and a summary of public comments compiled by AI. DHR reiterates our request to review the public notice comments not an AI generated summary regarding this undertaking so that we, as Virginia SHPO, can understand the comments expressed by citizens of the Commonwealth of Virginia regarding this project. DHR would also like to be afforded the opportunity to review the actual comments prepared by consulting parties, not NPS' summary. Based on the summary, many of the consulting parties' comments remain unaddressed. Please advise when NPS will directly address the comments provided by consulting parties.

Initiation of Construction Prior to Completion of Section 106 Review

On September 3, Secretary of the Interior Doug Burgum posted on X that "we are preparing to start, over the next two-week period, the excavation work necessary for the Great Triumphal Arch and Military Observation Deck, at Memorial Circle on Columbia Island between the Lincoln Memorial and Arlington National Cemetery."

Excavation work at Memorial Circle required to construct the arch and conduct the archaeological investigations proposed beyond the presumed fill on Columbia Island, as described in submissions prepared by the NPS, will be extensive and will adversely affect historic properties. It is DHR's opinion that initiation of any construction with the potential to cause adverse effects to historic properties prior to the conclusion of the Section 106 review and the resolution of adverse effects to historic properties constitutes a failure to comply with the National Historic Preservation Act and 36 CFR Part 800. It is DHR's opinion that the proposed start of construction constitutes a foreclosure of the Advisory Council on Historic Preservation's opportunity to comment in accordance with 36 CFR § 800.9. DHR requests that NPS address this at the consulting parties meeting and in writing.

Please contact me at s[redacted]@dhr.virginia.gov or [redacted] to continue consultation on this undertaking.

Sincerely,

Samantha Henderson, Director
Review and Compliance Division

Eastern Region Office
2801 Kensington Avenue
Richmond, VA 23221
Tel: (804) 367-2323
Fax: (804) 367-2391

Western Region Office
962 Kime Lane
Salem, VA 24153
Tel: (540) 387-5443
Fax: (540) 387-5446

Northern Region Office
5357 Main Street
PO Box 519
Stephens City, VA 22655
Tel: (540) 868-7029
Fax: (540) 868-7033

# EXHIBIT F

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

September 21, 2026

Ms. Tammy Stidham
Associate Regional Director, Lands and Planning
National Park Service
5300 Wellington Branch Drive, Suite 100
Gainesville, Virginia 20155

Re: Triumphal Arch at Memorial Circle—Proposed Memorandum of Agreement
Arlington, Virginia
DHR File No. 2026-4065

Dear Ms. Stidham:

On September 15, the Department of Historic Resources (DHR) received from the National Park Service (NPS) a draft Memorandum of Agreement (MOA) for the proposed undertaking. The NPS requested written comments or signature of the document by September 21.

At this time, it is DHR's opinion that the review and proposed signature of the MOA on behalf of the Virginia State Historic Preservation Office is premature. The potential Signatories and consulting parties are not in agreement regarding the completion of the identification efforts and the assessment of effects. It is not possible to determine that a Memorandum of Agreement is acceptable to resolve adverse effects to historic properties when agreement has not been reached regarding what the effects of the undertaking are. The parties have also not agreed that the proposed mitigation measures, which were only just introduced in the August 28 Assessment of Effect as conceptual, are sufficient and appropriate.

As DHR has stated in previous letters, NPS has received numerous comments from the public, consulting parties, the DC Historic Preservation Office and Virginia DHR. These comments have not been directly addressed in a manner that shows that NPS is consulting with the goal of seeking agreement where feasible on the review of this undertaking. DHR recommends that NPS directly and specifically address the comments received in response to the Assessment of Effect prior to attempting to execute an MOA.

In addition to the above procedural issues regarding the timing of the proposed MOA, the MOA as written lacks specificity and a clearly defined review process to ensure continued and effective consultation on the implementation of the Agreement. As such it is not executable in its current form.

The draft MOA falls short of the Advisory Council on Historic Preservation's guidance regarding the preparation of Agreement documents, https://www.achp.gov/initiatives/guidance-agreement-documents,

regarding the minimum expected information that should be included in the preamble and stipulations of a Section 106 Agreement document. In DHR's review we noted the following non-exhaustive list of examples:

- The draft Agreement cites but does not include several Appendices and Exhibits as such the draft Agreement does not clearly identify the APE, does not list the historic properties affected, and does not fully enumerate the adverse effects to be mitigated.

- It is not clear whether the stipulations include mitigation for all historic properties that will be adversely affected, for example the Pentagon and Arlington Ridge Park are unaddressed.

- The stipulations fail to identify the party responsible for the implementation of any of the proposed stipulations and the timeline for completion of each stipulation.

- The MOA lacks any clearly defined process for Signatories and consulting parties to review the outputs of the stipulations for sufficiency and accuracy.

Regarding the content of the MOA stipulations, it is DHR's general opinion that, while documentation and interpretation of the affected landscapes has value and should be completed prior to the implementation of the undertaking, the mitigation proposed fails to address the severity of the adverse effects. By seeking to document and interpret the affected landscapes prior to the insertion of the arch into the symbolic space, NPS will create a snapshot of the past without contextualizing the present. DHR anticipates all the proposed mitigation will do will further highlight how this undertaking has marred rather than added to these spaces. DHR recommends that meaningful mitigation should be commitment to concrete preservation and/or restoration measures on these historic properties. The proposed interpretive and documentary mitigation is focused on the landscapes themselves as merely a static built environment rather than symbolic spaces and the past and present they represent; DHR also recommends that the interpretation of these spaces should focus on the history that drove the need to build these commemorative spaces, the history of sacrifice and honor represented by Arlington National Cemetery and Arlington House, and how that past informs our use of these spaces now.

Finally, NPS originally proposed a Programmatic Agreement for this undertaking. A programmatic agreement can be utilized in accordance with 36 CFR § 800. 14 (b) when effects on historic properties cannot be fully determined prior to approval of an undertaking or for adverse effects from complex projects. The Whereas clause at the top of page four of the draft MOA states:

> "**WHEREAS**, specific design details are not developed at the concept planning level, therefore, the Triumphal Arch Assessment of Effects includes determinations from portions of the proposed Undertaking. These effects will be further assessed as part of future Section 106 reviews of individual project components, as required under the terms of this MOA;"

The stipulations also describe the need to conduct archaeological investigations in order to identify potential archaeological sites within the Area of Potential Effect. However, the subsequent stipulations contain no requirements for ongoing review of the Undertaking, continuing assessment of effects, and the potential to develop additional mitigation measures if additional adverse effects are identified. NPS has not consulted with consulting parties regarding the potential for additional, separate undertakings associated with this undertaking subject to review under Section 106. DHR request that NPS consider the appropriateness of a Programmatic Agreement based on the above information or, at a minimum, per 36 CFR § 800.4 (b) (2), ensure that a process for continued review is provided for in the proposed MOA.

Please contact me at [redacted]@dhr.virginia.gov or [redacted] to continue consultation on this undertaking.

Sincerely,



Samantha Henderson, Director
Review and Compliance Division

Eastern Region Office
2801 Kensington Avenue
Richmond, VA 23221
Tel: (804) 367-2323
Fax: (804) 367-2391

Western Region Office
962 Kime Lane
Salem, VA 24153
Tel: (540) 387-5443
Fax: (540) 387-5446

Northern Region Office
5357 Main Street
PO Box 519
Stephens City, VA 22655
Tel: (540) 868-7029
Fax: (540) 868-7033

# EXHIBIT G

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

September 25, 2026

Ms. Jennifer T. Neresian
Regional Director, National Capital Region
National Park Service
5300 Wellington Branch Drive, Suite 100
Gainesville, Virginia 20155

Re: Triumphal Arch at Memorial Circle
Arlington, Virginia
DHR File No. 2026-4065

Dear Ms. Neresian:

The Department of Historic Resources (DHR) received from the National Park Service (NPS) on August 28, 2026 a final Assessment of Effects (AoE) Report, architectural plans, renderings, transportation plans, proposed mitigation measures, and a summary of public and consulting parties comments regarding the proposed construction of a Triumphal Arch at Memorial Circle within the George Washington Memorial Parkway. The undertaking will be constructed in Washington, DC but will affect historic properties in Virginia. Our comments are provided to the NPS as assistance in meeting its responsibilities under the National Historic Preservation Act (NHPA) and its implementing regulations 36 CFR Part 800 as the State Historic Preservation Office for Virginia.

The AoE report includes additional justification for the purpose and need of the undertaking and further clarification of NPS' consideration of project alternatives. The report reflects the revised Area of Potential Effects (APE) for the undertaking, the identification and assessment of effect for additional historic properties in APE within Virginia, and proposed mitigation and minimization measures.

Purpose and Need/Project Alternatives

The NPS states that "The purpose of the proposed undertaking is to celebrate 250 years of American independence by honoring America's founding principles…in a manner consistent with the avenue's established role as a ceremonial gateway and "Avenue of Heroes" celebrating valor, sacrifice, and American heritage." NPS further justifies their failure to consider alternatives to the proposed location at Memorial Circle "because the proposed undertaking is grounded in the historic design intent for the Arlington Memorial Bridge and Memorial Avenue corridor."

DHR strongly disagrees that the proposed arch is consistent with the symbolic and nationally significant corridor of Memorial Avenue and the axis connecting Arlington House/Arlington National Cemetery to the Lincoln Memorial. This assertion on the part of NPS is further undermined by the determination that this is an adverse effect to those properties and landscapes. The proposed arch is grossly incompatible with these intentionally designed and reverent landscapes.

While the McMillan Plan and the McKim Mead & White design for this corridor envisioned some commemorative space in the Memorial Circle, none envisioned a 250-foot-tall, monumental arch celebrating the 250th anniversary of Independence. The cited column design from 1924 was specifically intended to represent the unity between the North and the South (each represented by a column) by further reinforcing the symbolism of the connection between DC and Virginia, Lincoln and Arlington National Cemetery. The column design was not visually heavy and would not have obscured any sightlines across this memorial landscape. The proposed arch interrupts that connection and its symbolism is antithetical to the concept of the Arlington Memorial cultural landscape.

In Republican and Imperial Rome, triumphal arches were erected by generals, later exclusively emperors, to commemorate conquests. They were propagandistic; proclaiming the might and power of the emperor over his enemies. They honored the individual leader who erected them not the sacrifice of the soldiers who died and in fact they often depicted the conquered in submission to the victory. This tradition is further reflected in the history of the construction of many of the triumphal arches throughout Europe that are the inspiration for this project. This symbolism is in no justifiable way consistent with the ceremonial space of Memorial Avenue. It is incongruous when inserted into the avenue commemorating the reunification between the North and South after the Civil War and even more inappropriate domineering over the final resting place of the men and women who served this Nation in its armed forces. The triumphal arch symbolism is even more problematic when considering the purpose of commemorating American Independence; DHR is unclear how a traditional symbol of conquest and victory is appropriate to commemorate the anniversary Colonial America proclaiming its independence.

DHR further understands that the NPS has rejected alternatives to the design, selecting the largest proposed arch as smaller versions would obscure rather than frame Arlington House from the Lincoln Memorial. While the proposed arch's central passage enables visibility of Arlington House from a single viewpoint in the vicinity of the Lincoln Memorial, the arch obscures completely the complementary view from Arlington House across the Potomac to the Lincoln Memorial; it serves only to frame the house from DC while obscuring the connection from Virginia to DC and dominating over the landscape of Arlington National Cemetery. It constructs a gateway where reciprocal connection is symbolic.

The NPS repeatedly contended in the second consulting parties meeting that the NPS did not consider alternative locations because this project is intended to be the "realization of" and consistent with the intent and the requirements of the 1924 Act of Congress authorizing the construction of Arlington Memorial bridge. This assertion is made in spite of the fact that the proposed arch is a different design concept entirely to the McKim Mead & White proposed pillars and its commemorative purpose, in honor of the 250th anniversary of the Declaration of Independence, was obviously not envisioned by the Act that was enacted over 100 years prior to such anniversary.

The justification for failing to consider alternatives is not that no other practical, less intrusive alternative exists, as evidenced by the thoughtful alternatives presented by consulting parties, but that the NPS does not wish to consider them. This location meets the requirements for an extremely visually prominent placement for this arch and the design is as large, domineering, and visually intrusive as possible. Despite the effects to historic properties and its incongruity and inappropriateness within the landscape, these are choices made by the project's proponent regardless of responsibilities under the NHPA . It is DHR's opinion that NPS has failed to

provide sufficient justification for a lack of viable alternative to this undertaking and has failed to meet its obligations under 54 U.S.C. § 306107.

Identification of Historic Properties

The NPS expanded their identification of historic properties in the APE to include properties that are recorded as determined eligible or potentially eligible within DHR's Virginia Cultural Resource Information System (VCRIS). DHR understands that NPS does not intend to undertake any field survey or independent identification of historic properties within the APE and proposes to rely solely on existing information. NPS did not review or consider any properties recorded in VCRIS within the APE that have not been formally evaluated for listing in the NRHP. Considering the scale of the undertaking and its potential effects, it is DHR's opinion that this approach risks effects to unrecorded historic properties.

NPS has asked DHR and consulting parties to identify any properties within the APE that they did not consider and provide that to them. While DHR maintains that identification of historic properties, both recorded and unrecorded historic properties is Federal Agency's responsibility, DHR provides the following recommendations. Based on our review of VCRIS and the APE, DHR has identified the below properties that are not included within NPS' assessment that DHR recommends should be.

| DHR ID No. | Property Name | Address | NRHP Eligibility Status | Justification |
|---|---|---|---|---|
| 000-6000 | The Virginian Overlooking Rosslyn | 1500 Arlington Boulevard | Unevaluated but not recently surveyed | Previous survey recommended that this property is "the tallest example and best representative of the individual high-rise garden apartment building in Arlington County." Due to the property's prominence within the APE and the potential for effects, DHR recommends evaluation of the property and assessment of effect. |
| 000-6005 | Apartment Building, Rosslyn Heights | 1302 Meade Street North | Previously recommended potentially eligible | Property directly overlooks Arlington Ridge Park. The visibility and potential effects of the undertaking is unclear. Due to the potential for effects to this property, DHR recommends evaluation and assessment of effect. |
| 000-6006 | Apartment Building, Rosslyn Heights | 1220 Meade Street North | Previously recommended potentially eligible | Property directly overlooks Arlington Ridge Park. The visibility and potential effects of the undertaking is unclear. Due to the potential for effects to this property, DHR recommends evaluation and assessment of effect. |
| 000-6537 | River Place, North | 1121 Lynn Street | Unevaluated but not recently surveyed | The River Place Apartment buildings are within the APE and have clear views of the undertaking. Due to the properties prominence within the APE and the potential for effects, DHR recommends evaluation of the property and assessment of effect. |
| 000-6538 | River Place, East | 1021 Lynn Street | Unevaluated but not recently surveyed | |
| 000-6539 | River Place, South | 1011 Lynn Street | Unevaluated but not recently surveyed | |

| | | | | |
|---|---|---|---|---|
| 000-6540 | River Place, West | 1111 Lynn Street | Unevaluated but not recently surveyed | |
| 000-9733 | Rosslyn Commercial Historic District | Fort Myer Drive, Key Boulevard, Nash Street North, Oak Street North, Wilson Boulevard | DHR Evaluation Committee: Eligible | This historic district was recently determined eligible by DHR under Criteria A and C. The potential visibility and effects of the undertaking from the District is unclear. Due to the potential for effects to this property, DHR recommends evaluation and assessment of effect. |
| 000-9820 | Prospect House Condominiums | 1400 14 Street North | Previously recommended eligible | This property was recommended eligible for the NRHP for local level significance as a mid-century modern high-rise apartment building designed by notable local architect Donald Hudson Drayer. The property provides views to DC, including a roof top level restaurant "Top of the Town" which advertises its DC skyline views. Due to the properties prominence within the APE and the potential for effects, DHR recommends evaluation of the property and assessment of effect. |
| 000-9821 | Air Force Memorial | 1 Air Force Memorial Drive | DHR Staff: Potentially Eligible | The Air Force Memorial has been recommended individually eligible for listing under Criterion C meeting Criteria Consideration G. Effects should be evaluated and mitigated individually as well as in relation to Arlington National Cemetery. It is DHR's opinion that the undertaking will adversely affect this property. |
| 000-1233 | Iwo Jima Memorial/ The United States Marine Corps War Memorial | George Washington Memorial Parkway, Marshall Drive | DHR Staff: Eligible | The US Marine Corps War Memorial has been determined individually eligible for listing under Criteria A and C. Effects should be evaluated and mitigated individually as well as in relation to Arlington Ridge Park. |
| 000-1239 | Netherlands Carillion | George Washington Memorial Parkway, Marshall Drive | Previously recommended potentially eligible | The Netherlands Carillon has been recommended potentially eligible for listing under Criterion C meeting Criteria Consideration G. DHR recommends evaluation. If found individually eligible, effects should be evaluated and mitigated individually as well as in relation to Arlington Ridge Park. |

<u>Effects Assessment</u>

For properties within Virginia, DHR generally concurs with NPS' effects assessments included in Appendix L.

NPS has identified adverse effects to the following properties in Virginia:

- Memorial Avenue Corridor Cultural Landscape
- Arlington Memorial Bridge and associated features (DHR ID 000-0014)
- Arlington National Cemetery Historic District (DHR ID 000-0042)

- Arlington House, Arlington House Historic District and associated Cultural Landscape (DHR ID 000-0001)
- Mount Vernon Memorial Highway Historic District (DHR ID 029-0218)
- Mount Vernon Memorial Highway North Cultural Landscape (DHR ID 000-9920)
- George Washington Memorial Parkway (DHR ID 029-0228)
- Arlington Ridge Park (DHR ID 000-9707)
- The Pentagon National Historic Landmark (DHR ID 000-0072)
- Fort Myer National Historic Landmark District (DHR ID 000-0004)
- The Francis Scott Key Bridge (DHR ID 000-5823)
- Bridge #5020 (DHR ID 000-2270)
- Old Warehouse Area and Ground Maintenance Complex (DHR ID 000-7809)

DHR concurs that the above listed properties will be adversely affected and concurs with the no adverse effects assessments for the remaining properties in Virginia listed in Appendix L. DHR recommends that NPS assess the effects to those properties listed in the Identification Section above by DHR for further evaluation.

Mitigation

DHR has previously provided comments to NPS regarding the proposed mitigation for adverse effects on September 21, 2026 based on the request to review the draft Memorandum of Agreement. DHR will add to those comments that the proposed mitigation measures include little to no mitigation for both of the adversely affected National Historic Landmarks, Fort Myer NHL and the Pentagon NHL. As NPS feels it is unable to avoid or minimize effects to these properties, specific mitigation to these NHLs is appropriate.

DHR will reiterate our opinion that while documentation of the affected landscapes has value and should be completed prior to the implementation of the undertaking, the mitigation proposed is perfunctory and fails to address the severity of the adverse effects to the historic properties. DHR strongly recommends that the NPS commit to mitigation measures that will go beyond documentation and interpretation. DHR questions how much of the proposed documentation would be duplicative or redundant considering the amount of existing documentation available about many of the adversely affected properties. Many of the cultural landscapes have recent Cultural Landscape Inventories and context documents. Arlington House has been documented with HABS level documentation.

DHR thinks it is likely that many of the affected historic properties could benefit from support to complete needed preservation, rehabilitation, and/or restoration work. The nature the adverse effects to these nationally significant landscapes and historic properties and, in the case of Arlington National Cemetery, hallowed ground is so significant that DHR recommends that NPS consider more than the most basic and minimal mitigation measures.

While DHR appreciates the proposed minimization measures for temporary construction impacts, DHR also requests clarity regarding the feasibility of the proposed c measures considering the timelines outlined for construction in the AoE document, the high volume of visitors and traffic experienced by the location, and the frequency of memorial services at Arlington National Cemetery. No clear information has been provided regarding how NPS will enact these measures.

DHR notes that the AoE states that Phase IB archaeological testing will occur prior to the start of construction activities. As the potential for archaeological sites eligible for listing in the NRHP is not known at this time, it is not possible to know if additional historic properties will be identified within the APE and whether mitigation

is warranted. The draft MOA provides no process for ongoing assessment of effect and developing additional mitigation. DHR reiterates our recommendation that this should be included.

Altered Purpose and Need of the Project

Finally on September 20, 2026 President Trump posted on Truth Social that the proposed Arch would be converted "into a top grade Military Complex/Triumphal Arch" which will "house, store, and have the rapid ability to use large numbers of drones, plus snipers, on both the roof and plaza area, and additional have a hold large quantities of sniper ammunition in storage." As none of the plans included in the consultation materials include spaces that could meet this proposed change in use; DHR questions whether the designs for the Arch and plaza will need to change to address this. DHR shares the questions raised by other consulting parties regarding whether the proposed change to the purpose, need, and (potentially) the design of the arch will be required. DHR also questions whether the proposed mitigation, which relies heavily on interpretation (presumably within the public spaces of the proposed Arch and its Observation Deck), will need to change based on security limitations. To date NPS has not responded to these questions.

Please contact Samantha Henderson, Director of the Review and Compliance Division at [redacted]@dhr.virginia.gov or [redacted] regarding our review of this undertaking.

Sincerely,

Roger W. Kirchen
Director, Virginia Department of Historic Resources and
State Historic Preservation Officer

# EXHIBIT H

# COMMONWEALTH of VIRGINIA

## Department of Historic Resources

2801 Kensington Avenue, Richmond, Virginia 23221

David L. Bulova
*Secretary of Natural and Historic Resources*

Roger W. Kirchen
*Director*

Tel: (804) 367-2323
Fax: (804) 367-2391
www.dhr.virginia.gov

September 29, 2026

Vice Chairman Travis Voyles
Advisory Council on Historic Preservation
401 F Street NW, Suite 308
Washington, DC 20001-2637

Re: Termination of Consultation: Triumphal Arch at Memorial Circle
Arlington, Virginia
DHR File No. 2026-4065

Dear Vice Chairman Voyles:

On September 24, 2026 DHR was notified that the Advisory Council for Historic Preservation (ACHP) has terminated consultation under Section 106 of the National Historic Preservation Act for the proposed Triumphal Arch at Memorial Circle pursuant to 36 CFR § 800.7 (a) (4). The ACHP states that this decision was made "in recognition of the public's significant concerns regarding the adverse effects the undertaking would pose to historic properties." It is DHR's opinion that terminating consultation this early in the review process is contrary to the consideration of the concerns of the public and consulting parties. Termination will silence the voices of the States, consulting parties, and the public at a point in the review of this undertaking when the NPS has barely begun to meaningfully address and consider those views.

It is DHR's opinion that termination of consultation after only three (3) months of review of this undertaking is premature and indefensible. DHR has repeatedly provided comments to NPS within the restricted time frames requested despite objecting to expedited review of this undertaking in accordance with 36 CFR § 800.3 (g). DHR has been consulting in good faith and providing constructive and specific feedback to NPS regarding the completion of their obligations under 36 CFR Part 800. DHR has never indicated that we believe an agreement to resolve adverse effects could not be reached. It is DHR's opinion that agreement in the case of this undertaking, due to the significance of the resources and the numerous adverse effects, would take time to negotiate and require that the Federal Agency uphold their responsibility to consult in good faith and meet their obligations under 36 CFR Part 800.

The NPS has repeatedly requested comments within arbitrary and unreasonably short time frames, for which there is no justification or basis in current regulations. Upon the initiation of the review of this undertaking the NPS proposed to expedite the review process in accordance with 36 CFR 800.3 (g) and despite objections from both the DHR and DC HPO, has proceeded to compress the steps of the review

process despite the fact that, per 36 CFR 800.3 (g), they cannot do so over the objections of the SHPO. The NPS initiated consultation on this complex and significant undertaking with a single report attempting to initiate review, complete all identification of historic properties, assess effects, and propose resolution effects into a single review. This is not how the 36 CFR Part 800 regulations are written or intended; as a result, the NPS' information lacked the feedback and input of consulting parties. DHR reminds both NPS and the ACHP that the draft revisions to the 36 CFR Part 800 regulations have not been enacted; there is no regulatory justification for the NPS' approach to consultation for this undertaking. The process thus far does not reflect a lack of potential for agreement but a lack of consultation in good faith under the current, enacted regulations.

Critical comments provided in response to NPS' submissions thus far do not reflect an inability to reach agreement but rather speak to the quality of information provided by NPS. In the past three (3) months, NPS has provided:

- an unsubstantiated and insufficient initial Area of Potential Effect (later modified in recognition of its inadequacy based on consulting parties' comments);
- identification efforts that did not meet the standards in 36 CFR 800.3 (b) (also later also modified but remaining lacking in a consideration of historic properties in Virginia, see our September 25, 2026 letter);
- an assessment of effects that is limited to discussion of physical and visual effects only with no discussion of other changes that many diminish the integrity of affected historic properties (audible and atmospheric elements, reasonable and foreseeable indirect effects, and cumulative effects remain unaddressed); and
- an overly vague, incomplete, and inexecutable by ACHP's own guidance, Memorandum of Agreement to resolve adverse effects that does not include mitigation commensurate with the severity of the effects to many historic properties and includes little to no mitigation for several adversely affected historic properties (including no mitigation for the Pentagon National Historic Landmark and only photographic documentation of viewsheds from the Fort Myer National Historic Landmark).

Consulting parties have put considerable time, effort, and thought into their comments. NPS has only been consulting with parties outside the SHPOs, Federal Agencies, and localities for two (2) months; this is less than the typical time frames for the review of an undertaking's initiation of Section 106 and identification efforts. The goal of consultation is not for the Federal Agency to receive agreement and concurrence from all parties on their final decisions and actions. The goal of consultation is for the Federal Agency to seek and consider consulting party knowledge, opinions, and recommendations and for that information to inform their decision making. While NPS has made progress in their determination of the APE and identification efforts, the NPS has failed to meaningfully or clearly address many of the comments provided. Terminating consultation when the Federal Agency has not even allowed for the possibility of coming to agreement on the historic properties within the APE avoids constructive consultation that could still make progress and ensure the NPS and the ACHP has all the information it should to make decisions.

DHR shares ACHP's opinion that the public has raised significant concerns about the adverse effects of this undertaking and its potential to radically change this nationally significant, thoughtfully planned and designed, and solemn commemorative space. Public comments overwhelmingly reflect objection to and concerns about this undertaking. Termination of consultation will effectively remove from further

consideration the voice of concerned citizens from the process intended to give a platform for public input into Federal decision-making on projects that affect historic properties.

While it remains DHR's opinion that the proposed undertaking is extremely incompatible with the affected historic landscapes, DHR has always understood that Section 106 of the National Historic Preservation Act does not prohibit adverse effects and cannot obligate a Federal Agency to abandon an undertaking. We have approached our comments and consultation with that understanding and with the goal of ensuring that the NPS is meeting the obligations and intent of the Act and its implementing regulations. We have been advocating for meaningful consideration of the effects to historic properties in Virginia which we consider to be some of our Nation's most sacred and nationally significant memorial spaces. We have not agreed to mitigation at this point because NPS has not offered mitigation that would go beyond the most rudimentary mitigation measures. The historic properties in question are significant at the highest level; they are nationally significant historic districts, parks and landscapes; two (2) National Historic Landmarks, multiple memorials commemorating the actions and sacrifice of our Armed Forces, and Arlington National Cemetery, our Nation's most hallowed ground. Adverse effects to these properties deserve meaningful consideration, thoughtful deliberation, and decision making that considers whether the cost is worth the outcome.

It is clear, based on the timing of the initiation of the Section 106 process, the NPS' continued attempts to expedite review despite objections from consulting parties, and the unwillingness to consider any alternatives, that this consultation has not been conducted with any intent to seek concurrence. The most prominent design and location was chosen for this monument with no regard for the impacts to memorial spaces that millions of Americans visit for solemn contemplation. The rationale for the project's location is refutable, the refusal to seek a more appropriate location is baseless, and the project's exigency is manufactured. In short, the decision to terminate consultation is unjustified and ignores decades of commitment by the ACHP to defend a consultative process that supports public input and negotiated outcomes.

DHR acknowledges that, per 36 CFR§ 800.7, the ACHP can terminate consultation if it determines that further consultation will not be productive. DHR strongly disagrees that further consultation will not be productive. Do not hesitate to contact me at [redacted]dhr.virginia.gov with any questions.

Sincerely,

Roger W. Kirchen
Director and State Historic Preservation Officer