# DECLARATION OF DAVID MALONEY

I, David Maloney, declare under penalty of perjury that the following statements are true and correct:

1. My name is David Maloney. I am over the age of 18 and able to provide true and accurate testimony under oath.

2. I give this declaration based upon my personal knowledge of the facts cited herein and information acquired during my employment.

3. I am currently the Associate Director for Historic Preservation and the State Historic Preservation Officer (SHPO) at the District of Columbia Office of Planning (OP), a position I have held since 2007. I have served in the Historic Preservation Office (HPO) since 1985. From 1979 to 1985, I served in an architect position on the staff of the Pennsylvania Avenue Development Corporation (PADC), working primarily on design guidelines, historic preservation planning, and design review of new construction along Pennsylvania Avenue NW, one of the nation's most prominent ceremonial boulevards in a historic context. I have a bachelor's degree in architecture with honors from Princeton University, completed a year in the architecture program with a minor in historic preservation at the University of Pennsylvania Graduate School of Fine Arts, and have a master's degree in urban and regional planning from George Washington University, with a concentration in historic preservation.

4. As DC SHPO, my responsibilities include managing 12 staff in the HPO, executing the duties of the SHPO in accordance with the National Historic Preservation Act (NHPA) and the DC Historic Landmark and Historic District Protection Act (DCHPA), and representing the Mayor on the National Capital Memorial Advisory Commission (NCMAC), among other duties.

5. Additionally, in my capacity as the DC SHPO, I serve in a defined consultative role in Section 106 reviews conducted under the NHPA, as well as Section 9b reviews conducted under the DC Historic Landmark and Historic District Protection Act (DC Code § 6-1108.02), which are similar to Section 106 reviews for District-owned properties. The DC SHPO is responsible for reflecting the interests of the District and its citizens in the preservation of their cultural heritage.

6. I have more than 45 years of experience evaluating projects for compliance with federal and District historic preservation requirements, first as a staff reviewer with PADC and HPO, then as Deputy DC SHPO, and for the past 19 years as DC SHPO. During that time, I have reviewed hundreds of projects, mostly involving large-scale commercial and government construction in downtown Washington and the monumental core. My role has been to provide critical evaluation of project proposals, identifying design features that do and do not comply with preservation standards and guidelines, meeting with applicants to suggest alternate ways for bringing projects into compliance, preparing analytical comments for project sponsors and review boards, negotiating revisions with applicants, and seeking consensus among multiple review agencies and consulting parties when involved.

7. I am aware that Defendants have received final approval from the U.S. Commission of Fine Arts (CFA) to initiate construction at Memorial Circle of the United States Triumphal Arch, "a signature monumental structure honoring the nations [sic] 250th anniversary and contributing to Washington, D.C.'s tradition of honoring national principles." I have reviewed the materials provided to consulting parties for the Section 106 process for the Triumphal Arch, including the project description, architectural plans and renderings, and all of the evaluative materials submitted with the NPS initiation letter, listed in detail below. I have

also participated in the consulting party meetings and reviewed consulting party comments, AI-generated summaries from the more than 100,000 public comments, and several hundred comments, especially from DC residents.

8. As set out in more detail below, based on the DC SHPO's participation as a consulting party, Defendants did not properly engage in the requisite review process under Section 106 of the NHPA and its implementing regulations prior to receiving final approval by CFA and NCPC. The DC SHPO was not afforded an adequate opportunity to provide input on alternative locations, design concepts, or structures for the Triumphal Arch project, and the final project harms the District as a planned federal city.

9. In addition, for the reasons set forth below, the planned Arch would severely undermine the officially recognized historic plan for the District, degrade several of its central and most historically significant urban landscape features, and harm the District's interests in preserving the historic design of the capital.

10. The *Plan of the City of Washington* is a DC Historic Landmark, designated in part in 1971 and in full in 1997, and is listed in both the DC Inventory of Historic Sites (DC Inventory) and National Register of Historic Places (National Register). Commonly referred to as the L'Enfant Plan, after its 1791 designer Pierre L'Enfant, the plan was notably revived and expanded by the Senate Park Commission Plan of 1902, commonly known as the McMillan Plan. The evolved plan, along with such landmarks as the Lincoln Memorial, Arlington Memorial Bridge, Arlington National Cemetery, and Arlington House, was recognized in the 1964 Preliminary List of Landmarks of the National Capital (Landmarks List), the first such comprehensive list, prepared by CFA and NCPC in response to an alarming destruction of historic resources in Washington, particularly in Southwest and Downtown and its adjacent

neighborhoods. This was part of a widespread post-WWII concern brought about nationwide by urban renewal, interstate highway construction, suburbanization, and disinvestment in urban downtowns, leading to the passage of the NHPA in 1966. The NHPA established the National Register, and the DCHPA, enacted in 1978 after Home Rule, established the DC Inventory by combining the then-current Landmarks List and the DC listings in the National Register.

**I. The DC SHPO's Role in the Standard Consultation Process.**

11. Under standard practice, the DC SHPO normally steps into a consulting role early in the project planning process for parties seeking to undertake projects that will implicate historic properties, including the construction of new monuments or memorials.

*Commemorative Works Act and NCMAC*

12. For new monuments and memorials, initial contact with the DC SHPO routinely occurs through either a required review of the monument's authorizing legislation or a site selection review by the National Capital Memorial Advisory Commission (NCMAC), pursuant to a process established under the Commemorative Works Act (CWA) that Defendants have followed for decades.

13. NCMAC follows the Memorials and Museums Master Plan (3M Plan), prepared jointly by NCPC, CFA, and NCMAC in 2001 to guide site selection for new commemorative works and museums. Appendix A of the 3M plan is a 24-step guide for establishing memorials in the nation's capital. NPS distributes a 2012 version of that appendix for memorials on its property as a 24-Step Guide to Erecting Memorials in Washington, D.C. (24-Step Guide), outlining the process for obtaining approval for a memorial under the CWA. Following the 24-Step Guide, NPS as the sponsor of the project would first seek authorization for a proposed memorial from Congress. At this very early stage, the NCMAC—which includes the DC SHPO

as a member representing the Mayor—has an opportunity to comment on the proposed authorizing legislation. Comments typically address whether the proposed memorial is appropriate for national commemoration and conforms to the submission requirements of the CWA, or whether it seeks exceptions that would circumvent CWA restrictions on specific criteria such as restricted locations reserved for commemorations of preeminent significance, or commemoration of living individuals or groups.

14. Once Congressional authorization is obtained, and if a sponsor seeks authorization for a site in Area I, the Secretary of the Interior then submits the project proposal to NCMAC for advice on whether the memorial warrants placement in Area I, which is reserved for memorials of the highest national significance and includes Columbia Island. If, after obtaining that advice, the Secretary determines that the commemorative subject is of "preeminent historical and lasting significance," the sponsor must then seek further Congressional authorization for siting the commemorative work in Area I. Once that additional authorization is obtained, NPS would then need to prepare an alternative site study and accompanying preliminary environmental analysis for submission to and consultation with NCMAC. NPS would then submit the recommended site and environmental document to NCPC and CFA for review. Once the preferred site is identified, NPS would then initiate Section 106 consultation with the SHPOs.

15. Since the DC SHPO represents the Mayor on NCMAC, the site selection review both informs the DC SHPO and provides an informed opportunity for the DC SHPO to comment, even before the Section 106 process is initiated.

*Section 106 Review*

16. I am aware that the NHPA requires a federal agency to "take into account the effect of [an] undertaking on any historic property" before it obtains "approval of the expenditure

of any Federal funds on the undertaking or prior to the issuance of any license." 54 U.S.C. § 306108. The implementing regulations for the Section 106 process, codified at 36 CFR Part 800, set out the required process for federal agencies in assessing adverse effects on historic properties, including consultation with SHPOs.

17. The primary goal of consultation in the Section 106 process is "to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 CFR § 800.1(a). The federal agency representative typically works with consulting parties, which include the SHPOs in the affected jurisdiction. *Id.* § 800.2(c)(1). The federal agency is also required to initiate "the section 106 process . . . early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." *Id.* § 800.1(c) The Section 106 implementing regulations also require the federal "agency official [to] plan consultations appropriate to the scale of the undertaking . . . ." *Id.* § 800.2(a)(4).

18. Consulting parties can also include "individuals and organizations with a demonstrated interest in the undertaking . . . due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties." *Id.* 800.2(c)(5). The DC SHPO has been strongly supportive of including such consulting parties in the Section 106 process to ensure that the federal agency complies with the requirement to involve the public and is able to properly consider alternatives to avoid, minimize, or mitigate adverse effects to historic properties.

19. In the Section 106 consultation process, the DC SHPO has a responsibility to reflect the interests of the District of Columbia and its citizens in the preservation of their cultural heritage. *See* 36 CFR § 800.2(c)(1). The SHPO further is responsible for "advis[ing] and

assist[ing] Federal agencies in carrying out their section 106 responsibilities and cooperates with such agencies, local governments and organizations and individuals to ensure that historic properties are taking [sic] into consideration at all levels of planning and development." *Id.* Federal agencies that routinely participate in reviews for projects of this scale include CFA and NCPC. The interests of the District government are also frequently represented by the District Department of Transportation, which can advise on traffic and other impacts to District roadways, and sometimes by the Deputy Mayor for Planning and Economic Development, who can advise on the project's anticipated impact to the District's economy. Organizations ordinarily include the DC Preservation League, National Trust for Historic Preservation, Committee of 100 on the Federal City, and the Cultural Landscape Foundation. Affected Advisory Neighborhood Commissions participate occasionally, as do the National Mall Coalition and American Institute of Architects, both of which are consulting parties for the Triumphal Arch. For projects affecting Virginia historic resources, the Virginia SHPO and historic preservation offices of Alexandria and Arlington County ordinarily consult. Various tribal historic preservation officers are routinely invited to consult in all jurisdictions.

20. For most projects subject to Section 106 review, the responsible federal agency—usually NPS, NCPC, or the General Services Administration—typically reaches out to the DC SHPO in the very early planning stage, when project design is at the concept phase. This almost always occurs before submitting a project to CFA or NCPC for a scheduled public review. Since most DC projects involve both Section 106 review and a review by those two federal Commissions, it is routine for joint consultation with the DC SHPO, CFA, and NCPC staff to occur on projects before they are submitted formally for commission review. This early consultation may include several meetings over one to three months. Such projects typically

involve existing historic buildings, but for new construction projects, informal consultation often begins earlier, while still deciding on location and concept design.

21. The Section 106 process formally begins when the agency responsible for the project sends an initiation letter to the DC SHPO. The initiation letter typically includes a general description of the project, identification of the Area of Potential Effects (APE), and a list of potential consulting parties. The DC SHPO's response usually includes a restatement of the purpose of the project to ensure clarity of understanding, any general comments on the scope of the project, comments on any areas of particular concern, any recommendations for procedure and schedule, and any comments on the APE and list of potential consulting parties. The response sometimes includes suggestions for an expanded APE to ensure the review captures all potentially affected historic properties, or suggestions for additional consulting parties who may be able to provide further expertise on potential adverse effects to those historic properties.

22. The DC SHPO then takes part in an initial consulting parties meeting arranged by the agency, which typically includes an agency presentation describing the project, discussion about the APE, and discussion of the agency's identification and evaluation of significant properties within that area. Consulting parties and the DC SHPO often suggest additional areas and/or properties to include (and occasionally exclude), based on general knowledge of the District, familiarity with our historic resource survey databases, online historic resource maps, and listings in the DC Inventory and/or National Register. The DC SHPO and consulting parties typically follow up with recommended changes in writing, and the agency typically follows up with a second letter to the consulting parties providing any updates in response to comments received and setting the agenda for a second consulting parties meeting.

23. The DC SHPO then takes part in the second consulting parties meeting arranged by the agency, which typically includes an agency presentation with more detail on the project and any further updates, a discussion of the assessment of adverse effects on historic properties, and discussion of potential alternatives to avoid, minimize, or mitigate adverse effects. The DC SHPO determines potential adverse effects by applying the criteria of adverse effect included in § 800.5 of the Section 106 regulations (36 C.F.R. § 800.5), using the expertise and experienced judgment of DC SHPO staff, and taking into account the views expressed by other consulting parties and the public. Factors considered include physical damage, both immediate and long-term, to structures or landscapes, incompatible alterations that diminish the integrity of significant historic features, visual intrusions such as obstruction of views to or from affected properties, noise and environmental intrusions, ground disturbance of subsurface resources, and other pertinent factors.

24. The DC SHPO will also engage in further consultation as necessary to resolve adverse effects. Depending on the nature and complexity of a project, there may be multiple consulting party meetings and written comments as designs are refined and adverse effects resolved sufficiently to reach agreement. All consulting parties, including the sponsoring agency, typically propose alternatives to address adverse effects, either in writing or verbally at meetings. Suggestions can include changes in location, size, design, or materials of a new construction project, and modifications of its relationship to surrounding properties. Consultation typically concludes with the collaborative development of an agreement document that records the outcome of consultation and the conditions of approval. For complex projects, adequate consultation to ensure resolution of adverse effects can take several years, given multiple rounds of comment from the SHPO, CFA, NCPC, and consulting parties as projects evolve from initial

concepts to developed designs and as project sponsors and their architects take the requisite time for revisions in response to comments.

25. The DC SHPO has a long and constructive history of working collaboratively with NPS and other federal agencies, the Smithsonian Institution, and similar sponsoring organizations to complete Section 106 review of many large-scale, monumental buildings and commemorative projects in and around the monumental core of Washington, D.C. Unlike more routine Section 106 consultations, projects on the National Mall are exceptional and involve a more extended, iterative process of collaboration to ensure the highest quality of civic improvements, commensurate with their setting among the most important symbols of the nation. The consultation for these projects involves not only elevated review standards for National Historic Landmarks and the highest level of scrutiny from government review bodies, but also expert and incisive commentary from numerous consulting parties. Examples from the last two decades, noting the length of consultation from initiation to a concluding agreement, include the Martin Luther King Jr. Memorial (3/1999 to 8/2008, about 9.5 years), National Museum of African American History and Culture (12/2007 to 9/2011, 3.75 years), World War I Memorial (5/2015 to 4/2019, nearly 4 years), Eisenhower Memorial (4/2010 to 3/2012, nearly 2 years), Desert Shield and Desert Storm Memorial (7/2017 to 3/2020, about 2.5 years), and the Bezos Learning Center addition to the National Air and Space Museum (6/2023 to 6/2025, 2 years). These unusually rigorous reviews have markedly improved the architectural quality of proposed new monuments and their sensitivity to context, resulting in the highest quality of civic improvements in the public landscape of Washington.

26. Section 106 reviews are resource-intensive for the HPO. The office typically consults on 400 to 500 Section 106 cases annually, distributed among four staff reviewers—two

senior preservation specialists and a senior and junior archaeologist—in addition to their caseload for Section 9b reviews under the DCHPA, which follow a similar but more streamlined and less structured process without formal consulting parties or regulatory controls. Most Section 106 and Section 9b cases (some projects invoke both reviews) are handled by a single assigned staff person, or two staff when both built resources and archaeology are involved. As the DC SHPO, I participate actively in the most complex cases, including review of the Triumphal Arch. In total, the reviews account for about 4 staff FTEs (full-time equivalents), divided roughly at 2.25 FTEs for Section 106 and 1.75 for Section 9b, or 31% of the 13 HPO staff including the SHPO.

**II. Defendants' Deviation from Standard Review Processes for the Triumphal Arch**

27. The Triumphal Arch is currently planned to be an approximately 250-foot-tall structure to be located at Memorial Circle near the western terminus of Arlington Memorial Bridge. Once complete, it would be the largest memorial arch in the world. It would also be the tallest and most visible memorial constructed in the District since completion of the Washington Monument in 1888. The NPS initiation of consultation describes the proposal this way: "The proposed United States Triumphal Arch (the Arch) would serve as a signature monumental structure honoring the nations [sic] 250th anniversary and contributing to Washington, D.C.'s tradition of honoring national principles."

28. The site of the Triumphal Arch is located on Columbia Island in the Potomac River, which falls within the territorial boundaries of the District of Columbia.

29. The proposed location for the Triumphal Arch is a place of extraordinary historic significance. As a cultural landscape, the grand ceremonial urban design of Arlington Memorial Bridge and Memorial Avenue, with its supporting composition of landscape features and

artwork, constitutes one of the most significant and recognized places in Washington, DC, perhaps second only to the National Mall. It originated in the 19th-century desire to create a place of national reconciliation after the devastation of the Civil War. Widely regarded as Washington's most beautiful bridge, Memorial Bridge symbolically links North and South by its alignment between the Lincoln Memorial and Arlington House (the Robert E. Lee Memorial) in Arlington National Cemetery. A masterpiece of urban planning and architectural design, the memorial river crossing extends and terminates the great composition of the National Mall, shifting its axis at the Potomac River to establish an impressive and dignified ceremonial approach to the nation's most revered military cemetery. Its processional route is marked by solemn and restrained pylons and statuary that mark the progress over the gentle arc of the bridge from city to island to cemetery, measuring the distance across each stage of gradual transition from the wide-open river to the nearly half-mile-long enclosing frame of holly hedges, while always keeping in view its architectural terminus, the embracing Hemicycle with Arlington House rising on the wooded hill above it.

30. Because of the Arch's proposed location in such a significant historical landscape, a vast array of adversely affected historic properties has been identified through the Section 106 process. Given that the proposed location affects historic properties in both the District and Virginia, both the DC SHPO and Virginia's SHPO have been included as consulting parties for this undertaking.

31. NPS's initial Assessment of Effects (AOE) report identified the following adversely affected properties: the Lincoln Memorial, Arlington Memorial Bridge, Memorial Avenue Corridor, Arlington Memorial Cemetery, Arlington House, Lyndon B. Johnson Memorial Grove and Lady Bird Johnson Park, the Pentagon, Fort Myer, Arlington Ridge Park, East and

West Potomac Parks, Rock Creek and Potomac Parkway, Mount Vernon Memorial Highway, National Mall Historic District, George Mason Memorial, and Washington Monument and Grounds. The Jefferson Memorial Cultural Landscape was also identified, as were the cultural landscapes associated with several of the properties listed above.

32. Within the Memorial Avenue Corridor and Rock Creek and Potomac Parkway, affected properties include the *Arts of War* and *Arts of Peace* statuary, Memorial Circle Pylons, Boundary Channel Bridge Pylons, Arlington Hemicycle and Pylons, and multiple military service memorials and landscape features. Within Arlington Cemetery, affected properties include the John F. Kennedy and Robert F. Kennedy Memorial Gravesites, and Pierre L'Enfant grave, with its panoramic view over the City of Washington that he designed. Within West Potomac Park, affected properties include numerous national memorials.

33. After receiving comments from the SHPOs and other commenting parties, NPS revised the AOE report in August 2026 to list additional adversely affected properties including the L'Enfant Plan, U.S. Capitol, Jefferson Memorial, World War II Memorial, National War College, Frederick Douglass National Historic Site, Old Naval Observatory, Observatory Hill Historic District, American Institute of Pharmacy, Georgetown Historic District, Halcyon House, Vigilant Firehouse, Key Bridge, George Washington Memorial Parkway, National Cathedral, Alban Towers, and two smaller properties in Virginia.

34. Significant among this group is the District-owned Key Bridge, an iconic DC landmark used daily by thousands of pedestrians and motorists who experience panoramic views over the Potomac, historic monuments, and island parks. The gargantuan presence of the Arch, two-and-a-half times the 100-foot height of both the Kennedy Center and the bridge, would overwhelm the view and diminish the relative stature of both landmarks. Also significant are the

District-owned public spaces and public buildings in the Georgetown Historic District, including the public streets, Georgetown Waterfront Park, public schools, and the Georgetown Public Library. Preliminary analysis suggests that crowds on M Street may well be able to see the Arch looming over the skyline of trees on Roosevelt Island, nearly two-thirds the 390' height of the tallest Rosslyn skyscraper. From buildings fronting the Waterfront Park, the site of Georgetown's former trading port and industrial hub, the Arch would intrude on historic views down the river. When trees are bare for at least a third of the year, views from the public library on Georgetown Heights at R Street would be affected, as would views down some streets descending from the heights. Year-round, the rooftop educational terrace at Duke Ellington School (listed in the DC Inventory and National Register), installed to capture the sweeping views, would also be adversely affected. Collectively, these effects would diminish characteristic features of Georgetown's public environment to the detriment of the District of Columbia. As a National Historic Landmark, the Georgetown Historic District must be afforded all possible planning to minimize harm under NHPA Section 110(f), 54 U.S.C. § 306107.

35. During consultation, the Virginia SHPO and National Trust for Historic Preservation, among others, noted the requirement to consider not only properties listed in the National Register but also those eligible for listing. The DC SHPO concurs with this requirement. NPS also acknowledged the requirement and that they had not fully considered eligible properties. Additional adversely affected eligible properties include the Kennedy Center, determined eligible by the Kennedy Center and DC SHPO in 2012, and the Air Force Memorial, considered potentially eligible by the Arlington Historic Preservation Program.

36. Due to its highly visible location and overwhelming bulk and height (250 feet), the Triumphal Arch would adversely affect all other prominent historic landmarks on the skyline

of the national capital in its vicinity, noticeably diminishing their relative prominence. For comparison in size, these landmarks include the Lincoln Memorial (99 feet), Jefferson Memorial (129 feet), Air Force Memorial (270 feet), Kennedy Center (100 feet), Washington National Cathedral (301 feet), Washington Monument (555 feet), and Old Post Office tower (315 feet). At 250 feet high and 165 feet wide, the Triumphal Arch would rise nearly half the height of the Washington Monument yet triple its width (55 feet). The main section of the arch (166 feet) would rise higher than the two-stage drum supporting the U.S. Capitol dome (162 feet) while at 165 feet wide, greatly exceeding the diameter of the lower drum (125 feet) and the upper drum (104 feet). Its roof features would rise another 24 feet to 190 feet, roughly to the top of the windows around the base of the dome, and its crowning statue would rise to the top of the circular colonnade that crowns the Capitol dome. By any measure, this scale is gargantuan. It would also greatly exceed the height and altitude of Arlington House (about 30 feet high from grade at 171 feet above sea level), which would rise behind it.





*Elevations of the Arch and Thomas U. Walter drawing of the U.S. Capitol, at 1:1 scale*

37. Given the physical scale of the Triumphal Arch project and the anticipated scope of its visual impact on numerous historically significant sites in the District and other jurisdictions, Defendants should have provided the SHPOs and consulting parties sufficient opportunity through the Section 106 process to carefully examine which historic properties were included in the assessment of effects and to evaluate the adverse effects on those properties, as well as adequate opportunity for the SHPOs and other consulting parties to work with NPS to identify alternatives for the Triumphal Arch project that would meaningfully adhere to Section 106 requirements to avoid, minimize, and mitigate adverse effects. However, as set out in more detail below, throughout the Section 106 review for the Triumphal Arch, Defendants have deviated from the standard process to rush the project to final approval, bypassing critical input from consulting parties and the general public and failing to resolve the adverse effects on a vast number of historic properties.

*(1) Delayed Initiation of Consultation with DC SHPO and Other Parties*

38. For a project of this scale, Defendant NPS should have included the DC SHPO and other consulting parties far earlier in the Section 106 process.

39. As explained above, NPS would usually first seek Congressional authorization under the CWA for projects of this scale. Although the Triumphal Arch will be located on federal land managed by NPS and is intended to be a "signature monumental structure" honoring the 250th anniversary of American independence and contributing to "Washington, D.C.'s tradition of honoring national principles"—as described in the attachments to the NPS Section 106 initiation letter of June 9, 2026—Defendants to my knowledge have not sought separate authorization for the Triumphal Arch and have instead relied on the 1925 Act authorizing construction of

Arlington Memorial Bridge. In bypassing the CWA process and consultation with NCMAC, Defendants deprived the DC SHPO of critical opportunities to provide input early in the design and planning process to avoid some of the adverse effects to historic properties that the current project will inevitably create.

40. Instead, NPS submitted the concept design for the Triumphal Arch to CFA by its April 2, 2026, monthly filing deadline, and the commission approved the concept submission with comments on April 16, 2026. CFA approved the final proposal for the architectural design on May 21, 2026, with comments and requesting further information about the program of sculpture. NPS submitted the concept design for the Triumphal Arch to NCPC by its monthly filing deadline of May 1, 2026, and the commission provided comments on the concept submission on June 4, 2026, with a request for more information, and gave its preliminary approval on July 9, 2026.

41. It was not until June 5, 2026—more than seven months after the Triumphal Arch was first announced on October 15, 2025, and after multiple rounds of public comment—that NPS first contacted DC SHPO to initiate the Section 106 consultation process.

42. The NPS initiation letter notified the DC SHPO that the undertaking would affect a number of historic properties and proposed an attached Programmatic Agreement (PA) to identify and resolve adverse effects as the project advanced. The letter included a list of invited consulting parties, Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and Assessment of Effects (AOE) report with appendices including project plans and renderings, Area of Potential Effect (APE) maps, Phase 1A Archaeological Assessment, and table of affected historic properties and effects. These materials constituted nearly 200 pages of documentation.

43. NPS's June 5, 2026, initiation letter to the SHPOs identified a list of consulting parties including the DC and Virginia SHPOs, ACHP, 11 Indian nations, 10 federal government entities, and three local government entities. It also included a list of six nonprofit organizations (the National Trust for Historic Preservation, Committee of 100 on the Federal City, DC Preservation League, Cultural Landscape Foundation, National Parks Conservation Association, and American Institute of Architects) identified as "other parties that have requested consulting party status" but not yet granted such status. Although these organizations have routinely been admitted as consulting parties by NPS and other agencies, their initial exclusion from the consulting party list caused them to miss the first of only two consulting party meetings, precluding their input from this critical step of the Section 106 process.

*(2) Unjustified Expediting of Section 106 Review*

44. Even after failing to initiate consultation at an early stage of planning, NPS requested in its initiation letter that the DC SHPO agree to expedite consultation by addressing multiple steps in the Section 106 process, pursuant to 36 C.F.R. 800.3(g). These steps, set out in §§ 800.3 through 800.6, cover essentially the entire process: initiation, identification of the APE, evaluation of historic properties, assessment of adverse effects, resolution of adverse effects, and conclusion of the PA. NPS indicated that expediting consultation in a consolidated manner would be "the most efficient and appropriate means of carrying out review."

45. The DC SHPO did not concur because we did not believe that expediting consultation on an undertaking of the magnitude of the Triumphal Arch was appropriate or consistent with the purpose of the NHPA and Section 106 process. The Virginia SHPO did not concur either. Nevertheless, NPS proceeded with Section 106 review on a condensed timeline.

46. NPS invited the SHPOs to a consulting party meeting on June 15, 2026, just 10 days after sending the initiation letter.

47. The DC SHPO responded to the NPS initiation letter in writing on June 15, 2026, and also attended the consulting parties meeting on the same date. The response letter noted that the proposed Triumphal Arch would be the largest memorial arch in the world and the most visible memorial constructed in the District since completion of the Washington Monument. In addition to declining to agree with expedited consultation, the DC SHPO concurred with the NPS determination of properties that would be adversely affected and notified them that we anticipated further comments on additional adverse effects, pointed out the rushed process, criticized the failure to begin consultation at the early stages of project planning for a project of this prominence, strongly urged the admission of those organizations that had requested but not been granted party status, noted the inadequate time for public review of documents, noted that the APE should be expanded, urged consideration of alternate sites to avoid adverse effects, criticized the NPS's refusal even before consultation began to minimize effects by reducing the size of the memorial, and did not concur with the use of a PA given the inadequate mitigation proposed and unlikelihood of resolving adverse effects using that method.

48. To date, the DC SHPO has submitted five more comment letters to the NPS for the Triumphal Arch Section 106 process.

49. On June 26, 2026, we followed up to summarize the verbal comments we presented at the June 15th consulting parties meeting. We disputed the NPS characterization that the Triumphal Arch was celebratory and not memorial in nature, requested copies of the 100,000 public comments, pointed out eloquent testimony at NCPC that the arch would be divisive and not healing, reiterated that it would severely damage an exceptional landscape and one of the

most important symbolic places in the nation, and suggested an alternate location, such as South Capitol Street at the Anacostia River as a way to avoid those adverse effects (following up with an email clarifying that the alternate location was a DC SHPO suggestion and not one of the DC government as a whole).

50. On July 24, 2026, we recommended the APE include prominent tall landmarks on the skyline in order to consider the effect of diminishing their prominence given the greater height of the Triumphal Arch.

51. On August 31, 2026, we protested the near-constant NPS requests for expedited reviews on multiple projects over several months, including a rushed seven-day turnaround on a 113-page revised AOE report by September 4th, a consulting party meeting for the White House Visitor Screening Facility (VSF) on September 8th, a consulting party meeting for the Arch on September 9th, a site visit for the Lafayette Square security project on September 10th, comments on a 20-page draft MOA with five appendices and a consulting party meeting for the VSF on September 12th (instead of September 28th) and a consulting party meeting on Lafayette Square on September 21st or 24th. We made our fifth request for the 100,000 public comments and renewed our objection to NPS's refusal to cease work and engage in mandatory consultation on disputed painting of the Lincoln Memorial Reflecting Pool.

52. On September 16, 2026, we provided comments on the revised AOE report, concurring with the expanded APE and noting that it increased the number of adversely affected properties to at least six National Historic Landmarks, eight historic districts, eight cultural landscapes, and 20 individual historic properties. We also cited the adverse effects of 320-foot tower cranes for a full year of construction, 20 hours daily, adjacent to Arlington National Cemetery (an active site with a heavy schedule of interments); reiterated that the Arch would

visually overwhelm the surrounding historic context and irreparably compromise the Arlington Memorial Corridor, in contrast to NPS's milder characterizations of the visual impact; rejected the specious argument that the "inherently location dependent" Triumphal Arch is authorized by a 1925 Act of Congress and would somehow "complete" the century-old McKim Mead & White design for a completely different pair of slender columns carefully situated to frame the view between the Lincoln Memorial and Arlington House and more directly signifying reunification by using the columns to symbolize the North and the South; provided our preliminary analysis that among the 100,000 public comments from all 50 states and most U.S. territories, approximately 93% of the roughly 11,000 submitted from the District of Columbia expressed very strong opposition to the proposal; and requested meaningful consideration of an alternative design that would more accurately reflect the spirit and intent of the 1924 McKim Mead & White design.

53. On September 21, 2026, we provided preliminary comments on a draft Memorandum of Agreement (MOA) circulated by NPS, responding that the routine mitigation measures proposed were not proportionate to the significant adverse effects of the Arch. (After the second consulting parties meeting on September 9th, NPS circulated the MOA on September 15th, one day before the September 16th deadline for written comments after the meeting, indicating that NPS could not have considered all public comments, including ours, before preparing the MOA.)

54. In addition to providing written comments to NPS, the DC SHPO attended two meetings for consulting parties. The concerns raised by the DC SHPO at the June 15, 2026, meeting are summarized in our letter of June 26, 2026. The concerns raised by the DC SHPO at the September 9, 2026, meeting are summarized in our letter of September 16, 2026.

55. The DC SHPO has attempted to provide as much input as possible on the Arch project in order to ensure we have met our obligations to identify adverse effects to historic properties and recommend changes to resolve those adverse effects. However, given the complexity of the project and the extremely condensed timeframe, participation in this Section 106 process has been incredibly burdensome on our office's resources, constraining our ability to review projects of other sponsoring agencies. The unprecedented onslaught of rushed NPS reviews required a comparable response, and we committed our best efforts to responding effectively given what we see as a nearly existential issue for the District and its fundamental historic character. The review of non-NPS projects was delayed due to the inordinate amount of time the SHPO's NPS reviewer had to spend on the Arch and other NPS projects being rushed simultaneously, including the White House VSF, Lafayette Square security, and others. To meet the rushed and often overlapping deadlines, the SHPO's NPS reviewer had to work considerable overtime to meet the deadlines. His work started at 4:00 a.m. and lasted through 8:00 p.m. on several occasions. During mid-June, he worked the rough equivalent of seven days during the regular five-day workweek. Work focused on reading and analyzing lengthy AOE and other reports, preparing correspondence and comments for meetings and letters, participating in project meetings, reviewing and commenting on draft agreement documents and negotiating for appropriate mitigation measures. Additional time was also required to coordinate drafts with internal legal counsel and external offices. Concurrently, meeting the SHPO's 30-day review and comment period required additional overtime and doubling up by other SHPO reviewers.

*(3) Failure to Consider Alternatives to Resolve Adverse Effects*

56. The most notable deficiency in compliance with the Section 106 process is NPS's failure to consider alternatives to avoid, minimize, or sufficiently mitigate the adverse effects of the Triumphal Arch.

57. NPS's AOE report acknowledges that the "most substantial" adverse effects from the Triumphal Arch will occur on those properties that "derive significance, in part, from their planned visual, commemorative, and spatial relationships across the Potomac River and through the monumental core." The DC SHPO concurs with that as a general assessment, but it understates the devastating and unprecedented adverse effects on the extraordinary composition of the Lincoln Memorial, Arlington Memorial Corridor, and Arlington National Cemetery cultural landscape, and the unique skyline of Washington D.C. as a symbolic national capital with a longstanding tradition of controlled building heights to ensure that the historic landmarks expressing the institutions and principles of American democracy remain visually pre-eminent. The most substantial adverse effect of the arch is that its colossal scale and highly exposed placement would ruin that commemorative landscape and establish an overwhelming visual presence on the skyline of the monumental core that would greatly diminish the stature of the U.S. Capitol, Washington Monument, Lincoln Memorial, and the National Mall.

58. The Section 106 process prioritizes *avoidance* of adverse effects, then minimization, then mitigation. In the typical Section 106 process of new memorials, a Federal agency usually begins with the evaluation of a range of possible locations when initiating avoidance efforts. To that end, the DC SHPO has provided NPS with suggestions for alternative locations, such as a Triumphal Arch at another location elsewhere in the District, or an appropriate commemorative monument on Columbia Island but flanking the processional axis rather than blocking it.

59. In a June 26, 2026 letter to NPS, the DC SHPO proposed an alternative location for the Arch, at the newly created oval marking the arrival of South Capitol Street at the Anacostia River and its shift in direction to cross the new Frederick Douglass Bridge. An alternative location would allow Defendants to construct a structure similar to the one proposed for the Arch as a centerpiece for a recently created urban landscape in a rapidly developing section of the city, rather than creating a massive visual obstruction in the midst of a century-old historic landscape revered for its commemoration of those who died in service to the nation.

60. Even with several options for relocating the Arch, NPS has made clear that it has not and will not consider alternative sites for the Arch. Instead, NPS has alleged that the Arch *must* be located at Memorial Circle to fulfill the statutory purpose of the 1925 Act.

61. As another option, the DC SHPO suggested at the second consulting parties meeting that NPS explore design options that would be suitable for the Memorial Circle location. We followed up with that suggestion in our comment letter of September 16, 2026. Given the ample documentation of the 1924 McKim Mead & White design for two slender columns, widely spaced on either side of Memorial Circle, we requested consideration of a design inspired by that original idea and included an image of the architect's rendering for reference. As explained in the Bridge Commission Report, such columns would serve to frame Arlington House as the visual terminus and would leave a sweeping view of Lincoln Memorial, in line with the intention of the McMillan Plan, in contrast to the visual obstruction that would be created with the Arch.

62. A second possible approach to a design inspired by the two columns is to create a new design that would perform the same urbanistic role of marking the center point of the Memorial Corridor composition, establishing a cross-axis similar to those in the L'Enfant Plan

(the White House axis crossing the Mall, for example, or 8th Street NW crossing Pennsylvania Avenue), with vertical elements to balance the long horizontal expanses of the processional route and create a sense of place on Columbia Island. There are numerous examples of contemporary approaches to a slender vertical monument, such as the U.S. Air Force Memorial and the Spire of Dublin in the Irish capital.

63. This alternative design approach could still fulfill the parties' obligations under the Section 106 process by largely avoiding or minimizing the adverse effects on historic properties.

64. In considering new memorials, NCPC, CFA and NCMAC rely heavily on the 3M Plan. The plan analyzes the attributes and constraints of 100 potential sites and pointedly does not include Memorial Circle as an appropriate site for a future memorial. In contrast, it identifies a pair of locations *flanking* Memorial Avenue on the Virginia riverbank well to the west of the circle as a suitable site.

65. NPS has indicated that it will not be considering any design alternatives, even though it has an obligation under the NHPA and Section 106 regulations to consider input from consulting parties and the public in addressing adverse effects.

66. The NPS representative at the Section 106 meeting with consulting parties on September 9, 2026, stated "The determination was made that no reasonable avoidance alternative exists."

67. NPS circulated a proposed Memorandum of Agreement (MOA) on September 15, 2026, which included suggested "mitigation" to include construction management control; archaeological investigation; park improvements such as rehabilitation of the landscape along the Arlington Memorial Corridor and wayfinding for pedestrians; documentation of historic features,

to include archival-quality drone and ground photography of their condition before construction of the arch, oral histories, a 3-D digital model, and other items; and various interpretive programs on the corridor and its vicinity, the history of triumphal arches, archaeological investigations, maritime activity along the Potomac, Native peoples, and the like.

68. The laundry list of proposed mitigation measures is not proportionate to the adverse effects of the Arch. Many are routine construction and land management requirements or measures implemented for undertakings causing far lesser adverse effects. The mitigation proposals do nothing to address the acknowledged "substantial" adverse visual, spatial, and experiential effects of the Triumphal Arch on the historic integrity and ambience of solemn and respectful honor at one of the nation's most important symbolic places.

69. Introducing a gargantuan symbol of triumph into this setting will effectively destroy one of the most important commemorative landscapes in the nation's capital and undermine the history it purports to celebrate, a harm that is underscored by Defendants' failure to give any meaningful consideration to the public's substantial opposition to the project. Unfortunately, the sponsors have repeatedly invoked a trifecta of *musts*—that the monument *must* be an arch, it *must* be 250 feet high, and *must* be at only one location. That obstinacy has foreclosed any other possibility, ruled out any other alternative, and rendered the review process little more than a meaningless exercise.

*(4) Last-Minute Change in Purpose*

70. Whether there will be additional adverse effects and how those should be addressed remains unclear, because the purpose and scope of the proposed arch is in flux. Although the designs shown for the Arch have been consistent throughout the Section 106

consultation process, the President announced on September 20, 2026, that the Arch would also serve a military function.

71. However, no information has been provided about the impact of these uses on the design of the Arch and the surrounding area. NPS has not provided an updated EA to account for this new purpose, and no further consulting party meetings have been scheduled to discuss potential adverse effects. Under these circumstances, it is impossible under the standard process to conclude any Section 106 review.

*(5) Unprecedented Termination of Section 106 Consultation*

72. The Advisory Council on Historic Preservation (ACHP), at NPS's request, issued a termination notice on September 24, 2026, which ended consultation with SHPOs and other consulting parties. ACHP requested public comments on the undertaking and resolution of adverse effects by September 29, 2026.

73. In response to the ACHP termination and scheduling of a meeting for final comments from interested parties, on September 29, 2026, the DC SHPO provided oral comments at an ACHP meeting and sent a comment letter to ACHP. In both sets of comments, the DC SHPO highlighted that the Section 106 process conducted by NPS had been inadequate and ACHP termination was premature. The DC SHPO requested that ACHP reconsider its decision to terminate and explained how the adverse impacts of the proposed arch could be avoided or minimized, and finally how it might be possible to begin to mitigate the adverse impacts.

74. The ACHP provided the Secretary of the Interior with its comments on the undertaking on October 9, 2026. These comments acknowledged that the DC and Virginia SHPOs had "raised numerous concerns to the NPS, including whether alternatives to meet a

similar purpose and need for the undertaking had been considered to meet the NHPA's Section 110(f) requirements (54 U.S.C. § 306107), and whether the NPS's identification efforts and assessment of effects were sufficient for an undertaking of this scale." ACHP Letter, p. 2. The ACHP also recommended that NPS provide additional information on its efforts to avoid, minimize, or mitigate adverse effects, noting that providing "additional information or explanation as to how the undertaking and its direct adverse effects to historic properties remain[s] in the public interest." *Id.* at 3.

75. I expect that on November 5, 2026—despite the numerous deficiencies in the Section 106 review process—NCPC will grant its final approval for the Arch project.

76. Despite the DC SHPO's efforts to provide input to protect historic properties in the District, it appears that Defendants have bypassed the proper Section 106 procedures in an effort to rush the project to final approval. Without properly considering input from the DC SHPO and other consulting parties, NPS has not adequately taken into account the interests of the District of Columbia and its citizens in the preservation of our cultural heritage.

**III. The Triumphal Arch's Harm to the District as a Planned Capital City**

77. The District of Columbia is internationally recognized as a planned capital city. As described in its National Register listing, it is the foremost example in the United States of two combined nationally significant city planning styles—Baroque and City Beautiful—and is the result of careful adherence to two renowned design plans: the L'Enfant Plan and the McMillan Plan. The two plans together have significantly shaped the capital city, and it is the combination of the two plans that constitutes a historic resource of national and international significance. However, as set out in further detail below, the Triumphal Arch will interfere with centuries of careful planning and development, destroying the intended viewshed and historical significance of

the L'Enfant Plan and the McMillan Plan and undermining the District's status as a planned federal city.

78. The L'Enfant plan for the national capital, designed in 1791, was developed throughout the 19th century and substantially amplified in 1901-02 by the McMillan Commission (officially, the Senate Park Commission). Both the Baroque and City Beautiful aspects of the plan are significant examples of their respective design philosophies, but the design and evolution of the two combined plans is even more outstanding as a unified entity that has no parallel in American city planning. Many elements of the L'Enfant Plan took shape in the nineteenth century and remain in place, and many of the McMillan Commission's recommendations were implemented, particularly in the first three decades of the twentieth century.

79. For more than 200 years, development of the District has carefully followed the *Plan of the City of Washington* designed and named by the Revolutionary War military engineer and architectural designer appointed by President Washington, Peter (Pierre) Charles L'Enfant. L'Enfant's 1791 plan, though incomplete upon his dismissal, has remained the basic framework that was refined by the designers who followed him.

80. L'Enfant's plan was grounded in the Renaissance and Post-Renaissance urban and landscape design principles developed first in Italy, relying on grand spaces interconnected by a network of sweeping vistas defined by architectural elements and structured plantings including rows of trees and formal hedges. The brilliance of L'Enfant's Plan of the City of Washington is that he managed to transform regal design elements to express the character and structure of a new democracy defined by a balance of powers among three branches of government, with the Congress House occupied by the representatives of the people at the center, on the crest of Capitol Hill, and the Executive Mansion in a secondary but comparably imposing setting at a

measured distance. The physical expression of this interdependent relationship shapes the great cross-axis of the Mall greenswards, with the diagonal of Pennsylvania Avenue creating reciprocal vistas between the two power centers. But importantly, the Capitol and White House do not face each other frontally as if in competition. Each faces its own vista to the horizon, the Capitol to the west and White House to the south, separately expressing their independent functions in the national government. Similarly, the anticipated home of the third branch of government at Judiciary Square also faces its own vista across the Mall to the south.

81. The Arlington Memorial Corridor follows the same principles, with the bridge, like Pennsylvania Avenue, as a diagonal between the Lincoln Memorial and Arlington House, both of which face not on the diagonal, but in different directions. In contrast, the gigantic Triumphal Arch occupies the center of the corridor, directly confronting the viewer in both directions, destroying the composition with an overwhelming head-on view.

82. The foremost enhancement of L'Enfant's plan began in 1882, with a 30-year project by the Army Corps of Engineers to improve sanitation and protect the city from persistent flooding by reclaiming the Potomac River mudflats, moving 12 million cubic yards of fill and creating the Tidal Basin and broad expanses of parkland for recreation. The urban design opportunity thus created was crystallized in 1901-02 with the McMillan Commission, which convened a panel of the nation's foremost architects, landscape architects, and artists to formulate a comprehensive program of park planning and urban improvements. After traveling to European capitals for inspiration, the Commission members returned to develop a comprehensive plan for the improvement of the District's park system, focusing most attention on the National Mall. Their work resulted in the most elegant example of City Beautiful tenets in

the nation, the McMillan Plan, which restored key features of L'Enfant's plan while also anticipating a much larger and more cosmopolitan world capital.

83. The McMillan Plan expanded and reinterpreted portions of L'Enfant's earlier plan, incorporating proposals for the newly reclaimed lands along Potomac River. Most significantly, the proposed improvements were not conceived as scattered individual projects but as part of a unified system for the enhancement of the city as a whole. The plan guided the removal of train tracks from the Mall to restore the continuous open greensward envisioned by L'Enfant, and it extended the improved Mall to the Potomac, with an elongated reflecting pool along the axis, surrounded by waterfront parks, parkways, new monuments, and vistas. Terminating the grand axis from the Capitol, the plan proposed a new monument to Abraham Lincoln, set within a circle from which would radiate parkways and a bridge across the Potomac to Arlington National Cemetery.

84. L'Enfant's placement of the U.S. Capitol at the very heart of the city is his most important symbolic idea: from here, the representatives of the people rule. The Capitol is the preeminent symbol of American democracy, and no other structure in the nation's capital rivals it in prominence and magnificence. It rises on the highest point of the city center and is the focal point of the radiating avenues and the axial grid that defines the quadrants of the city. Other structures like the White House and the memorials to Lincoln and Jefferson do not rival it but rather support its dominance. Even the Washington Monument, 267 feet higher, defers to the Capitol by its simple and slender shape.

85. The Arch would challenge and disrupt the primacy of the Capitol as the permanent symbol of our democracy due to its stature. A visitor looking over the city from the top of the Washington Monument, or flying in over the parks along the Potomac, would see both

the Capitol at one end of the Mall and a structure of similar prominence at the other end, diverting attention from the Capitol.

86. The McMillan Commission, like L'Enfant, was clear in its intentions for the symbolic landscape of Washington. The McMillan Plan created the national processional route of honor from the Capitol to the resting place for the nation's martyrs and heroes at Arlington National Cemetery, as discussed below. The funerals of President Kennedy and many others following that route in solemn commemoration of their lives are indelibly etched in the nation's memory. The imposition of a colossal arch at an incongruous location on the route, rivaling the Capitol in size and prominence, would distort the design of that century-old route and distract from the intended focus on honoring those interred there.

87. The Memorial Bridge to Arlington National Cemetery had been envisioned since the 1880s, and the McMillan Plan firmly established its location marking the axis between the Lincoln Memorial and Arlington House. The bridge and its features were intended to be both a monumental entry to the federal city and a formal, processional route to the national cemetery.

88. Planning for the Memorial Bridge project began in earnest in 1921, as the Lincoln Memorial neared completion. The Arlington Memorial Bridge Commission (ABMC), created by Congress to develop a design and carry out construction of the bridge, selected the distinguished New York architectural firm of McKim, Mead and White to design the project, with William Mitchell Kendall serving as the project architect. His elegant and sophisticated plan was accepted and published in 1924.

89. An earlier design for the Memorial Bridge, shown below, included prominent arched drawbridge towers, but the final ABMC report to Congress rejected this design in favor of

a low horizontal bridge with vertical pylons marking its entries. The report describes the aspirations for the memorial bridge in these stirring terms:

> "This project has many important features which, taken together, will make it the greatest single memorial project undertaken by any Nation in recent times. Following immediately after the Lincoln Memorial in time of construction, it fortunately supplements and completes that great Memorial in finishing the landscape in its vicinity and carries the Mall treatment of Washington and L'Enfant across the Potomac to Arlington and up to the last resting place of the designer of the original plan of the Capital at the portico of the Lee Mansion. In addition to this relationship, there is a compelling patriotic motive in the project of a direct broad boulevard from the Capitol through B Street extended and widened [Constitution Avenue], by way of the Lincoln Memorial and on across the broad and dignified bridge, as a route for the Nation's fallen heroes to their last resting place in the Arlington National Cemetery. There is a third great motive in the complete plan and that is the provision of a magnificent entrance to Washington from Virginia for the Lee Highway coming across the entire country from Los Angeles, California."
>
> "The fourth and perhaps the greatest of all is the symbol of the binding together of the North and South in one indivisible Union, knowing no sectional lines."
>
> "As the traveler approaches Washington over the brow of Arlington Heights in Fort Myer there will burst on the view a panorama that has few equals in the world; once seen it will never be forgotten, and will live in the memory of the beholder forever as a perpetual inspiration to loyalty, patriotism, and devotion to country." (ABMC Report, p. 5)
>
> . . .
>
> "In order not to interfere with the view of the Lincoln Memorial as seen from Columbia Island, the bridge has been kept as low as possible consistent with sound engineering and economy. . . ."
>
> "The architecture has been kept as simple and severe as possible, the structure mainly depending for its beauty upon the perfection of its general proportions and its adornment with significant sculpture pieces of the highest quality of design." (ABMC Report, p. 7)
>
> . . .
>
> "Being so intimately related to the bridge, it was thought proper that the plans for the ultimate development of Columbia Island as a park should be included as part of the project for the Memorial Bridge. Accordingly, the lines of the shore of the island have been somewhat rectified to permit a cross axis almost perpendicular to the main axis of the bridge and extending the full length of the island. The intersection of these two axes has suggested a plaza with fitting architectural adornment in a measure

supplemental to the Lincoln Memorial across the river, and for this purpose two stately columns are proposed to be erected here, framing in but not interfering with the view of the Lincoln Memorial from the direction of the Lee Mansion. These columns symbolize the North and the South. . . ." (ABMC Report, p. 9)



*Burr-Casey bridge design selected in 1899 by the Army Corps of Engineers and rejected in 1916 (NPS Cultural Landscape Inventory, GW Memorial Parkway)*

90. As shown in the project renderings, the final bridge design's elements were widely spaced to keep a spacious open vista between the terminal focal points, with the slender columns adding the suggestion of a frame.



PERSPECTIVE

*Arlington Memorial Bridge design with Columbia Island columns (Bridge Commission Report)*

91. Work on the bridge began in 1926 and was largely complete by 1929. The memorial avenue was completed by 1932. As shown in the photographs below, excerpted from the NPS EA, the existing conditions highlight the visual termini for the Arlington Memorial Corridor, the Lincoln Memorial and Arlington House overlooking the cemetery at the crest of Arlington Heights.





*Existing views (NPS EA, 2026, pp. 20 top and 18 bottom)*

92. The project architect for the bridge, William Mitchell Kendall, also proposed two monumental columns marking points about 500 feet apart, flanking the central circle on Columbia Island. These milestones served a very important purpose for the main axis between the Lincoln Memorial and Arlington House, elevating the visual strength of Arlington House by marking a larger but secondary visual frame around the focal house, very much in the same way as a framed portrait. This is clear in the architect's panoramic rendering of the composition. The idea was to create a better visual balance with the more prominent Lincoln Memorial, the opposite terminus.





*McKim Mead & White elevation view to Arlington Heights (Bridge Commission Report)*

93. Subsequent projects have adhered to the L'Enfant and McMillan Plans' emphasis on framing or otherwise leaving fully unobstructed the visual termini envisioned in the plans. Design elements that obstructed these views were either modified to be less intrusive or fully eliminated.

94. For example, in 1979-80, the project architect designing Western Plaza (now Freedom Plaza)—located at the western end of the Pennsylvania Avenue corridor and in the foreground of the Treasury—proposed two monumental slab-like pylons to create a frame for the Treasury, elevating its visual prominence as a focal point to create a better balance with the Capitol at the opposite end. But these pylons were not approved, largely because renderings showed how their flat width and orientation facing the avenue was visually too strong, overpowering the view of the Treasury. In contrast, the design for columns on Columbia Island included in the 1924 Commission Report avoided the pitfall of the Western Plaza flat pylons. The columns, being round, were non-directional and narrow in profile, thus avoiding a visual overshadowing of the house within the frame.

95. In 1981-82, another project architect proposed a bandstand for Market Square as a backdrop or proscenium for the newly delineated semicircular plaza at 8th Street and Pennsylvania Avenue, so that it could be used as a small amphitheater. To preserve at least a visual window from the Archives to the Patent Office, the bandstand was to be in the shape of a small classical arch, similar to the Washington Square arch in New York City. But this design element was ultimately rejected because renderings of the views from the Patent Office showed that the bandstand would block the most important part of the view, that of the majestic Archives portico.

96. In marked contrast, the 2004 National World War II Memorial, honoring the service of millions of American civilians and 16 million members of the armed forces, including more than 400,000 dead, successfully commemorates a hugely consequential event, *without* intruding upon the dominant vista between the Capitol and Lincoln Memorial. Its tallest features are a pair of triumphal arches, 43 feet high, flanking the oval rainbow pool and marking a minor cross-axis, very much along the lines of the McKim, Mead & White design for the pair of columns flanking Memorial Circle in the Arlington Bridge composition. The arches align with the tree-lined promenades along the reflecting pool, serving as destination markers for approaching pedestrians, but they disappear from the long view down the central axis because they are nestled in the trees. The proposed Triumphal Arch exhibits none of the same care for its surroundings.



*View from Washington Monument to Lincoln Memorial, 2010* (User:Webfan29)

97. Renderings of the Triumphal Arch, included in the NPS EA and excerpted below, show that the structure would be even more visually obstructive than the rejected design elements for the above-mentioned Pennsylvania Avenue projects, not to mention the World War II Memorial. First, the bulky shape of the arch, placed at midpoint, blocks critical views that are the entire purpose of the architectural and spatial composition. This is obvious from the panoramic renderings included in the NPS EA. For an observer at the Lincoln Memorial, there would be at least a small window for glimpses to Arlington Heights, but they would be overwhelmed by the distracting colossal arch in the foreground. In the opposite direction, an observer at Arlington House would not be able to see the Lincoln Memorial at all. It would be totally blocked from view. The purpose of the composition is for the terminal buildings to remain

dominant and in full view, and the Arch effectively destroys the composition. Moreover, the Arch's placement in the center of the corridor overwhelms both sides of the composition, placing the entire focus of attention on the Triumphal Arch, rather than on the Lincoln Memorial or Arlington House, contrary to the intention of the McMillan Plan.



*Rendering of proposed arch looking west (NPS EA, 2026, p. 21)*



*Rendering of proposed arch looking east (NPS EA, 2026, p. 20)*

98. The District's status as a planned city is critical to its economic vitality, serving as an exemplar of urban planning on both the national and international stage and drawing millions of tourists each year. The L'Enfant Plan's commemorative and symbolic location of buildings, structures, and vistas collectively establish Washington, D.C. as the singular American example of an urban core that from inception has physically expressed its political role as a designed national capital using Baroque design principles. The McMillan Plan elements overlaid on the original L'Enfant city plan provide an additional dimension of significance as a City Beautiful design that was influential on many other cities in the United States and on the emerging field of city planning. Washington's plan as representative of a capital city is echoed in the number of planned national capitals and schemes for ideal urban complexes generated in the twentieth century, among them: Canberra, Australia; New Delhi and Chandigarh, India; Brasilia, Brazil; and Abuja, Nigeria. Within an international context, it is the only completely planned national

capital that physically and politically has been sustained and preserved during its continual history as a federal headquarters. It is largely for these reasons that Washington, D.C. is a unique destination for both national and international travelers. According to data from Destination DC, it attracted 27.2 million visitors, spending $11.9 billion, generating $2.4 billion in tax revenue, and supporting 114,000 jobs.

99. More than 200 years since the design of the L'Enfant Plan, and more than a century after the McMillan Plan, the integrity of the unified plan of Washington is largely unimpaired, boasting impressive and dignified architectural landmarks in carefully planned hierarchical balance, a legally enforced building height restriction, spacious parklands, ordered avenues with open sightlines, and carefully designed reciprocal vistas that, just as centuries ago, orient and guide visitors who come to see and be inspired by the places that express "the spirit and direction of [their] nation . . . founded upon and reflected in its historic past." Pub. L. 89-665, 80 Stat. 915. Maintaining these irreplaceable features in good condition is essential to the interests of the District and its residents, and indeed the nation. These lands are controlled by Congress, and their careful stewardship and development has been directed by Congress through the creation of the U.S. Commission of Fine Arts in 1910, the Lincoln Memorial Commission in 1911, the Arlington Memorial Bridge Commission in 1913, the National Capital Park Commission in 1924, its reshaping as the National Capital Park and Planning Commission in 1926 and expanded duties as the National Capital Planning Commission in 1952, and the creation of the Advisory Council on Historic Preservation and State Historic Preservation Offices in 1966, and the National Capital Memorial Advisory Commission in 1986. In bypassing standard consultation processes and ignoring overwhelming opposition by the general public to fulfill the President's mandate to build the Arch, Defendants will undermine decades of work by

these commissions and agencies, instead allowing the first egregious and colossally destructive intrusion into the monumental landscape of the nation's capital, which has for more than two centuries been carefully stewarded by Congress and by generations of architects, landscape designers, artists, and public servants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 30th day of October, 2026.

David Maloney