# DECLARATION OF CHAIRMAN PHIL MENDELSON

I, Phil Mendelson, declare as follows:

1. I am the Chairman of the Council of the District of Columbia and an ex officio member of the National Capital Planning Commission ("NCPC"). I make this declaration based on my personal knowledge.

2. NCPC is the federal government's central planning agency for the National Capital Region. It reviews federal development projects and memorials in the District and works to protect the capital's historic and symbolic character. Its membership includes Chairman of the Council of the District of Columbia so that the District's perspective is part of federal planning decisions affecting the capital.

## Background and Basis of Knowledge

3. I am Chairman of the Council of the District of Columbia. I was first elected to the Council in November 1998, took office in January 1999, and have served as Chairman since June 2012. Before my election I worked for approximately seven years as a Council staff member. I have worked within the District's legislative branch for more than three decades. I make this declaration based on my personal knowledge, my review of the documents identified herein, and information provided to me by District agency officials in the course of my duties.

4. From 2005 through 2012 I chaired the Council's Committee on the Judiciary, with oversight of District public safety agencies including the Metropolitan Police Department (MPD) and Fire and Emergency Medical Services Department (FEMS). Since 2012, I have chaired the Council and presided over the Committee of the Whole, which coordinates the Council's consideration of the District's annual operating and capital budgets. That work entails examining government-wide agency operations, staffing, funding, proposed expenditures, and demands on finite appropriated resources.

5. Through annual budget deliberations, performance oversight, legislation, and interaction with agency officials, I have learned how environmental management and reviews, transportation management, and public safety preparedness require actual expenditures of staff time, equipment, and operating resources. Assigning personnel to a new project can impose costs even without an immediate supplemental appropriation because the same personnel cannot simultaneously perform other work. I distinguish below between documented work already undertaken, work inherent in a described regulatory process, and future costs that remain contingent on construction and operational decisions.

6. My regional responsibilities have given me additional familiarity with the shared transportation and public safety systems of the District, Maryland, and Virginia. I have served twice as chairman and three times as president of the Metropolitan Washington Council of Governments, chaired the National Capital Region Transportation Planning Board four times, and served as president of the Association of Metropolitan Planning Organizations. In those capacities I have dealt with regional transportation planning and regional emergency response, as well as with the effects of regional construction, traffic disruptions, and intergovernmental coordination.

7. By virtue of my office as Council Chairman, I have been an ex officio member of the National Capital Planning Commission (NCPC) since June 2012. I have participated through my membership and representation on the Commission in matters affecting federal development, land use, transportation, historic resources, and commemorative works.

**The Responsibilities and Duties of My Job Require Careful Evaluation of Each Memorial Proposed To NCPC**

8. When NCPC reviews a proposed memorial, it considers what the memorial commemorates, why it belongs at its proposed site, and how its purpose, placement, scale, and design relate to Washington D.C.'s historic and symbolic landscape.

9. The symbolism of a memorial considers several independent factors.

10. Vistas are evaluated to ensure that they are protected or intentionally created. For example, the World War II Memorial was designed to preserve the visual relationship between the Washington Monument and Lincoln Memorial.

11. Siting, or the location of a memorial, is evaluated for the meaning it contributes to a memorial. As an example, the Desert Storm Memorial's location near the Vietnam Veterans Memorial and other twentieth-century war memorials helps tell the story of a change in the nation's treatment of returning veterans, while its proximity to diplomatic institutions reflects the international coalition central to that conflict. In the case of the Fallen Journalists Memorial, for example, NCPC evaluated 24 potential sites for their thematic connection, prominence, visibility, and independence.

12. Massing is evaluated to prevent a new structure from overwhelming its setting. The height of the White House fence was designed to maintain views and minimize solid elements and visual clutter, while the World War I Memorial wall was reduced and simplified to preserve open views across Pershing Park.

13. The design is also evaluated for its communicated purpose. For example, the Eisenhower Memorial uses landscape, sculpture, inscriptions, and tapestry to convey aspects of Eisenhower's life and legacy, while the Desert Storm Memorial's circular form, storm wall, and unity shield evoke the military campaign, desert environment, and international coalition.

14. In addition, the design is evaluated for its effect on the District of Columbia. The construction of a memorial generally results in the elimination of scarce recreation space, alteration of traffic patterns, changes to the natural and built environment, and other alterations to the lived experience of District residents and visitors. NCPC considers these impacts and seeks to ensure that a memorial will respect the interests of the District's residents and preserve the plan for the capital.

15. My work and ability to fulfill my role on the NCPC require information and the opportunity to review and comment on information that addresses these various goals and objectives. Among this information would be a statement of the memorial's purpose and an evaluation of alternative sites. For commemorative works, I would also have the advice of the National Capital Memorial Advisory Commission ("NCMAC"), given the Commemorative Works Act's requirement that project sponsors first consult with NCMAC regarding the selection of alternative sites and design concepts before going to NCPC. I also benefit from understanding congressional intent, which I obtain through the commemorative works process because it requires congressional authorization at the outset.

16. Without a process or information identifying what a proposed memorial commemorates and evaluating alternative locations in light of that purpose, Commissioners cannot assess whether the location gives the memorial a coherent symbolic or historical meaning, whether a different location would better serve that purpose, or whether the memorial's placement, massing, vistas, and design would instead disrupt the symbolism already embodied in the site and undermine the interests of the District. If I cannot make the requisite assessment based on necessary information, then I am unable to fulfill my responsibilities.

**The Arch Failed to Follow the Statutorily Mandated Procedures That Enable Meaningful Review and Approval**

17. The U.S. Department of the Interior ("Interior") has submitted plans for a new Triumphal Arch at Memorial Circle on the George Washington Memorial Parkway, near Arlington National Cemetery and along the Potomac River.

18. The Administration has presented the Arch to NCPC as an ordinary federal development project under the National Capital Planning Act rather than as a commemorative work under the Commemorative Works Act ("CWA").

19. The National Park Service ("NPS") website explains that the Arch "would serve as a signature monumental structure honoring the nations [sic] 250th anniversary and contributing to Washington, D.C.s [sic] tradition of honoring national principles. Drawing on the historic Roman precedent of erecting freestanding arches to celebrate civic achievement, the Arch is envisioned as a prominent addition to the capitals [sic] architectural landscape in the monumental core."

20. The NPS website states an explicitly commemorative purpose to the Arch: "The purpose of the proposed action is to celebrate 250 years of American independence by honoring Americas [sic] founding principles through installation of a structure at the intersection of Arlington Memorial Bridge and Memorial Avenue within George Washington Memorial Parkway, in a manner consistent with the avenue's established role as a ceremonial gateway and 'Avenue of Heroes' celebrating valor, sacrifice, and American heritage."

21. Under this description, the Arch would be a commemorative work subject to the CWA.

22. To my knowledge, the Arch has not followed the process that Congress established for commemorative works:

a. Congress has not specifically authorized the commemorative work;

b. Congress has not designated an authorized sponsor;

c. The National Capital Memorial Advisory Commission has not provided the advice contemplated by the CWA;

d. Interior has not made the determinations and recommendation required for placement of a commemorative work in Area I;

e. Congress has not approved the Area I location; and

f. The site and design have not been submitted to NCPC for approval under 40 U.S.C. § 8905.

23. Because the Administration ignored the requirements of the CWA, I have been blocked from fulfilling my responsibility to meaningfully evaluate and vote on the Arch pursuant to the procedure outlined by the CWA.

24. The opportunity to vote under the National Capital Planning Act does not replace the separate CWA approval vote. The two proceedings arise under different statutes, follow different processes, and require NCPC to exercise different responsibilities. The CWA process also ensures that NCPC receives the input of NCMAC, Congress, and the project's sponsor before voting on whether to approve a monument. The Administration's choice of process has prevented the required CWA proceeding—and therefore the corresponding NCPC vote—from occurring at all.

25. I have consistently raised the concern that the Commission cannot adequately evaluate the Arch without receiving the input contemplated under the CWA and understanding the object of the Arch's commemoration and the justification for that commemoration's location at Memorial Circle. But I have not received a definitive statement of what the Arch commemorates under the CWA. Broad statements are not sufficient, and without specificity, I cannot judge whether the Arch's site, scale, and form fit its purpose.

26. The Administration has also failed to provide the commemorative work-specific purpose-and-place analysis that is necessary for my ability to perform the planning review and cast the informed site-and-design vote contemplated by the CWA.

27. Memorial Circle has been presented to NCPC as an effectively predetermined location, without an antecedent process explaining why the stated commemorative purpose should be expressed at that particular place.

28. I have not received any evaluation of alternative sites, explanation of why Memorial Circle was chosen, evaluation of the relationship between the commemorative subject and Memorial Circle, or any justification for the Area I placement.

29. I have not had the benefit of NCMAC's advice on the Arch's site or design.

30. Without a defined commemorative purpose and defined site-selection process, I cannot meaningfully evaluate:

a. whether the Arch has a coherent symbolic or historical relationship to Memorial Circle;

b. whether its placement between the Lincoln Memorial and Arlington National Cemetery gives it an appropriate commemorative meaning;

c. whether its scale and architectural form are justified by that meaning;

d. whether another location would better serve the stated purpose;

e. whether the design and placement respects or interferes with the meaning, design, and vistas of existing commemorative works;

f. whether the Arch is genuinely a site-specific commemorative work or simply a monumental structure placed in a prominent location; or

g. whether alternatives to the proposed Arch would better respect the interests of the District's residents or mitigate the historic, traffic, environmental, and other harms that the Arch is expected to cause.

31. The loss of this purpose-and-place analysis is a concrete impairment of my ability to perform the planning review and cast the informed site-and-design vote contemplated by Congress for NCPC in the CWA.

**Due to the Expedited, Improper Process and Inadequate Record, I Cannot Make an Informed Review of the Arch**

32. The Arch has proceeded on a compressed schedule, with NCPC moving from concept review to preliminary approval in about five weeks. In my time on NCPC, this is unprecedented. Typically, this process would take at least two years—and even longer if the project concerns or otherwise implicates national security interests.

33. In this compressed time period, I could not fully review submissions, determine the project's purpose, obtain independent analysis, or consult Councilmembers, the Mayor, District agencies, and affected residents.

34. This short review period also precluded me from addressing important, threshold legal questions, including the relevant governing law in light of the project's purpose and whether the Arch justifiably exceeds the capital's building height limit.

35. Because the project has bypassed the CWA, NCPC also lacks the benefit of the record that would normally be developed through congressional authorization, an authorized sponsor, NCMAC consultation, examination of alternative sites and designs, the Area I process, and submission for formal CWA approval.

36. At concept review on June 4, 2026, NCPC requested information on traffic and transportation, pedestrian access, parking, loading and unloading, materials, lighting, security, Federal Aviation Administration coordination, and justification for the Arch's height. To my knowledge, that information has not been fully provided.

37. The review also lacked adequate information concerning:

a. the legal basis for treating the Arch as something other than a commemorative work;

b. the precise event, person, idea, or historical subject being commemorated;

c. the relationship between that commemorative purpose and Memorial Circle;

d. the consideration of alternative sites;

e. the basis for selecting an Area I location without the statutory Area I process;

f. the source and structure of project funding;

g. the anticipated construction and excavation schedule; and

h. the extent to which material design or engineering questions remain unresolved.

38. Nor have I received information on the Arch's funding or construction schedule.

39. This missing information limits my ability to assess the project and prevents me from performing my responsibilities on a fully informed basis.

**Absent Intervention, I Will Be Unable to Fulfill My Duties**

40. It has been publicly reported and announced that the government is moving toward excavation and construction of the Arch. Once work begins, my ability to weigh the Arch's site and design on their merits is diminished. The CWA process must occur before irreversible commitments, such as destruction of existing land features, begins.

41. An instructive example is that of the World War I Memorial project and NCPC's participation in that CMA process. NCPC's engagement–before physical work began–was crucial in the development of the World War I Memorial. Original plans for the Memorial would have transformed Pershing Park into an entirely different landscape, and the first design proposal for the World War I Memorial was that of a prominent victory tower evocative of an arch.

42. Ultimately, the NCPC engaged under the CWA process and provided input that informed the final project into one that preserved and even rehabilitated the historical

significance and aesthetic benefits of the existing park while adding a meaningful, structural commemoration of World War I. Instead of centering a victory tower, the memorial instead renovated and built upon the park's existing structures. As a result, the memorial successfully commemorates America's sacrifices in the Great War. The project ultimately took nine years, from commencement of the designs to the completion of construction.

43. Here, proceeding with any construction of the Arch—including preliminary demolition or other preparation activities on the proposed site—before completion of the CWA process would preclude me from providing such feedback and insight, render void the practical effectiveness of my vote, and prevent me from carrying out my assigned duties.

44. In addition, NCPC staff recommended that the Arch be redesigned to reduce its height. At preliminary approval on July 9, 2026, the Commission deferred the height question to final review while advancing the project. I will therefore address the Arch's most prominent feature only after the project has moved further toward construction.

45. I am an ex officio member of NCPC to bring the District's perspective to NCPC's decisions. The Arch would affect, at the least, the District's monumental core, streets, sightlines, public spaces, and the people of this District, now and in the future given the nature of the Arch project. Without the information and time described above, I cannot represent these interests or fulfill my duties on behalf of myself, the District, or its visitors.

**Effects of the Arch on the District of Columbia**

46. I have reviewed the National Park Service's Triumphal Arch at Memorial Circle Revised Environmental Assessment dated October 2026, its Revised Finding of No Significant Impact signed October 9, 2026, and site and building plan materials submitted for NCPC's reviews to date. Those materials describe an approximately 250-foot structure, a new visitor

destination, approximately three years of construction, and substantial changes to the site and its circulation. I have also reviewed news reports concerning President Trump's September 20, 2026 public statement announcing that the Arch would be converted into a "top grade Military Complex/Triumphal Arch" with facilities for drones, snipers, and ammunition storage. The President described this conversion as being undertaken for national security purposes at the request of the United States military.

47. These documents provide an overall construction phasing concept, including work anticipated for up to 20 hours each day. They do not provide the specific site preparation and construction schedule, final funding commitments, or all operational details that would allow the District to anticipate precisely when and where particular agency resources will be required. The project documents nevertheless make clear that the project would impose substantial demands on District environmental, transportation, and emergency preparedness responsibilities, and that some of these costs would begin as soon as construction starts.

**Environmental Responsibilities**

48. The Department of Energy and Environment (DOEE) administers District environmental programs involving stormwater management, erosion and sediment control, air quality, wildlife, and habitat. Through the Council's annual operating and capital budget processes and my long experience with legislation and oversight, I am familiar with the personnel and specialized technical work those programs require. The fact that the Triumphal Arch is a substantial construction project on federal land within the District does not forego the need to determine which District environmental standards and programs apply. The federal applicant itself is required to identify its obligations under District stormwater regulations for this project.

49. Memorial Circle is located on federally administered land within the District of Columbia, adjacent to the Potomac River and Boundary Channel. The National Park Service's October 2026 Revised Environmental Assessment describes an approximately three-year project, including excavation, deep foundations, utility installation, construction staging, and extensive concrete work. It anticipates year-round activity in two ten-hour shifts, potentially involving operations for twenty hours per day. Its described project phasing is a general plan, not a binding day-by-day excavation or construction schedule. Environmental coordination therefore must address both the scale of the work and uncertainty about when particular activities will occur.

50. The project documents describe removal of approximately 1,400 truckloads of soil, importation of approximately 400 truckloads of engineered fill, and extensive drilling and material delivery. Excavation and dewatering of the site are to be managed through sediment treatment equipment, protected storm inlets, stabilized entrances, and other erosion-control measures. Particularly given the magnitude of this project, this work requires evaluation of soil disturbance, drainage, sediment transport, and compliance with applicable environmental standards. Operation of heavy equipment and trucks also creates construction dust and diesel emissions, and if off-site conditions or complaints warrant it, DOEE must respond under its air-quality responsibilities.

51. The applicant's own documents establish a specific connection to District environmental requirements. NPS identifies approximately 62,875 square feet of new impervious surface and estimates a stormwater retention requirement of approximately 6,300 cubic feet under District regulations. It proposes bioretention areas, erosion and sediment controls, and treatment of water accumulated during excavation, with detailed design

calculations still to be finalized. DOEE administers the system under which qualifying stormwater plans are reviewed for compliance, including payment of applicable review fees. Review of the proposed stormwater controls and evaluation of compliance with applicable District requirements will require DOEE personnel and technical resources.

52. The District's stormwater requirements serve an important public purpose. Without adequate erosion and sediment controls during excavation and construction, rainfall can carry disturbed soil, sediment, and other pollutants through drainage systems and into the Potomac River and Boundary Channel. The addition of approximately 62,875 square feet of impervious surface also increases the volume of runoff that must be managed after construction. Inadequate stormwater controls would threaten water quality in District waters, including waters that the District expends public funds to protect and restore. Based on my experience overseeing DOEE's budget and environmental programs, I understand that preventing and responding to such impacts requires professional staff, technical review, inspections where applicable, and other District-funded resources. The project's substantial land disturbance and permanent changes to runoff make compliance with the District's stormwater requirements particularly important.

53. DOEE's Natural Resources Administration includes its Fisheries and Wildlife Division, whose work encompasses conservation and monitoring of wildlife and habitat throughout the District. The NPS assessment acknowledges the potential occurrence of federally endangered or proposed endangered northern long-eared bats and tricolored bats near the project area but makes a "no effect" determination, relying in part on surveys conducted between 2016 and 2018 and the expectation that no trees will be removed. Those findings concern the federal review; they do not by themselves resolve the effects of prolonged nighttime

construction, lighting, and operational activity on wildlife. In my experience, DOEE typically evaluates new conditions potentially affecting District wildlife resources by engaging in timely, professional analysis and, where warranted, field monitoring.

54. The NPS plans substantial, permanent illumination of the Arch plaza, and rooftop statuary, and anticipates year-round construction that could operate for twenty hours per day. These features make nighttime lighting and disturbance pertinent to understanding the project's effects on the surrounding Potomac River corridor. DOEE employs professional staff capable of evaluating effects of construction projects on wildlife and habitat . The project's proposed nighttime construction and permanent lighting will require DOEE to consider whether additional review, coordination, or monitoring is warranted. Any such review or response would use staff time funded through the District budget.

55. NPS issued a Revised Finding of No Significant Impact on October 9, 2026, and its assessment concludes that certain environmental effects, including wildlife effects, are negligible or otherwise insufficient to require preparation of a more detailed environmental impact statement. That is the federal agency's evaluation under the process it applied; it is not a finding that the District has no environmental work or that no additional monitoring or compliance question will arise during actual construction. On the contrary, I expect that as soon as construction begins, DOEE officials will need to expend time and resources both reviewing compliance with the District's stormwater management requirements and assessing the project's effect on wildlife.

56. District environmental programs require trained personnel, technical review capacity, inspection resources, and intergovernmental coordination. The NPS documents make clear that the project will alter stormwater conditions, involve prolonged excavation and heavy-

equipment operations, and introduce extensive nighttime illumination within the District. From my experience with the annual budget, DOEE's review and coordination responsibilities will consume staff time and agency capacity at the expense of its existing environmental duties to protect water quality, wildlife, and other environmental resources throughout the District.

**Transportation Responsibilities**

57. The District Department of Transportation's (DDOT) responsibilities for District streets, traffic operations, transportation planning, and coordination with neighboring jurisdictions are familiar to me through the Council's budget and oversight process and my four terms chairing the region's Transportation Planning Board. Arlington Memorial Bridge is a heavily traveled connection between the District's downtown and monumental core and Northern Virginia. The applicant's transportation study reports that eastbound bridge traffic entering the District exceeds 3,000 vehicles during the weekday morning peak hour. Operations at its western terminus are thus consequential to the movement of District commuters, visitors, and emergency personnel even though some of the roadways immediately around Memorial Circle are under either federal or Virginia jurisdiction.

58. The revised NPS assessment anticipates approximately three years of construction. It describes closing the southern part of Memorial Circle for most of the work, diverting traffic to the north side, temporarily prohibiting specified turning movements, and reducing westbound Arlington Memorial Bridge traffic from three lanes to two. The applicant's transportation study reports that eastbound traffic entering the District exceeds 3,000 vehicles per hour during the morning peak, while westbound traffic reaches a peak of nearly 2,500 vehicles per hour. The study also identifies existing recurring congestion on Washington Boulevard south of Memorial Circle, where average queues extend approximately 2,700 feet during the morning

commuting period. Thus, the project would impose prolonged construction restrictions on an already heavily used transportation corridor with existing operational constraints. The reduction from three to two westbound travel lanes would remove one-third of the available outbound capacity lanes at the approach to Memorial Circle. Additional closures and detours during utility installation and other phases would create changing conditions requiring continued transportation coordination and monitoring.

59. The federal proposal involves more than the main construction footprint. NPS anticipates the movement of approximately 1,400 truckloads of excavated soil and 400 truckloads of fill – 20 to 30 trucks carrying 80 to 100 loads per day -- with additional deliveries of concrete, structural materials, and stone. The location sits at a major regional interchange, so coordination of construction traffic, restrictions, and responses to incidents must take account of their effects on traffic entering and leaving the District.

60. DDOT submitted comments concerning off-site traffic effects for the Arch for NCPC's November 5, 2026 final review. The Department of the Interior responded with an expanded transportation study and noted DDOT coordination is "ongoing." Its written response anticipates coordination regarding temporary detours, permanent changes to transportation infrastructure, and traffic-signal connections and operations. These materials themselves demonstrate that this project will affect the District's transportation planning and coordination efforts and require continued professional staff time and resources.

61. DDOT's existing responsibility for the connected transportation network requires it to consider how the Arch's restrictions interact with other regional infrastructure projects. The NPS environmental assessment discusses possible overlap with other regional infrastructure projects, including work associated with the Theodore Roosevelt Bridge and Interstate 395, and

recognizes that overlapping activities can disrupt vehicle approach routes and reduce predictability. That illustrates why a prolonged restriction at one Potomac crossing cannot be evaluated solely as a change to a single traffic circle; changes in alternative routes, congestion, and access affect the larger connected regional network. My service as chairman of the region's Transportation Planning Board on four occasions has made me familiar with the need for transportation agencies to study and coordinate such interactions, and DDOT will need to be heavily engaged in such study and coordination here.

62. The NPS transportation analysis predicts that proposed signals and pedestrian improvements would not materially worsen ordinary modeled commuter congestion and would provide safety benefits. The traffic model, however, is principally a forecast of defined baseline and build conditions. It cannot eliminate the need to affirmatively and proactively manage temporary detours, crashes or disabled vehicles, unanticipated incidents, major special events, or changed construction conditions. In my experience, transportation agencies, including DDOT, must devote personnel to reviewing and coordinating plans before such conditions arise and to managing operational responses when they occur. Thus, the agency's favorable traffic forecast does not eliminate the need for DDOT to expend staff time and operating resources engaging in continued transportation planning and coordination to assess the impact of the Arch on the District, both when construction begins and for years into the future.

63. After construction, the facility would introduce a new visitor destination with a gallery, observation deck, timed entry, security screening, and new pedestrian crossings. The design includes extensive changes to signalization, circulation, pickup and drop-off arrangements, and pedestrian access to the center of Memorial Circle. Those changes have consequences for traffic proceeding to and from the Lincoln Memorial, the National Mall, and

the District's downtown area, and they require coordination among the operators of the various connected transportation systems, including DDOT. Coordinating these permanent operational changes will consume DDOT staff time and resources.

64. DDOT's documented participation and ongoing coordination are essential governmental activities, not simply inconveniences to individual motorists. The Arch project requires technical coordination concerning traffic operations, detours, infrastructure changes, and connections between the District and regional transportation systems. The project documents also anticipate an approximately three-year construction configuration affecting a major approach to the District and permanent changes to circulation at the bridge's western end. From my experience leading the Council's budget process, I understand that DDOT must accommodate those responsibilities while carrying out its other transportation priorities. The use of existing publicly funded agency capacity is itself an operational consequence.

**Emergency Preparedness and Public Safety**

65. My familiarity with public safety and emergency management comes from chairing the Council's Judiciary Committee from 2005 through 2012, subsequent Council-wide budget leadership, and oversight of agencies including the Homeland Security and Emergency Management Agency (HSEMA), Fire and Emergency Medical Services Department (FEMS), and Metropolitan Police Department (MPD). HSEMA coordinates emergency preparedness with District, federal, and regional partners and supports the District's Emergency Operations Center. The District appropriates resources for planning, exercises, communications, equipment, and incident response, including emergencies that involve federal land or infrastructure. FEMS was a first responder on 9/11/2001 when American Airlines Flight 77 crashed into the Pentagon only a mile away from Memorial Circle. All District public safety agencies were engaged in response

efforts to the January 29, 2025 mid-air collision over the Potomac River near Reagan National Airport between a commercial airplane and a military helicopter. District emergency personnel participated extensively in response and recovery.

66. The Potomac River near Memorial Circle lies within the District's territorial boundary extending to the Virginia shoreline. The January 29, 2025 collision demonstrates why that fact matters operationally. HSEMA's FY2025 performance report describes the Emergency Operations Center's situational-awareness, logistical, and multiagency support. Those functions required real District personnel and resources, rather than being a speculative concern about an event that could never occur. The experience informs my understanding of the District's preparedness responsibilities for aviation incidents on or over the river near the proposed project.

67. The District provides emergency response services for Memorial Circle, with District responders available through mutual assistance agreements. The District accordingly must be prepared for incidents, including requests for mutual assistance and multi-jurisdictional response, on District waters and roadways like the Memorial Bridge, and any such responses must contend with reduced traffic lanes, potential closures, and other obstacles during three years of construction. Construction restrictions and unexpected traffic incidents will require the District and regional emergency responders to account for alternative routes and changing access conditions when coordinating and planning emergency response.

68. The proposed permanent structure would rise approximately 250 feet and, during construction, would require tower cranes reaching approximately 320 feet, along with other large lifting equipment. On September 18, 2026, the Federal Aviation Administration issued a determination that the proposed Arch would not present a hazard to air navigation, subject to specified lighting and marking conditions. That determination preceded the President's

September 20 announcement that the Arch would be used as a military complex with the capacity to deploy drones. The federal environmental assessment does not evaluate the aviation or emergency preparedness implications of those potential military operations. Drone activity near or within an airport's operating environment presents considerations different from those associated with a stationary monument. Based on the District's experience responding to the January 2025 aviation collision, I understand that HSEMA and other District public safety agencies must be prepared to coordinate responses to serious aviation incidents in the adjoining Potomac River corridor. The announced military functions create additional variables that District emergency planners will have to understand, evaluate, and account for as the project proceeds.

69. The NPS materials anticipate reducing westbound Arlington Memorial Bridge traffic from three lanes to two during much of construction. Its transportation modeling concludes that emergency vehicles would not experience delays under the ordinary traffic conditions modeled. That analysis does not resolve what would occur during an unexpected closure, incident in the work zone, special security event, or mass movement of people away from the monumental core. Government-published regional evacuation-route data identify Arlington Memorial Bridge among regional egress routes. It confirms that the bridge has been considered in regional evacuation planning, reinforcing the need for DDOT and HSEMA to engage in coordination concerning prolonged Arch-related construction restrictions.

70. The completed project would accommodate visitors through a gallery, observation deck, timed entry, security screening, and a public plaza within an active traffic circle. These uses create a new public destination that District emergency planners must account for in coordinating regional response and evacuation planning. HSEMA also coordinates with partners

during National Special Security Events and major gatherings in the District; as a result, it will need to prepare for and consider the relationship between visitor activity at the Arch and routes into and out of the National Mall, which will incur additional staff time and resources.

71. On September 20, 2026, President Trump publicly described the proposed Arch as a "top grade Military Complex/Triumphal Arch," stating that it would "house, store, and have the rapid ability to use large numbers of drones, plus Snipers" and "have and hold large quantities of sniper ammunition in storage." I understand these as announced intended uses, not as features established in the submitted architectural plans. I understand that top Cabinet officials have recently reiterated these uses in sworn court declarations in a separate Arch-related action. The NPS October Revised Environmental Assessment and the Finding of No Significant Impact signed October 9, 2026 do not include any analysis of these announced functions. The possibility of a military facility at a major public visitor site, if carried into effect, would raise additional and very different security, coordination, and emergency-response questions from an ordinary monument. Those questions are relevant to HSEMA's responsibility to plan with federal and regional partners for incidents affecting the District.

72. Emergency preparedness requires governmental work before any incident occurs, including risk assessment, interagency planning and communication, exercises where appropriate, and coordination of response capabilities. HSEMA's documented role in the January 2025 aviation collision illustrates the personnel, situational awareness, and logistics necessary for an effective response in this area. The Arch proposal combines prolonged traffic restrictions, exceptionally tall construction equipment, and a new visitor destination near the Potomac and National Airport; its possible military functions raise additional questions. From my experience overseeing the District's public safety agencies and their appropriations, assessing and

coordinating responses to these conditions will require HSEMA personnel and other District-funded emergency preparedness resources.

**District Fiscal and Operational Responsibilities**

73. The consequences described in these sections are distinct from the injury to my participation in NCPC's statutory review of commemorative works. They concern the environmental, transportation, and emergency-management responsibilities of agencies funded through the District's annual budget. My experience as Councilmember and Chairman gives me substantial familiarity with the effects that major federal projects have on those responsibilities. When District employees conduct project review, intergovernmental coordination, emergency preparedness, or related functions, they expend publicly funded time and resources. There is no question that the District will need to incur such costs as soon as construction begins on the Arch and for years thereafter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 30th day of October in Washington, D.C.

Chairman Phil Mendelson