# EXHIBIT 13

District of Columbia Office of Planning

September 29, 2026

Mr. Travis Voyles, Vice Chair
Advisory Council on Historic Preservation
401 F Street, NW
Suite 308
Washington, DC 20001

Ms. Tammy Stidham
Associate Regional Director – Lands and Planning
National Park Service
National Capital Region
1100 Ohio Drive, SW
Washington, DC 20242

RE: DC SHPO Comments on Termination of the NPS Triumphal Arch Project Section 106 Consultation Process

Mr. Voyles and Ms. Stidham:

This letter responds to the September 24, 2026 letter of the Advisory Council for Historic Preservation (ACHP) terminating Section 106 consultation for the proposed triumphal arch at Memorial Circle in Washington, DC. The DC State Historic Preservation Office (DC SHPO) has a long and constructive history of working collaboratively with the National Park Service (NPS) and other federal entities to complete the Section 106 review of many large-scale, monumental buildings and commemorative projects in and around the Monumental Core of Washington, DC. Examples from the last two decades include the Eisenhower Memorial, Martin Luther King Jr. Memorial, World War I Memorial, Desert Shield and Desert Storm Memorial, National Museum of African American History and Culture, and the Bezos Learning Center addition to the National Air and Space Museum. We are proud of our record and appreciate the cooperation that has been typical of these consultations. These reviews have often taken many months, but the completed projects speak to how effectively the Section 106 process works in ensuring the highest quality of civic improvements in the public landscape of Washington, DC.

Since NPS initiated the Section 106 process for the proposed arch in June 2026 the DC SHPO has worked diligently and constructively to help ensure NPS properly discharged its Section 106 responsibilities. (Each of our six comment letters is attached, and we request ACHP consider them in preparing its comments on the proposed arch.) But now, faced with the exceedingly rare termination of consultation, it is important to consider the many significant ways the Triumphal Arch project and its Section 106 review have differed from comparable projects, and how the Section 106 process for the Triumphal Arch has been inadequate.

Before the Triumphal Arch project:

1. No other undertaking proposed a structure that would be the tallest and most visible since the Washington Monument, let alone the largest monumental arch in the world.

2. None had as much potential to alter the fundamental composition of the Monumental Core.

3. None proposed a structure more than twice the height of the Lincoln Memorial and a little more than a half-mile away.

4. None that we can recall received final Commission of Fine Arts approval before Section 106 was initiated.

5. None was initiated with a simultaneous request to expedite and compress multiple steps in the Section 106 process.

6. None that we recall was met with strong opposition from consulting parties, veterans' groups, and a vast majority of public comments at the onset of Section 106 consultation.

7. None involved the initial denial of consulting party status to organizations that routinely participate in Section 106 reviews.

8. None involved overlapping comment deadlines or unnecessarily rushed schedules.

9. None was reclassified as a "military facility" shortly before construction was supposed to begin.

10. None had their Section 106 reviews concluded in a mere four months.

11. None involved termination of consultation.

12. All previous comparable projects benefited from Section 106 reviews commensurate with the nature of the undertakings and their effects on historic properties as required by 36 CFR 800.3(c)(3).

13. All were initiated based upon general concepts rather than fully developed plans that had already been fully or preliminarily approved by the Commission of Fine Arts and National Capital Planning Commission.

14. All had at least general support from consulting parties and the public.

15. All involved the meaningful identification and evaluation of alternatives.

16. All benefited from numerous consulting parties' meetings.

17. All were modified in some manner to acknowledge their historic contexts and to avoid and minimize the resulting adverse effects on historic properties.

18. All were implemented along with mitigation measures that were commensurate with the adverse effects.

19. Most included the consideration of multiple sites before the location was finalized and design completed.

The contrast between the proposed arch and previous projects is due to NPS's initiating the Section 106 process once the decision to build a 250-foot-tall arch in Memorial Circle had been made and the arch had been substantially, if not fully, designed, leaving no room for NPS to consider ways to avoid or minimize the arch's adverse effects.

As stated in ACHP's September 24, 2026, letter terminating consultation, "[t]he consideration of alternatives to avoid or minimize adverse effects is particularly important for the National Historic Landmarks within the undertaking's Area of Potential Effect, given the NPS's responsibility to meet the requirements of Section 110(f) of the NHPA." However, NPS has failed to consider any alternative location or design for the proposed arch. Notably, NPS has failed to provide a single rendering or related document to illustrate how a potential alternative design might appear or how it might meet the stated purpose and need. NPS has stated that it considered constructing a smaller arch at Memorial Circle, but that "alternative" was dismissed from consideration before Section 106 was initiated.

Similarly, NPS refused to consider alternative locations for the proposed arch. Instead, NPS has incorrectly asserted that the arch is somehow related to the 1924 recommendations of the Arlington Memorial Bridge Commission and the corresponding 1925 Act of Congress authorizing construction of two slender, widely spaced columns, rather than blocking the vista between the Lincoln Memorial and Arlington Cemetery. Despite relying on the 1925 Act, NPS refused to consider our proposal to construct columns inspired by the approved 1920s designs on the grounds that they were not an arch.

Notwithstanding the groundswell of public interest in the proposed arch, NPS has given short shrift to public comments. Section 106 regulations describe the views of the public as "essential to informed federal decision making." In a June 22, 2026 letter, NPS described public participation regarding the proposed Triumphal Arch as extraordinary, noting that NPS had received over 100,000 public comments. However, NPS never provided any sort of response to these comments, instead simply stating that "some" expressed opposition to the proposed arch. But saying only some people expressed opposition to the arch is grossly understating the reality. . Our analysis of the comments, which we received only after requesting them four times, showed that opposition to the arch is overwhelming. Of the approximately 11,000 comments submitted from within the District of Columbia, approximately 93 percent expressed strong opposition to the proposal. Consulting party comments have also been almost entirely in opposition; veterans' groups have filed lawsuits and described the proposal as divisive rather than healing; and both the DC and Virginia State Historic Preservation Offices have objected and consistently raised similar concerns regarding the proposal. Despite this outpouring of opposition, there has been no material change to the design of the proposed arch.

NPS acknowledges the undertaking will adversely affect at least 42 historic properties, six of which are National Historic Landmarks, but has not meaningfully revised the undertaking in any way. Rather, NPS has rushed to move ahead with an undertaking that will forever alter the very fabric of the Monumental Core and significantly diminish the integrity of the Arlington Memorial Bridge and its environs.

The proposed location for the Triumphal Arch is a place of extraordinary historic significance. As a cultural landscape, the grand ceremonial urban design of Arlington Memorial Bridge and Memorial Avenue, with its supporting composition of landscape features and artwork, constitutes one of the most significant and recognized places in Washington, DC, perhaps second only to the National Mall. It originated in the desire to create a place

of national reconciliation after the devastation of the Civil War. Widely regarded as Washington's most beautiful bridge, Memorial Bridge symbolically links North and South by its alignment between the Lincoln Memorial and Arlington House in Arlington National Cemetery. A masterpiece of urban planning and architectural design, the memorial river crossing extends and terminates the great composition of the National Mall, shifting its axis at the Potomac River to establish an impressive and dignified ceremonial approach to the nation's most revered military cemetery. Its processional route is marked by solemn and restrained pylons and statuary that mark the progress over the gentle arc of the bridge from city to island to cemetery, measuring the distance across each stage of gradual transition from the wide-open river to the nearly half-mile-long frame of enclosing holly hedges, while always keeping in view its architectural terminus, the embracing Hemicycle with Arlington House rising on the wooded hill above it. Introducing a massive arch into this setting will effectively destroy one of the most important historical landscapes in the nation's capital and undermine the history it is supposed to celebrate.

That much is clear. But whether there will be additional adverse effects and how those should be addressed remain unclear, because the scope of the proposed arch is in flux. President Trump very recently announced that the arch would also serve a military function, yet no information has been provided about the impact of these uses on the arch's design and the surrounding area. Especially under these circumstances, it is impossible to conclude any Section 106 process. Indeed, the proposal for a *military* arch should start the Section 106 process anew as the analysis may be completely different and the public was not given an opportunity to comment on the various considerations involved in housing drones, snipers, and ammunition at the site.

For the reasons stated in this letter, we see no reason for termination of consultation and ask that ACHP reconsider its decision to terminate. The DC SHPO has never refused to sign an agreement document and never terminated consultation. Furthermore, there are many ways to commemorate the 250th anniversary appropriately with support from the public and consulting parties, and without causing such significant and irrevocable harm to historic properties. All that is required is for the NPS to do is what it has always done in similar circumstances and what is required by the regulations: properly identify the scope of the project and consider modifications and alternatives that could avoid and minimize adverse effects.

If ACHP does not reconsider its decision to terminate consultation, it should ask NPS to take the steps to avoid, and failing that, to minimize the impact of the proposed undertaking. As detailed in the attached correspondence with NPS, the adverse effects on this sensitive area can be avoided by building the arch elsewhere or be minimized by constructing the slender columns originally planned for Memorial Circle in the 1920s. If these approaches are rejected, we support the National Trust's suggestion that the only mitigation that would approach being commensurate with the adverse effects of constructing something as imposing and out of place as the proposed arch would be to establish and endow a fund to pay for its demolition.

If you should have any questions or comments regarding any of these matters, please contact me at [redacted]@dc.gov or [redacted] or Andrew Lewis at [redacted]@dc.gov or [redacted].

Sincerely,

David Maloney
District of Columbia State Historic Preservation Officer

Attachments (all 6 letters)
26-0593, 26-0495, 26-0474 and 26-0371

District of Columbia Office of Planning

June 15, 2026

Ms. Jennifer T. Nersesian, Regional Director
National Capital Region
National Park Service
1100 Ohio Drive, SW
Washington, DC 20024

RE: Initiation of Section 106 Consultation for the Proposed Triumphal Arch in Memorial Circle

Dear Ms. Nersesian:

Thank you for initiating consultation with the District of Columbia State Historic Preservation Officer (DC SHPO) regarding the proposed Triumphal Arch in Memorial Circle. We have reviewed the project submittal and are writing to provide our initial comments regarding effects on historic properties in accordance with Section 106 of the National Historic Preservation Act and its implementing regulations, 36 CFR Part 800.

We understand that the National Park Service (NPS) proposes to use Federal funds to construct a new memorial within the District of Columbia that will celebrate the 250th anniversary of the founding of our nation. The approximately 250-foot-tall structure, which would be referred to as the Triumphal Arch, is proposed for Memorial Circle near the western terminus of Arlington Memorial Bridge, an area of extraordinary historic significance. Once complete, it would be the largest memorial arch in the world. It would also be the tallest and most visible memorial constructed in the District since completion of the Washington Monument. For these reasons, the effects of the proposed undertaking on historic properties should be carefully considered in accordance with the Section 106 regulations.

The NPS has requested our concurrence to expedite consultation by addressing multiple steps in the Section 106 process pursuant to 36 CFR 800.3(g). According to 36 CFR 800.2(a)(4), Federal agencies are to "plan consultations appropriate to the scale of the undertaking and the scope of Federal involvement." Given the scale, visibility and effects of the proposed Federally funded monument on historic properties, the DC SHPO does not agree that expediting consultation is appropriate in this case.

However, we do concur with NPS's determination that this undertaking will adversely affect numerous historic properties and, as described in the Assessment of Effects (AOE) Report, the "most substantial" adverse effects will occur on those properties which "derive significance, in part, from their planned visual, commemorative, and spatial relationships across the Potomac River and through the monumental core." Within the District of Columbia, these adversely affected properties include the Memorial Avenue Corridor Cultural Landscape, Arlington Memorial Bridge, the Lady Bird Johnson Park Cultural Landscape, the Lincoln Memorial Cultural Landscape, the Lincoln Memorial, the National Mall Site, the National Mall Historic District, and the Mall Cultural Landscape. As documented in the AOE, other historic properties in DC will also be adversely affected. We anticipate providing further comments regarding additional adverse effects as consultation continues.

While DC SHPO's primary concerns center on the memorial's adverse effects, we also have significant, overarching concerns about how and why we are being requested to resolve those adverse effects at the onset of consultation rather than considering potential sites, reviewing conceptual designs and planning for Section 106 consultation as we normally do when consulting with the NPS regarding a new memorial. The following comments, which generally follow the order of the step-by-step process outlined in the regulations, address what we consider to be the deficiencies in the overall Section 106 review of this undertaking that brought us to this point.

As an initial matter, we are concerned that consultation for one of the largest memorials ever proposed in the District of Columbia did not commence "at the early stages of project planning" as required by 36 CFR 800.1(a). Since our receipt of the formal initiation letter on June 5, 2026, marked the first time the NPS contacted us about the project, it also appears that the requirement of 36 CFR 800.1(c) to "…ensure that the… process is initiated early… so that a broad range of alternatives may be considered" has not been met. Nor does it appear that the NPS's responsibility to consult with our office "… in a manner appropriate to the agency planning process...and to the nature of the undertaking and its effects on historic properties" as cited at 36 CFR 800.3(c)(3) has been fulfilled.

DC SHPO has reviewed the lists of consulting parties and "[o]ther parties that have requested consulting party status" in the initiation letter and supports giving consulting party status to both. Under 36 CFR 800.2(c)(5), "[c]ertain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties." The significant scope and effects of the undertaking mean that it will affect many interests, including those of the "[o]ther parties that have requested consulting party status." Based on these organizations' missions and their routine participation in Section 106 consultations for projects in the District, their demonstrated interest in the properties affected by the undertaking is clear. We strongly urge that they may be made consulting parties. Considering the scope of the undertaking, even this expanded list is likely missing necessary consulting parties. It should be evaluated to determine who else should be added.

Along with the consulting parties, the Section 106 regulations stress the importance of involving and considering the views of the public. CFR 800.2(d)(1) describes those views as "essential to informed Federal decision making in the Section 106 process" and public participation in this undertaking is especially important given how the arch would alter the character of our nation's capital and likely be of interest to individuals from all parts of the country. Yet it is our understanding that the public has been offered just 10 days to review the nearly 200 pages of related documentation and provide comments within this insufficient window of opportunity.

Given the visibility of the proposed monument from other areas of the city, the proposed Area of Potential Effect (APE) is drawn too narrowly, especially in areas of higher elevation. Further analysis to determine the visibility of the structure is necessary to determine and document the APE in accordance with 36 CFR 800.4(a).

When adverse effects are found, 36 CFR 800.6(a) requires Federal agencies to "…consult with the SHPO and other consulting parties…to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate…" those adverse effects. So fundamental is this requirement to the Section 106 process that 36 CFR 800.1(a) identifies it among the primary goals of consultation.

Avoidance efforts in typical Section 106 reviews of new memorials usually begin with the evaluation of a range of possible locations. Since a memorial honoring our country's 250th anniversary appears to have no relationship to Memorial Circle and would be inconsistent with Memorial Avenue's symbolic view corridor, the arch could conceivably be constructed at other locations. However, the AOE suggests no consideration was given to any other sites, including the two ceremonial gateways suggested by the U.S. Commission on Fine Arts (CFA) for additional memorials, specifically Pennsylvania Avenue, SE near the Sousa Bridge and South Capitol Street near the Douglass Bridge, or any of the sites identified in the National Capital Planning Commission's Memorials and Museums Master Plan. While a large memorial on these sites could result in adverse effects, all adverse effects are not equal. The "most substantial" adverse effects of the proposed site could be avoided if the arch were constructed in a location that did not significantly diminish the important reciprocal views that symbolize the reunification of the country after the Civil War or visually compete with the Lincoln Memorial.

When avoidance of adverse effects is not possible, minimization is usually sought via the review of an initial concept for a new memorial and subsequent design modifications. In this instance, the consulting parties have been presented with a fully developed, CFA approved design for a memorial arch. No opportunities for concept review or meaningful design review have been provided and the few design options characterized by the AOE as "various smaller arch heights" were dismissed before Section 106 was initiated. While the NPS suggests opportunities for design review of architectural detailing and materials will be provided, the essential size, scale and character of the memorial have already been established via CFA approval and the AOE states that the structure will be clad in granite. All the remaining design review options suggested by the NPS address mostly minor details that have no potential to minimize adverse effects in any meaningful way. Similarly, DC SHPO does not believe any of the mitigation measures suggested in the draft Programmatic Agreement will adequately resolve the adverse effects of the proposed project, and therefore does not concur in its use.

For all these reasons , we are concerned the DC SHPO's opportunities to reflect the interests of the District of Columbia and its citizens in the preservation of our cultural heritage in a manner that would meaningfully avoid, minimize, or mitigate the adverse effects of the undertaking have been precluded. Moreover, it appears that the Advisory Council on Historic Preservation's (ACHP) opportunity to comment may be foreclosed.

If you should have any questions or comments regarding any of these matters, please contact me at [redacted]@dc.gov or [redacted] or Andrew Lewis at [redacted]@dc.gov or [redacted].

Sincerely,

David Maloney
District of Columbia State Historic Preservation Officer

26-0593

cc: Consulting Parties

District of Columbia Office of Planning

June 26, 2026

Ms. Jennifer T. Nersesian, Regional Director
National Capital Region
National Park Service
1100 Ohio Drive, SW
Washington, DC 20024

RE: Section 106 Consultation for the Proposed Triumphal Arch in Memorial Circle

Dear Ms. Nersesian:

Thank you again for initiating Section 106 consultation this month on the proposed Triumphal Arch in Memorial Circle, and for holding the first consultation meeting on June 15, 2026. We provided our initial comments verbally at the meeting and in our letter of the same date. Thank you also for your letter of June 22, 2026, seeking clarification of our comments.

Let me first summarize the verbal comments we presented at the June 15 meeting. We were unable to submit those comments in writing due to the quick turn-around in your schedule but will take the opportunity to do so now. As stated in our letter of June 15, the triumphal arch would be the tallest and most visible monument constructed in the District since completion of the Washington Monument. Once complete, it would be the largest monumental arch in the world. In response to a question at the June 15 meeting, your project team characterized the triumphal arch as celebratory rather than memorial, yet its placement in Memorial Circle at the opposite end of Arlington Memorial Bridge from the Lincoln Memorial would make it an inseparable part of a memorial composition in the nation's capital commemorating the reunification of the nation after the Civil War. It would become the most prominent element of that memorial composition. For these reasons alone, the effects of the proposed undertaking on historic properties should be carefully considered in accordance with Section 106 regulations.

Given the international stature that such a triumphal arch would assume, we began our comments by seeking insight from comparable monuments in other cities, notably the Arc de Triomphe in Paris and the 9/11 Memorial in New York City. Both of those famous and heavily visited monuments serve as focal points and destination venues that attract and can accommodate large crowds for public gatherings. In turn, the monuments feed the vitality of street life, businesses, and cultural attractions the urban fabric around them. In contrast, the proposed triumphal arch would be isolated and constrained on a high-volume traffic circle on Columbia Island, which is entirely parkland removed from the urban fabric of Washington. The location does not suggest a likelihood of success for a celebratory monument.

We cited insightful comments of those testifying recently to the National Capital Planning Commission, including veterans and family members of those buried at Arlington National Cemetery, about locating the arch at its entrance. Much eloquent testimony was given on how a 250-foot-high triumphal monument would be divisive and not healing. It would also severely damage an exceptional cultural landscape and one of the most important symbolic places in the nation.

899 North Capitol Street, NE, Suite 7100, Washington, DC 20002 Phone: 202-442-7600, Fax: 202-442-7638

Given the substantial adverse effects at the Memorial Circle location, we recommended that the National Park Service consider an alternate location for the arch, specifically at the newly created oval marking the arrival of South Capitol Street at the Anacostia River and its shift in direction to cross the new Frederick Douglass Bridge. This location offers multiple advantages. It is on direct axis with the Capitol and would mark the entrance to the original city on one of the four cardinal axes emanating from the Capitol dome. The 166-foot height of its main block would be more in scale with the 288-foot height of the Capitol dome. It would establish a direct visual interrelationship with the Capitol dome in the same manner as the other reciprocal vistas that characterize the L'Enfant city. It marks the intersection with Potomac Avenue, creating additional designed views. Its elongated shape would better accommodate a crowd that could arrive at multiple crossings controlled by traffic lights. It sits between Nationals Park and Audi Field, whose combined capacity is 60,000 seats. It would create an energizing focal point for a still-emerging neighborhood, suitable for a celebratory crowd. With the new RFK stadium at 70,000 seats and other historic recreational facilities a short distance away along the Anacostia River, it could become a symbol of sports triumph and an icon for a hoped-for DC Olympic Games. And importantly, it would enhance the historic L'Enfant Plan and the city's monumental landscape rather than detracting from it.

We appreciate your informing us about the numerous public comments you have received. We are particularly interested in any comments from DC residents and organizations so that we can better fulfill our responsibility to reflect the interests of the District of Columbia and its citizens. We are also interested in how you will be making comments available to consulting parties and taking them into account. We look forward to discussing this at a future consulting parties meeting.

As required by 36 CFR 800.3(c)(3), consultation is carried out in a manner commensurate with the nature of the undertaking and its effects on historic properties. The unprecedented nature of this proposal and the extraordinary level of public interest clearly require full consideration of alternatives that could avoid, minimize, or mitigate adverse effects. The potential for such effects on National Historic Landmarks elevates the requirement for planning to minimize harm. Exclusion of alternatives that may involve site relocation or diminution of the structure is not consistent with these requirements.

Our recommended alternative site is not a mitigation measure but a way to avoid adverse effects, which is a preferred outcome in Section 106 review. We would like to hear the views of other parties on it and any other suggestions. As part of the consultation process, we would like to know if NPS has considered other ways to avoid the adverse effects associated with this undertaking, and if so, what they were and why they were rejected. We have made no decision on whether there are measures that could adequately minimize or mitigate the adverse effects of the proposal and cannot make such a decision without first hearing and considering the views and suggestions of routinely qualified consulting parties who have expressed an interest in participating as such. These parties have so far been denied the opportunity to participate. We look forward to further consultation with you and all interested consulting parties as set forth in the regulations.

Sincerely,

David Maloney
District of Columbia State Historic Preservation Officer

26-0593

cc: Consulting Parties

District of Columbia Office of Planning

July 24, 2026

Ms. Jennifer T. Nersesian, Regional Director
National Capital Region
National Park Service
1100 Ohio Drive, SW
Washington, DC 20024

RE: Additional Comments on the Section 106 Consultation for the Proposed Triumphal Arch in Memorial Circle

Dear Ms. Nersesian:

The District of Columbia State Historic Preservation Officer (DC SHPO) received the National Park Service's (NPS) most recent letter regarding the proposed Triumphal Arch in Memorial Circle on July 10, 2026. This letter provides additional comments in accordance with Section 106 of the National Historic Preservation Act and its implementing regulations, 36 CFR Part 800.

We are pleased that consulting party status has been granted to the additional organizations that requested to participate in consultation. Opportunities for those parties and the public to comment should remain open until the consultation process is concluded.

With regard to the Area of Potential Effect (APE), we appreciate the detailed information that was provided to explain how the draft APE, which is attached for reference, was developed. We offer the following additional comments on that draft:

- Per 36 CFR 800.16(d) and as noted in your letter, the APE is "…influenced by the scale of the undertaking." Since the height and visibility of the proposed monumental arch would make it a permanent addition to the skyline of the nation's capital, a robust APE that includes comparable landmarks on the skyline is warranted.

- As previously noted, the visibility of the arch from areas of higher elevation should be evaluated. For this reason, we recommend that the NPS consider panoramic views from places such as the "Overlook" at St Es, views from the Washington National Cathedral observation deck, views from the Frederick Douglass National Historic Site (Cedar Hill), and the like. If such areas are included, they can be included as discontiguous sections of the APE.

- We note that the majority of East Potomac Park and points south (e.g. JBAB) are excluded from the APE. Was this decision based upon flag tests (i.e. balloon tests such as those conducted for cell phone antennas), site visits and/or related efforts which confirmed the monument would not be visible from these areas? For comparison, the new Frederick Douglass Bridge is 168' tall and highly visible from a very large area (see image below). A monument that exceeds that height by an additional 82' would be comparable in terms of effects and visible from an even larger area.



- Additional information about historic properties that fall within the APE is available via our PropertyQuest website (www.propertyquest.dc.gov)

If you should have any questions or comments regarding any of these matters, please contact me at [redacted]@dc.gov or [redacted] or Andrew Lewis at [redacted]@dc.gov or [redacted].

Sincerely,

David Maloney
District of Columbia State Historic Preservation Officer

26-0593

# DRAFT AREA OF POTENTIAL EFFECT



District of Columbia Office of Planning

August 31, 2026

Ms. Tammy Stidham
Associate Regional Director – Lands and Planning
National Park Service
National Capital Region
1100 Ohio Drive, SW
Washington, DC 20242

RE: Additional Comments Related to the Monumental Arch Project, the White House Visitors Screening Facility, the Lafayette Park Security Project, and the Repainting of the Lincoln Memorial Reflecting Pool

Dear Ms. Stidham:

On the afternoon of Friday, August 28, 2026, the District of Columbia State Historic Preservation Officer (DC SHPO) received several email messages from you. These messages addressed the following draft documents, comment deadlines and requests for consulting parties' meetings:

1. A 133-page revised Assessment of Effects Report for the Monumental Arch Project. We have not yet had sufficient time to determine whether all or some of the various appendices have also been revised;

2. A **September 4th** deadline for comments on the revised Assessment of Effects Report for the Monumental Arch (i.e. a seven-calendar day turnaround);

3. A 20-page revised White House Visitors Screening Facility (VSF) Memorandum of Agreement MOA with five appendices;

4. A request for a consulting parties meeting regarding the revised White House VSF MOA on **September 8th**;

5. A request for a consulting parties meeting regarding the Monumental Arch on **September 9th**;

6. A **September 12th** deadline for comments on the revised White House VSF MOA (i.e. a fifteen-calendar day turnaround);

7. A request for a consulting parties meeting regarding the White House VSF on **September 12th** (i.e. the same day comments are due on the VSF MOA); and

8. A request for a consulting parties meeting regarding the Lafayette Square Security Project on **September 21st** or **24th** (in addition to the **September 10th** site visit already scheduled).

These emails follow a recent, near-constant trend of requests for expedited reviews by the NPS over the last few months. We have attempted to meet these deadlines whenever possible, but we are not always able to do so since our responsibility to address the daily consultation requests we receive from other federal and District agencies has not diminished.

However, our records indicate that we requested the NPS to provide copies of the 100,000 public/consulting party comments on the monumental arch project in our letter of June 26th, and again in an email dated August 11th. We eventually received a "summary" on August 12th but requested the actual comments again in emails dated August 14th and August 21st. While the revised Assessment of Effects Report contains an additional summary of sorts, it still does not appear to contain the actual comments we consider essential for us to provide informed comments that reflect the interests of the citizens of the District of Columbia in the preservation of our cultural heritage.

Our records also show that we invoked the NPS Nationwide Programmatic Agreement's (PA) Dispute Resolution clause (Stipulation X) regarding the painting of the Lincoln Memorial Reflecting Pool in our letter of April 28, 2026, and requested the NPS to provide additional information during our May 13, 2026, meeting on the same topic. We have still not received a response. And even though Stipulation X.A of the PA requires, "all work that is the subject of the dispute to stop until the dispute is resolved…," it is evident that work on that project continues. When can the DC SHPO expect a response to our request and does the NPS intend to honor the requirements of the PA?

For this reason, we once again request the NPS to provide copies of the 100,000 public/consulting party comments on the monumental arch project, a response to our requests for additional information regarding the painting of the Lincoln Memorial Reflecting Pool, and additional time to review the most recently submitted materials and prepare for the related consulting parties' meetings.

If you should have any questions or comments regarding any of these matters, please contact me at [redacted]@dc.gov or [redacted]. Otherwise, we request a response from the NPS regarding all the matters outlined in this letter by September 2, 2026.

Sincerely,

C. Andrew Lewis
Senior Historic Preservation Specialist
District of Columbia State Historic Preservation Office

26-0593, 26-0495, 26-0474 and 26-0371

District of Columbia Office of Planning

September 16, 2026

Ms. Tammy Stidham
Associate Regional Director – Lands and Planning
National Park Service
National Capital Region
1100 Ohio Drive, SW
Washington, DC 20242

RE: DC SHPO Comments on the Assessment of Effects Report for the Triumphal Arch Project

Dear Ms. Stidham:

Thank you for providing the District of Columbia State Historic Preservation Officer (DC SHPO) with a revised Assessment of Effects (AOE) Report and related documents for the proposed Triumphal Arch Project and for hosting a second consulting parties meeting on September 9, 2026. We also appreciated receiving electronic copies of the more than 100,000 public comments we had requested from the National Park Service (NPS) on several prior occasions. Based upon our review of this additional information and our participation in the recent meeting, we are writing to provide additional comments regarding the effects of the Triumphal Arch on historic properties in accordance with Section 106 of the National Historic Preservation Act.

The DC SHPO concurs with the expanded Area of Potential Effect (APE) and NPS's determination that even more historic properties than originally anticipated will be adversely affected by the undertaking. According to the NPS summary tables (see attached), these include at least six National Historic Landmarks, eight historic districts, eight cultural landscapes and twenty individual properties.

However, we do not agree with every proposed finding of "no adverse effect." Theodore Roosevelt Island, for example, would also be adversely affected since its boundaries extend south of the bridge that the AOE suggests will block views of the arch. The use of 320' tower cranes for approximately one full year of construction would also cause adverse visual effects. Archaeological resources may also be adversely affected (see additional comments that follow).

In more general terms, we find that the language used to describe the nature of the adverse effects significantly underestimates the degree to which the integrity of the affected historic properties would be diminished. For example, the arch would not merely be "prominently visible." Instead, it would visually overwhelm the surrounding historic context. Likewise, the balanced architectural relationship of the Arlington Memorial Bridge complex would not merely be "altered." Instead, it would be irreparably compromised. Both these concerns are particularly relevant to the Lincoln Memorial since the proposed 250' arch would be more than twice as tall as the 99' memorial.

899 North Capitol Street, NE, Suite 7100, Washington, DC 20002 Phone: 202-442-7600, Fax: 202-442-7638

Foremost among our concerns with the revised AOE are the counterintuitive arguments the Purpose and Need section suggests as justification for the adverse effects. The NPS has cited the 1924 Report of the Arlington Memorial Bridge Commission and the corresponding 1925 Act of Congress authorizing construction of the bridge and related features as the legal basis for building an arch in Memorial Circle. Other sections of the AOE make similar references to suggest the arch is “inherently location dependent” and that it will somehow “complete” the McKim Mead & White design contemplated in the 1924 Report. The DC SHPO does not agree.

Obviously, neither the 1925 Act of Congress nor the design of Memorial Circle contemplated the 250th anniversary of our nation since both were completed over a century before the event. Moreover, McKim Mead & White’s design envisioned two slender columns carefully situated to frame the view between the Lincoln Memorial and Arlington House and to more directly signify reunification by using one column to symbolize the North and the other, the South (see rendering below).



In stark contrast, the proposed Triumphal Arch would effectively replace much of the important view with a frame – a massive frame that would significantly narrow and restrict, if not completely obstruct portions of the view corridor. And since the proposed arch does not symbolize reunification in any way, it would be more accurate to describe the current proposal as antithetical to McKim Mead & White’s design and the 1925 Act than to suggest it will fulfill or complete them in any way.

A triumphal arch would also run counter to the fervent opposition expressed by a significant majority of the more than 100,000 public comments the NPS solicited but does not appear to be heeding. We are still analyzing the massive electronic files, but our efforts thus far demonstrate that a majority of comments in opposition to the arch were submitted from all fifty states and most, if not all, U.S. territories. Matching, or possibly exceeding the national trend, approximately 93% of the roughly 11,000 comments submitted from within the District of Columbia expressed very strong opposition to the proposal.

Given the overwhelming public objections and related consulting party concerns, one would expect the AOE to offer some sort of generalized responses or at least justifications for why the comments are being disregarded. However, the only acknowledgment appears to be a public comment summary which downplays the volume of opposition by consistently using the ambiguous qualifier "some" to describe the number of objections. The consulting party comment summary merely lists the comments and provides no response of any sort. For these reasons, the DC SHPO requests the NPS to develop responses that, at a minimum, respond to the various headings under which the public comments were categorized (e.g. individual cultural resources, visitor experience, etc.).

In addition to a lack of credible support for an arch in historic designs, past acts of Congress or current public opinion, what the AOE underscores more than anything is that the NPS has still failed to meaningfully identify and evaluate alternative designs or locations that could avoid or minimize the project's multiple adverse effects. Consideration of smaller arches and the dismissal of the South Capitol Street alternative site we previously suggested fail to constitute adequate consideration of alternatives, especially in light of the number and nature of the adverse effects.

Since NPS seems convinced that Memorial Circle is the most fitting site for a commemorative monument, we request meaningful consideration of an alternative that more accurately reflects the spirit and intent of the 1924 McKim Mead & White design and the 1925 Act of Congress. Specifically, we request the NPS to evaluate design concepts consisting of two columns that truly frame, rather than limit the historic view corridor. We maintain that the development and meaningful consideration of some such alternative designs and/or alternative locations is essential for the NPS to comply with the most fundamental requirements of Section 106 for this undertaking.

With regard to archaeology, the NPS determined that Phase I archaeological identification survey was warranted but the draft Phase IB workplan received by the DC SHPO on August 24, 2026, was not approved. Following consultation with NPS on September 9, 2026, the archaeological consulting team is revising the draft archaeological workplan to include geoarchaeological coring and analysis by a qualified geoarchaeologist. The need for and locations of subsequent Phase IB mechanical trenching will be determined during consultation when the results of the geoarchaeological investigations are available. Until the identification survey is complete and identified resources are evaluated, the DC SHPO will be unable to assess the effects of this undertaking on archaeological resources.

If you should have any questions or comments regarding any of these matters, please contact me at [redacted]@dc.gov or [redacted]. Otherwise, we look forward to receiving the information requested in this letter at your earliest convenience and to consulting further with all parties to continue the Section 106 review of this undertaking.

Sincerely,

C. Andrew Lewis
Senior Historic Preservation Specialist
District of Columbia State Historic Preservation Office

26-0593, 26-0495, 26-0474 and 26-0371

# TRIUMPHAL ARCH ADVERSE EFFECT SUMMARY TABLES

## Historic Properties

| | Total Assessed | Adverse Effect | No Adverse Effect |
|---|---|---|---|
| **National Historic Landmarks** | **31** | **6** | 25 |
| **Historic Districts** | **53** | **8** | 45 |
| **Cultural Landscapes** | **10** | **8** | 2 |
| **Individual / Other Historic Properties** | **167** | **20** | 147 |
| **TOTAL** | **261** | **42** | **219** |

## Historic Properties – Adverse Effect

**National Historic Landmarks — 6**
- Fort Myer NHL District
- Georgetown Historic District
- National War College
- Old Naval Observatory
- Pentagon
- United States Capitol

**Historic Districts — 8**
- Arlington National Cemetery Historic District
- Arlington House Historic District
- Mount Vernon Memorial Highway Historic District
- National Mall Site and National Mall Historic District
- Washington Monument and Grounds Historic District
- Rock Creek and Potomac Parkway Historic District
- East and West Potomac Park Historic District
- Observatory Hill Historic District

**Cultural Landscapes — 8**
- Memorial Avenue Corridor Cultural Landscape
- Lady Bird Johnson Park Cultural Landscape
- Arlington House Cultural Landscape
- Lincoln Memorial Cultural Landscape
- The Mall Cultural Landscape
- Washington Monument and Grounds Cultural Landscape
- Thomas Jefferson Memorial Cultural Landscape
- Mount Vernon Memorial Highway North Cultural Landscape Inventory

**Individual / Other Historic Properties — 20**
- Arlington Memorial Bridge and Associated Features
- Arlington House (Robert E. Lee Memorial)
- Lyndon B. Johnson Memorial Grove
- Lincoln Memorial
- World War II Memorial
- Washington Monument
- L'Enfant Plan of the City of Washington, District of Columbia
- Arlington Ridge Park
- George Mason Memorial
- Thomas Jefferson Memorial
- Alban Towers Apartment Building
- American Institute of Pharmacy Building
- George Washington Memorial Parkway
- Halcyon House
- Francis Scott Key Bridge
- National Cathedral
- Vigilant Firehouse
- Bridge #5020 / State Bridge #5020
- Old Warehouse Area and Ground Maintenance Complex
- Frederick Douglass National Historic Site

District of Columbia Office of Planning

September 21, 2026

Ms. Tammy Stidham
Associate Regional Director – Lands and Planning
National Park Service
National Capital Region
1100 Ohio Drive, SW
Washington, DC 20242

RE: Initial DC SHPO Comments on the Draft Triumphal Arch Project Memorandum of Agreement

Dear Ms. Stidham:

The DC State Historic Preservation Office (DC SHPO) is writing in response to your September 15, 2026, email circulating a draft Memorandum of Agreement (MOA) for the Triumphal Arch Project and requesting "feedback/comments on the proposed mitigation measures outlined in the MOA by 12:00 noon EST on Monday, September 21, 2026."

Considering that NPS and the consulting parties are still in the process of evaluating the adverse effects associated with the planned undertaking, we respectfully submit that it is premature to determine and finalize mitigation measures at this time.

As you are aware, on September 9, 2026, the National Park Service (NPS) hosted a second consulting parties meeting regarding the Triumphal Arch Project. The purpose of that meeting was to discuss the project's revised Assessment of Effects Report. Comments were requested one week later, on September 16, 2026, but a day before the comment deadline was set to close, NPS requested comments on its proposed mitigation measures.

NPS could have neither received nor considered all consulting party comments regarding the adverse effects of the project (including our own) before drafting the measures that are supposed to mitigate them. Our September 16, 2026, letter identified examples of adverse effects that were not included in NPS's assessment and, therefore, require further consideration before they can be resolved. Moreover, the preliminary archaeological assessment for this project has not been completed, so the potential to adversely affect archaeological resources is not yet known. Mitigation cannot be assessed for adverse effects that have not yet been fully identified and evaluated. Finally, in light of reports over the weekend that the arch is to be used for military purposes, it is also important to clarify how such uses will impact the arch's design and review what additional adverse effects these uses will cause.

We were pleased to read in your September 15 email that the NPS wishes to "…refocus the consultation on avoidance, minimization and mitigation measures…." Our September 16, 2026, letter included specific suggestions for how avoidance and minimization might be achieved. We hope the NPS finds our comments, and those of the consulting parties, useful in determining how best to proceed in accordance with regulatory requirements.

While it is premature to fully assess what mitigation may be required, we have a few preliminary comments on the mitigation-related stipulations of the recently circulated draft MOA. Broadly speaking, the suggested mitigation measures are not proportionate to the significant adverse effects of the arch that NPS has proposed to date. Many of the measures are of the sort routinely implemented for undertakings causing far fewer and much less impactful adverse effects. For example, Stipulations III.A.6-8 are routine permit conditions required for much smaller construction projects within the District of Columbia. Similarly, the suggested commitment to regularly empty and place lids on trash receptacles (Stipulation III.A.10) should be counted among NPS's daily responsibilities instead of mitigation measures. Several of the rehabilitation projects outlined in the Park Improvements section (Stipulation III.C) are also the sorts of undertakings the NPS should be implementing on a reasonably routine basis instead of as mitigation. Finally, recordation is the most rudimentary and minimal form of recognized mitigation, followed by interpretive displays, and oral histories.

The question of mitigation should be more fully considered after NPS and the consulting parties complete the assessment of adverse effects, and, consistent with "refocus[ing] the consultation on avoidance [and] minimization," only after meaningfully developing and evaluating the alternatives that could render most of the suggested mitigation measures unnecessary.

If you should have any questions or comments regarding any of these matters, please contact me at [redacted]@dc.gov or [redacted]. Otherwise, we look forward to receiving the information requested in our previous letter and to consulting further with all parties to continue the Section 106 review of this undertaking.

Sincerely,

C. Andrew Lewis
Senior Historic Preservation Specialist
District of Columbia State Historic Preservation Office

26-0593, 26-0495, 26-0474 and 26-0371