# EXHIBIT 20

United States Department of the Interior
OFFICE OF THE SOLICITOR
Washington, D.C. 20240

To: National Capital Planning Commission

From: Department of the Interior

Date: 2 October 2026

Re: New Monumental Arch – NCPC File No. 8778

**Introduction and Bottom Line**

On July 9, 2026, the National Capital Planning Commission (the "Commission") approved preliminary site and building plans for the proposed Triumphal Arch at Memorial Circle, Columbia Island (the "Arch"), with comments to be resolved before final review. Among those comments, the Commission stated that it has not yet resolved whether the Height of Buildings Act of 1910 ("HBA") binds the federal government, said it must decide that question before taking final action, and asked the Department of the Interior ("Interior" or the "Department") to justify the project's height in the final submission.

After thorough analysis, the Department believes that the HBA does not apply to federal buildings. The Commission, however, need not resolve that broader question here, because the HBA does not bar the construction of the proposed Triumphal Arch in any event.

**Background**

**The Proposed Triumphal Arch**

Interior proposes to construct a 166-foot-tall Arch at Memorial Circle on Columbia Island in the District of Columbia. The Arch will be topped with an observation deck and three statues. The total height, including the arch and the statuary will be approximately 250 feet.

**History of the Memorial Bridge Project**

Long before construction began on Memorial Bridge, since at least the time of President Andrew Jackson, Americans have sought to build a bridge across the Potomac "as a symbol of the firmly established union of the North and the South!"[1] Congress first approved the purchase of land for a bridge during Jackson's presidency.[2] Despite early optimism for the bridge, progress was slow.

[1] W.E. Christian, "The Arlington Memorial Bridge: An Evolution of the Vision of Andrew Jackson and Daniel Webster Is About to Become an Actuality on a Scale Greater and Grander Than They Ever Planned and in Fit Keeping With Washington's Soon-to-Be Million or More Population," The Washington Post (Nov. 1, 1925).
[2] *Id.* at 2.

At the turn of the century, momentum began to gather. In 1900, the Senate formed the Park (McMillian) Commission to reconcile competing plans for the future of DC.[3] The McMillian Commission first articulated the basic elements of the Memorial Avenue Corridor, including the proposed development of a bridge across the Potomac River.[4] In 1910, the newly created Commission of Fine Arts ("CFA") began discussing plans to construct a bridge across the Potomac.[5] In 1913, Congress created the Arlington Memorial Bridge Commission (the "Bridge Commission"), tasked with choosing a design for the bridge and reporting back to Congress.[6] The Bridge Commission remained inactive for several years due to appropriations issues.[7]

In 1921, the dedication of the Tomb of the Unknown Soldier at Arlington National Cemetery served as the catalyst to turn ideas into action for the proposed bridge.[8] Due to an unprecedented traffic jam at the Tomb's dedication, President Harding sought and Congress approved appropriations for the Bridge Commission.[9] The Bridge Commission and the CFA then asked Congress to fund construction of a bridge reflecting the original McMillian plan.[10]

By 1925, Congress had authorized construction of the Arlington Memorial Bridge, "including appropriate approaches, roads, streets, boulevards, avenues, and walks leading thereto on both sides of said river, together with the landscape features appertaining thereto, all in accordance with the design, surveys, and estimates of cost" provided by the Bridge Commission to Congress.[11] Congress authorized the Bridge Commission to "make such changes in design and location of said bridge without increasing the total cost of the project as in its discretion may be found to be necessary or advisable."[12]

The Bridge Commission selected Columbia Island as "a fitting end for the Memorial Bridge."[13] Because Columbia Island is "so intimately related to the bridge," the development plans for the Island "as a park should be included as part of the project for the Memorial Bridge."[14] The Bridge Commission called for "a plaza with fitting architectural adornment in a measure supplemental to the Lincoln Memorial across the river, and for this purpose, two stately columns

---

[3] Arlington Memorial Bridge, Historic American Engineering Record (HAER) No. DC-7 at 3.
[4] *Id.* at 4.
[5] *Id.* at 3.
[6] *First Deficiency Appropriation Bill, 1922.* Hearings Before the Subcommittee of the Committee on Appropriations on H.R. 9237. Subcommittee on Appropriations. Committee on Appropriations. U.S. Senate. 67th Cong., 2d sess.
[7] *Id.*
[8] HAER at 3.
[9] "President Urges Funds for Bridge". *The Washington Post*. January 14, 1922.
[10] *Id.*
[11] P.L. 68-463, 43 Stat. 974 (1925).
[12] *Id.*
[13] Report of the Arlington Memorial Bridge Commission (1924 Report) at 9 (April 21, 1924).
[14] *Id.*

are proposed to be erected" where the bridge intersects the island.[15] The design called for the columns to be 166 feet tall and contain interior spiral staircases to permit access to the top.[16]

Construction began on Memorial Bridge in 1926 and it opened to traffic in 1932.[17] Much of the project, including related streets and approaches, remained unfinished.[18] Because of difficulties posed by the Great Depression, Congress deleted a proposed appropriation to continue work on the project.[19]

Around the same time, the Bridge Commission exercised its authority to revise the design plans for Columbia Island.[20] Because of economic conditions and safety concerns related to flights at Hoover Field (a small airfield approximately one mile north of the current location of Reagan National Airport), the Bridge Commission removed the columns from the site plan.[21] Then Chairman of the CFA, Charles Moore, disagreed with the decision to remove the columns, stating that Columbia Island should be treated "as a constituent part of one large composition . . . [and] should not be suffered to fall from this intended high estate into a mere thoroughfare."[22]

In 1933, President Franklin Delano Roosevelt took office and impounded all funds available to the Bridge Commission.[23] A few months later, FDR signed an executive order disbanding the Bridge Commission and transferring its functions and authority to the Department of the Interior, where they remain to this day.[24]

Shortly thereafter, though, the Memorial Bridge benefitted from a wave of New Deal spending.[25] DC received a grant to finish widening Constitution Avenue, and Virginia began work to connect the bridge to the broader road network.[26]

In 1933, revised plans for Columbia Island received initial approvals. The first called for two "large fountain pools with low coping and high perpetual sprays of water," each placed in the center of a 200-foot-wide circle.[27] An earlier fountain proposal called for two pavilions, 65 feet tall, with a roof supported by columns surrounded by a 160-foot-wide basin of water, but that

---

[15] *Id.*
[16] Schematic on file at Interior.
[17] HAER at 12, 91, 93–94.
[18] *Id.* at 95.
[19] *Id.*
[20] *Id.*
[21] *Id.* at 92.
[22] National Park Service Cultural Landscapes Inventory (NPS CLI Report), Memorial Avenue Corridor, George Washington Memorial Parkway - Memorial Avenue at 55.
[23] HAER at 95.
[24] *Id.* (citing E.O. 6166, Organization of Executive Agencies (June 10, 1933) ("The functions of the following agencies are transferred to the Office of National Parks, Buildings, and Reservations of the Department of the Interior, and the agencies are abolished: Arlington Memorial Bridge Commission")).
[25] *Id.* at 96.
[26] *Id.*
[27] NPS CLI Report at 55.

failed to secure CFA approval.[28] In 1934, a further revised plan eliminated the double fountains and called for "one fountain within a large circle."[29] Construction of the circle did not begin for almost four more years, and was not completed until the early 1940s.[30]

In addition to Columbia Island, one other element of the Memorial Bridge project remained uncompleted in the 1940s. In the early 1930s, the Commission approved revised plans that included equestrian statues depicting the Arts of War and the Arts of Peace on the Lincoln Memorial side of the river.[31] These statues were not in the 1924 Report, which called only for figures on each end of the bridge representing the "result of the energies of the entire country in the arts of peace."[32] F.D.R. was unwilling to fund completion of the statues, and restrictions imposed by World War II made their completion unrealistic (bronze was a strategic metal and tin was restricted, even after the war).[33] In 1949, as a gesture of friendship, the Italian government offered to cast the statues.[34] Italy delivered the statues in 1951 – finally completing work the Memorial Bridge's planned DC-side approach.[35]

In the years after World War II, Major General Ulysses S. Grant III, who served as the Executive Officer of the Arlington Memorial Bridge Commission and Chairman the National Capital Park and Planning Commission, described the condition of Columbia Island as a "temporary road with an informal circle."[36] He stressed that "the central plaza on Columbia Island had never been undertaken and seems to be absolutely essential to link together the two parts of the project, namely the main bridge itself and the entrance to Arlington Cemetery."[37]

This remains the situation today.

**The Height of Buildings Act**

Congress passed the first Height of Buildings Act in 1899.[38] The law regulated the height of buildings in DC but specifically did not apply to "Federal or municipal buildings."[39] A decade later, Congress passed a new Height of Buildings Act that repealed "All laws in conflict herewith."[40]

---

[28] Minutes of Meeting of the Commission of Fine Arts at 1 (Feb. 26, 1932), https://ia801409.us.archive.org/34/items/cfaminutes26feb1932/cfaminutes26feb1932.pdf.
[29] *Id.*
[30] *Id.*
[31] NPS CLI Report at 74; HAER at 35, 97–99, 100–01.
[32] 1924 Report at 8.
[33] HAER at 100.
[34] *Id.* at 101
[35] *Id.* at 102.
[36] NPS CLI Report at 74.
[37] *Id.*
[38] 30 Stat. 922 (1899).
[39] *Id.*
[40] 36 Stat. 452 (1910).

The HBA, as amended, is still in effect today. With some exceptions, the HBA generally caps the height of any building "erected, altered, or raised in the District of Columbia" to the length of the sidewalk or street in front of it plus 20 feet, not to exceed a maximum of 130 feet for buildings "on a business street or avenue."[41] The "height" of the building is measured "to the highest point of the roof."[42]

With NCPC approval, "spires, towers, domes, minarets, pinnacles, penthouses, ventilation shafts, chimneys, smokestacks, and fire sprinkler tanks may be erected to a greater height."[43] "Provided, however, that . . . except in the case of a penthouse which is erected to a height of one story of 20 feet or less above the level of the roof, no floor or compartment thereof shall be constructed or used for human occupancy above the top story of the building upon which such structures are placed."[44] "And provided that penthouses, ventilation shafts, and tanks shall be set back from the exterior walls distances equal to their respective heights above the adjacent roof."[45]

Buildings exceeding the height restrictions in the HBA are "common nuisances" and the owner of the building can be charged in the Superior Court of the District of Columbia, fined, and required to "abate the nuisance."[46]

**The Height of Buildings Act Is Not an Obstacle to the Arch**

**The Height of Buildings Act Does Not Apply Against the Federal Government**

The Height of Buildings Act does not apply to federal buildings for three reasons. First, the statutory exemption for federal buildings in the 1899 law is still in force notwithstanding the HBA. Second, the penalties included in the HBA are evidence of Congressional intent to regulate the conduct of private parties, not the government. Lastly, the HBA is a local zoning regulation which is not binding on the federal government.

First, the statutory exemption for federal buildings in the 1899 law is still in force notwithstanding the HBA. The 1899 Act did not apply to "Federal or municipal buildings," and the 1910 Act's limited repeal of laws "in conflict" with the new Act does not implicate the federal exception because the 1910 Act does not say anything about federal buildings.[47] The statute's history supports this interpretation. The repeal provision as first introduced expressly repealed the entire 1899 Act, but was later changed to a more limited conflict-based repeal.[48] Because the HBA does not mention federal buildings, there can be no conflict between it and the

---

[41] D.C. Code § 6-601.05.
[42] 36 Stat. at 454.
[43] 36 Stat.at 453; P.L. 113-103, 128 Stat. 1155 (2014).
[44] *Id.*
[45] *Id.*
[46] D.C. Code § 6-601.08.
[47] 36 Stat. at 452.
[48] 45 Cong. Rec. 4534.

1899 law. Therefore, the HBA did not repeal the federal building specific provisions of the 1899 law.

Second, the penalties provided for in the HBA show Congressional intent to regulate the conduct of private parties, not conduct of government. The HBA states that buildings exceeding the maximum height set by the act are public nuisances whose owners or maintainers are subject to criminal or civil prosecution, and upon conviction, fined and ordered to abate the nuisance. It is unlikely that Congress intended to subject the United States or its officers to civil or criminal prosecution in DC courts for maintaining a public nuisance. Further, the HBA does not meet the bar for a waiver of the United States' sovereign immunity for civil damages because it neither expressly waives sovereign immunity nor "explicitly authorizes suit against [the] government on [a nuisance] claim."[49] "Congress must, at a minimum, mention the government when it wishes to scrap sovereign immunity,"[50] and it did not do so in authorizing public nuisance prosecutions for violations of the HBA.[51] Indeed, because "[i]n its inception, a public, or common, nuisance was an infringement of the rights of the Crown," and "invasion[s] of the rights of the public,"[52] the authorization of public nuisance suits in the HBA promotes inferring that Congress sought to regulate only private entities when it passed the law.

Lastly, both the HBA and the 1899 Act are local zoning regulations. Since the first codification of the laws of the District of Columbia, the HBA has been codified in the chapter addressing zoning.[53] This continues to be true today.[54] As codified in the DC Code, zoning regulations expressly do "not apply to federal public buildings."[55] Rather, "in order to ensure the orderly development of the national capital, the height of federal public buildings in the District of Columbia will be subject to the approval of the National Capital Planning Commission"[56] As a general rule, the federal government does not view itself as bound by local zoning laws—at least absent Congressional direction.[57] There is no such direction in the HBA.

Federal law confirms this. The Commission's organic statute exempts federal buildings from DC zoning regulation, instead providing that the "height of federal public buildings in the District of Columbia [is] subject to the approval of the Commission."[58]

There are, therefore, two different zoning regimes for buildings in DC—one for local buildings subject to regulation by the DC Zoning Commission which ensures that the height of any

---

[49] *Department of Agric. Rural Dev. Rural Housing Serv.* v. *Kirtz*, 601 U.S. 42, 49 (2024) (quotations omitted).
[50] *Id.* at 56
[51] D.C. Code § 6-601.08.
[52] Restatement (Second) Torts § 821B cmt. 1 (1979).
[53] D.C. Code § 505 (1929); D.C. Code § 5-405 (1941).
[54] *See* D.C. Code § 6-601.05 (HBA placed in chapter 6 of Title 6, titled "Zoning and Height of Buildings").
[55] *Id.* at § 6-641.15
[56] *Id.* (cleaned up).
[57] *See* 40 U.S.C. 3312(c) (directing GSA to consider local zoning laws in building construction and alteration, but not mandating compliance with them).
[58] 40 U.S.C. 8722(d) (cleaned up).

building is consistent with the HBA; and one for federal buildings, which are exempt from that regulatory scheme and are instead regulated by the Commission, which is not bound by the requirements of the HBA.

**The HBA Does Not Bar the Arch**

Should NCPC determine the HBA applies against the federal government generally, it does not apply against the Arch for four reasons. First, the 1925 Act authorizing implementation of the Memorial Bridge Commission's 1924 report explicitly authorized a structure on Columbia Island exceeding the height restriction of the HBA. Second, even if changes from the proposed columns must comply with the HBA, the Congressionally authorized 166-foot exception continues, and the Arch complies. Third, the Height of Buildings Act applies only to "buildings" – not "structures" – and the Arch is a structure and not a building. Lastly, the restrictions in the HBA were imposed due to firefighting limitations in the early 1900's—considerations not applicable to the Arch.

First, the 1925 Act authorized the Bridge Commission to implement the plan in its 1924 Report. The Report called for two 166-foot-tall columns on Columbia Island, and schematics of the columns show interior spiral staircases permitting access to the top.[59] Congress is, of course, permitted to enact statutory exceptions to its otherwise generally applicable rules. The 1925 Act's express (and later in time) authorization of the Columbia Island columns means that the HBA's general 130-foot limit does not apply to that site and project. Congress also chose to grant broad discretion to the Bridge Commission, now possessed by the Department of the Interior, to make changes to that plan. Congress' prior determination that the HBA does not apply to the site on Columbia Island applies to Interior's discretionary changes to the plan for the same site.

Additionally, both the Bridge Commission and Interior previously exercised the authority delegated by Congress to make changes to the 1924 Report. First, the Bridge Commission removed the two Congressionally authorized pillars from the site plan.[60] Next, Interior proposed several design changes including fountains, pavilions, and a 160-foot-wide basin of water.[61] Later, Interior exercised its authority under the 1925 Act to create Memorial Circle.[62] The addition of the statues depicting the Arts of War and the Arts of Peace on the Lincoln Memorial side of the river were also added through Interior's authority under the 1925 Act.[63] The history of Columbia Island is a history of the Bridge Commission, and later Interior, exercising delegated authority to change budgets and designs for the site. That same authority allows Interior to again change the site design to construct the Triumphal Arch on Columbia Island.

---

[59] Schematic on file at Interior.
[60] HAER at 92.
[61] Minutes of Meeting of the Commission of Fine Arts at 1 (Feb. 26, 1932), https://ia801409.us.archive.org/34/items/cfaminutes26feb1932/cfaminutes26feb1932.pdf.
[62] *Id.*
[63] NPS CLI Report at 74; HAER at 35, 97–99, 100–01.

Second, even if design changes away from the planned columns must otherwise comply with the Height of Buildings Act, Congress's specific 166-foot exception continues, and the Arch otherwise complies. The main body of the Arch itself is 166 feet tall, the exact height of the columns authorized by the 1925 Act. The renderings label the section on top of the Arch (the structure on the observation deck and the pedestals for the three gilded figures) as 24-feet tall with a relatively small setback. But those features should each be evaluated *separately*. The structure on the observation deck is best understood as a "penthouse" for HBA purposes.[64] Additionally, the height of the pedestals on which the three figures sit should be attributed to the height of the figures – not the penthouse. The pedestals are not a "roof" under the ordinary meaning of that word.[65] They are part of the building's architectural embellishments like the sculptures themselves and should therefore be evaluated with the sculptures.

Although this interpretation means that much of the Arch's overall height is HBA-exempt ornamentation, that is not without precedent. A relatively modern (1990) office building, One Franklin Square (1310 K Street) is a 130-foot-tall building with 80-foot-tall unoccupied turrets that top out at 210 feet.[66] If the Commission approves the sculptures, including the height of their pedestals, the Arch complies with the HBA because it is only 166 feet tall, as expressly authorized by Congress, plus an HBA-compliant penthouse.

Third, the Height of Buildings Act applies only to "buildings" – not "structures" – and the Arch is a structure and not a building.[67] The Act itself recognizes this distinction, referring to a "structure" placed on the roof of a "building."[68]

Contemporaneous definitions of "building" included "[t]hat which is built, a fabric or edifice constructed, *as a house, a church, etc.*"[69] "Structure" has a broader meaning, inclusive of building but also extending to architectural ornamentation like that identified in the Height of Buildings Act. The use of "house" and "church" as examples to distinguish buildings from structures gets at the idea that buildings are structures that principally shelter the activities occurring inside. A free-standing monumental arch is more like a sculpture, pinnacle, or spire than a "house" or a "church" because the Arch is an end in itself.[70] It does not exist to shelter activities occurring inside – any activities occurring inside are incidental. Rather, the purpose of the Arch is to be viewed and enjoyed by those around it and for the symbolic image it conveys to viewers. Human presence in the Arch is incidental to that purpose. That makes it a structure and not a building.

---

[64] 36 Stat. at 454.
[65] *Id.*
[66] National Capital Planning Commission, Height Master Plan Study, Presentation at 1, https://www.ncpc.gov/heightstudy/docs/5_18_2013_boards_HMP.pdf; https://www.hines.com/properties/one-franklin-square-washington.
[67] 36 Stat. at 454
[68] *Id.*
[69] "Building," Webster's Dictionary (1913) (emphasis added).
[70] *Id.*

To be sure, the Arch will contain interior space for a certain amount of transient activity. But that does not transform it from a fundamentally ornamental structure into a "building." The two columns originally planned for Columbia Island also had interior space,[71] but no reasonable person would label a column a "building." So too for the Washington Monument, the Statue of Liberty, or the Gateway Arch, which has a tram leading to an interior observation space.[72] In ordinary parlance, these are all structures and not buildings.

Lastly, the HBA was enacted in response to concerns about fire based on the capabilities of firefighting equipment around 1900.[73] It sets different requirements for buildings depending on the flammability of their construction materials.[74] The Arch does not implicate these concerns. Ultimately, NCPC decides the height of federal buildings because it can approve all manner of unoccupied spires, towers, domes, minarets, and pinnacles.

**Conclusion**

Because the 1925 Act permits construction of a structure on Columbia Island exceeding the restrictions of the Height of Buildings Act, the Arch is authorized under that law. Further, the HBA is not an obstacle to the construction of the proposed Triumphal Arch because the HBA does not apply against the federal government, or alternatively, does not apply against the Arch.

---

[71] Schematic on file at Interior.
[72] https://www.nps.gov/jeff/planyourvisit/tram-system.htm.
[73] https://www.ncpc.gov/heightstudy/docs/Historical_Background_on_the_Height_of_Buildings_Act_%28draft%29.pdf.
[74] 36 Stat. at 452.